## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN
### Milwaukee Division

---

CENTENNIAL PARTNERS, LLC, a
Wisconsin limited liability company,
5300 South 108th Street – Suite 1
Hales Corners, WI 53130

      Plaintiff,

vs.

WENTWOOD CAPITAL ADVISORS, LP, a
Texas limited partnership,          Case No. 20-CV-1169-LA
515 South Capital of Texas Highway, Suite 250
Austin, Texas 78746,


WENTWOOD ORC ADVISORS, LLC, a
Ohio limited liability company,
515 South Capital of Texas Highway, Suite 250
Austin, Texas 78746,

      Defendants.

---

## CENTENNIAL PARTNERS, LLC'S AMENDED COMPLAINT

---

Plaintiff Centennial Partners, LLC ("Centennial Partners" or "Plaintiff"), a Wisconsin

limited liability company, by its attorneys Ralph A. Weber and Stephen T. Trigg of Gass Weber

Mullins LLC, alleges as follows for its Amended Complaint against Defendants Wentwood

Capital Advisors, LP, ("Wentwood Capital") and Wentwood ORC Advisors, LLC ("Wentwood

ORC", and together "Defendants"):

### Introduction

1.      In 1999, Centennial, LLC (the "Affordable Housing Company") was formed for

the purpose of acquiring, constructing, developing, owning, and operating an affordable housing

development for seniors, known as The Centennial.  The Centennial is a 97-unit complex located in the City of Oak Creek, Wisconsin ("The Apartments").

2.      The Apartments were financed, developed, and operated in such a manner as to qualify for the low-income housing tax credit program.  As described with more detail below, *infra* at ¶¶ 30-38, this federal tax credit program helps expand the supply of low income housing by making tax credits available to developers who sell the right to receive those tax credits to third-party investors and then use the resulting funds to finance the project.  Those investors of course purchase the tax credits in order to offset taxes for a period of time that otherwise would be due from other income.  The period of time over which the benefits are realized is scheduled, so that after the tax credits are distributed and not subject to recapture, the developer has the option of purchasing the interests of the investors in the company that owns the apartments (or the property itself), in accord with the original terms.

3.      The Affordable Housing Company was organized as an LLC, with the members consisting of (1) entities representing the developer of the property (plaintiff, Centennial Partners) and (2) the tax credit investors whose capital Centennial Partners used to finance The Apartments.

4.      As outlined above, in the tax credit financing structure, the investors on the one hand receive a substantial yearly return on their investment in the form of tax credits and other economic benefits (e.g., further reducing taxable income because of net losses while the project is developed).  The main benefit to Centennial Partners on the other hand is the right to purchase either the investors' interest in the operation of the business as a going concern or the real estate itself at the end of a specified period of time.

5.      For years the Affordable Housing Company's structure operated as it was designed, and the investors received the return on their investment.  When Centennial Partners attempted to

exercise its right to purchase the interests of the investor entities in accord with the original plan, however, Wentwood Capital and Wentwood ORC intentionally and improperly interfered with that right in order to reap unfair and improper benefits for themselves. The Defendants thus forced Centennial Partners into expensive and time-consuming litigation against the investors. Fortunately, a jury upheld Centennial Partners' right to purchase the interests of the investor entities in the Affordable Housing Company.

6. Having established its rights in the contract via a jury trial, at great expense, Centennial Partners now seeks to recover the damages Wentwood Capital and Wentwood ORC caused by their intentional interference with Centennial Partners' contract.

## Centennial's Structure

7. Centennial Partners is the Managing Member of Centennial, LLC. Centennial Partners' principal place of business is located at 5300 South 108th Street, Suite 1, Hales Corners, Wisconsin 53130.

8. The Affordable Housing Company is governed by an Amended and Restated Operating Agreement dated as of August 1, 2000 ("Operating Agreement"). A true and correct copy of the Operating Agreement is attached as **Exhibit A**.

9. Pursuant to the Operating Agreement, Centennial Partners is the Managing Member and has the exclusive right to manage the Affordable Housing Company in accordance with the Operating Agreement.

10. Between 2000 and 2017 the Operating Agreement also provided that Centennial had two additional members, an Investor Limited Member, and a Special Limited Member (together the "Limited Members"). The Investor Limited Member owned 99.989% of the ownership interests in the Affordable Housing Company, while the Special Limited Member

owned a de minimis amount, .001%. Centennial Partners itself owned the remaining .01%. Centennial Partners negotiated the terms of the Operating Agreement with the original investor in the project. Below is a chart showing the ownership interests in the Affordable Housing Company:



## Affordable Housing Company Owners

**Centennial, LLC**

| **ORC Tax Credit Fund 10, LLC** | **Centennial Partners, LLC** | **SCDC, LLC** |
|---|---|---|
| • Investor Limited Member<br>• 99.989% owner | • Managing Member<br>• .01% owner | • Special Limited Member<br>• .001% owner |

11.     When Centennial was formed, Banc One Tax Credit Fund IX, LLC was the original Investor Limited Member in the Affordable Housing Company. Banc One was renamed Provident Tax Credit Fund X, LLC in November 2000, and was later again renamed ORC Tax Credit Fund 10, LLC ("ORC Fund 10"). ORC Fund 10 was the Investor Limited Member in 2017. The managing member of ORC Fund 10 was Wentwood ORC Advisors, LLC between 2017 and 2019.

12.     BOC IX Asset Management, LLC was the original Special Limited Member in the Affordable Housing Company. Between 2017 and 2019, SCDC, LLC was the Special Limited Member in the Affordable Housing Company. Upon information and belief, SCDC, LLC's sole member was Wentwood ORC Advisors, LLC.

13.     Both ORC Fund 10 and SCDC were Ohio limited liability companies, formed under the laws of Ohio.

14. Wentwood Capital Advisors, L.P., is a Texas limited partnership. Wentwood provides asset management and other services to corporate investors and related companies on low-income housing tax credit equity investments, reportedly managing billions in investments in tax credit funds throughout the United States. Upon information and belief, Wentwood Capital Advisors provided asset management services to Wentwood ORC, SCDC, LLC, and ORC Fund 10. Below is chart showing the connections between the Wentwood entities and the Affordable Housing Company:

## Wentwood Entities & Affordable Housing Company

**Centennial, LLC**
- Affordable Housing Company

**ORC Tax Credit Fund 10, LLC**

**SCDC, LLC**

Contract          Contract

**Wentwood Capital Advisors, L.P.**

Contract

**Wentwood ORC Advisors, LLC**

- Asset Manager to ORC Tax Credit Fund 10, LLC.
- Asset Manager to SCDC, LLC.
- Asset Manager to Wentwood ORC Advisors, LLC.

**Tax Credit Investors**

- Managing Member of ORC Tax Credit Fund 10, LLC.
- Sole member of SCDC.
- De Minimis owner of ORC Tax Credit Fund 10, LLC.
- Ultimate owners include principals of Wentwood Capital Advisors, L.P.

- 99%+ owners of ORC Tax Credit Fund 10, LLC

15.     Wentwood ORC Advisors, LLC, is an Ohio LLC, and an affiliate of Wentwood Capital Advisors, L.P.  Wentwood ORC was the managing member of ORC Fund 10, and the sole member of SCDC, LLC, between 2017 and 2019.

16.     Wentwood ORC owned a de minimis interest in ORC Fund 10.

17.     Wentwood Capital did not have any ownership interest in either Limited Member or the Affordable Housing Company.

18.     Upon information and belief, Wentwood Capital was the agent of Wentwood ORC, including with respect to all actions and interactions regarding the Apartments, the Affordable Housing Company, and every aspect of a prior dispute between the Limited Members and Centennial Partners.  Upon information and belief, Wentwood Capital was acting at the direction and demand of Wentwood ORC at all relevant times, and Wentwood ORC is liable for any tortious acts committed by Wentwood Capital.

19.     Upon information and belief, the compensation of and distributions to Wentwood ORC and the owners of Wentwood Capital, was, in part, performance based.  This gave Wentwood Capital and Wentwood ORC the incentive to interfere improperly in the contract between Centennial Partners and the Limited Members.

20.     Upon information and belief, both Wentwood Capital and Wentwood ORC are part of the Wentwood Companies, a privately owned, fully integrated real estate investment company based in Austin, Texas.  Wentwood Capital and Wentwood ORC have an affiliation in ownership interests, as multiple owners of Wentwood Capital also have ownership interests in Wentwood ORC, and multiple officers, executives, and employees work for both Wentwood Capital and Wentwood ORC.  For example, George Sebastian is the President of Wentwood Capital, SCDC, and Wentwood ORC.  Robert Turner is the CEO/Manager for the same three entities.  Upon

information and belief, Wentwood Capital is the operating company whose employees provide services for the various entities in the Wentwood Companies, including Wentwood ORC.

21. Given the overlap in officers, employees, and owners between the two Defendants, the Defendants know best of all what actions were taken on behalf of a specific entity, or both entities at the same time. Plaintiff has alleged some information about what each defendant did specifically, and additional information will be developed in discovery. Because of their overlapping nature, it is difficult for third parties such as the Plaintiff to know which entity the individuals were acting on behalf of at all times. Defendants, however, are currently in the best position to know who specifically did what and on behalf of which entity.

**Jurisdiction and Venue**

22. This Court has jurisdiction over this dispute under 28 U.S.C. § 1332. *See Dkt. No. 1.* There is complete diversity of citizenship between Plaintiff and Defendants and the amount in controversy exceeds $75,000.00. Plaintiff is a Wisconsin limited liability company whose single member is a Wisconsin LLC. That LLC has two members, both of whom are citizens of Wisconsin. Thus, Plaintiff is a citizen of Wisconsin for purposes of diversity jurisdiction. Upon information and belief, Defendants citizenship is as alleged in their notice of removal. *See Dkt. No. 1.*

23. Jurisdiction and venue are proper because The Apartments at the heart of this dispute are located in Milwaukee County and Defendants have transacted business within Milwaukee County.

24. Jurisdiction and venue are further proper because Defendants have regularly communicated with Centennial Partners in Wisconsin, managed the interests of the Limited Members in The Apartments—a Wisconsin property—and knowingly caused harm to a Wisconsin

company as a direct result of its conduct, fully aware that the detrimental effect of its conduct would occur in Wisconsin.

25.     Defendants know or should have anticipated that by interfering with a contract based in Wisconsin, which governed a Wisconsin LLC and property located in Wisconsin, and causing the Limited Members to breach their Wisconsin-based contract with Centennial Partners to the detriment of Centennial Partners, that they would be subjecting themselves to the jurisdiction of this Court.

26.     Prior to, and while they interfered with Operating Agreement, Defendants communicated with Centennial Partners via telephone and email and visited Wisconsin multiple times.  The intentional interference was directed at Centennial Partners, which was the party harmed by Defendants' conduct.  These communications occurred over months and years. Further, Defendants were physically present in Wisconsin during the process of intentionally interfering with Centennial Partners' contract.  This interference culminated in a weeklong trial in Milwaukee, Wisconsin, where multiple representatives from Wentwood Capital and/or Wentwood ORC testified in person.

27.     Wentwood Capital and Wentwood ORC's management of the interests of the Limited Members in the Centennial regarding a Wisconsin property, and purposefully directing their intentional interference with Centennial Partners' contract at Wisconsin, demonstrates sufficient contacts with Wisconsin to exercise personal jurisdiction over Defendants.  It is not unreasonable to expect Defendants to defend their alleged interference in Wisconsin, given that the subject of the transaction (the properties and investment) is in Wisconsin and that Defendants repeatedly directed conduct and communications here.

28.     Wentwood Capital and Wentwood ORC's conduct satisfies the jurisdictional requirements of both due process and the Wisconsin long-arm statute.

29.     As Judge Thomas M. Durkin of the Northern District of Illinois recently described in a decision upholding personal jurisdiction in Illinois over Wentwood Capital in a similar tortious interference case in Illinois, "[i]nterfering with contracts based in Illinois regarding Illinois properties, and affecting Illinois residents, connects Wentwood to Illinois in a meaningful way to justify the exercise of personal jurisdiction." *Urban 8 Fox Lake Corp. v. Nationwide Affordable Housing Fund 4, LLC*, 18-CV-6109 (N.D. Ill., Dkt. 51 at 6, n.4); *see also Urban 8 Danville Corporation v. Nationwide Affordable Housing Fund 4, LLC*, 19-CV-3171 (N.D. Ill., Dkt. 108 at 1-11) (finding jurisdiction over Wentwood Capital in Illinois for its tortious interference with an operating agreement governing an Illinois development). The same analysis applies to this Wisconsin contract, properties and residents.

## The Low-Income Housing Tax Credit Program

30.     The low-income housing tax credit ("Tax Credit") is a federal tax credit that is generated from multi-unit housing projects that satisfy a number of requirements for a period of at least fifteen years after the property is placed in service (the "Compliance Period").

31.     In a typical low-income housing project, the project owner is organized as a limited partnership or limited liability company. The managing member, in this case Centennial Partners, owned a de minimis interest in the company but controlled the day-to-day operations of the project. Meanwhile, a third-party tax credit investor, in this case ORC Tax Credit Fund 10, LLC (f/k/a Provident Tax Credit Fund X, LLC), is admitted as an investor limited member, agreeing to contribute capital to the owner entity in exchange for an allocation of the Tax Credits available to the project owner and certain other expected tax benefits.

32.     The rules governing the Tax Credit provide that only the project owner of a qualified low-income housing project can qualify for and receive Tax Credits, and then only if the project owner meets certain terms and conditions and guarantees the continuation of these requirements for the duration of the Compliance Period, or as extended.

33.     The project owner collects the Tax Credits over a ten-year period but remains obligated to maintain the low-income rents during the fifteen-year Compliance Period.  By the end of the Compliance Period, the project owner has collected all Tax Credits available to the project and other tax benefits.  As a result, by the end of the Compliance Period, the investor limited member has realized the vast majority of economic benefits it bargained for and expected from the project and further expects to exit the company near or following the expiration of the Compliance Period.

34.     While the tax credit investor receives its benefits during the first ten to twelve years, the managing member waits for its return through a purchase option at the end of the Compliance Period.  This delayed purchase option is one of the primary economic incentives for the managing member in a typical low-income housing project.

35.     While the investor limited member receives a substantial yearly return on its investment over ten years in the form of Tax Credits and other economic benefits, the managing member or an affiliate of it manages the project during the Compliance Period for fees, which are traditionally required to be deferred and paid out from project cash flows, during the Compliance Period.

36.     The managing member undertakes its investment of time, resources and money, as well as its duties and obligations, with the expectation that it will have the option and right to

acquire the limited members' interest in the operation of the business as a going concern or acquire the real estate itself at the end of the Compliance Period at a formulaic price.

37.     In this case, Centennial Partners invested in and took on considerable risk over many years with The Apartments and dutifully served as the managing member of the Affordable Housing Company with these aforementioned understandings and expectations.

38.     Without the right to purchase the Limited Members' interests, and without the agreement that the price would not include, or even consider, the return of the Limited Members' capital contribution to the Affordable Housing Company or related capital account balances, Centennial Partners would have much less incentive to participate in, and otherwise would not have participated in, the development of the low-income housing and would otherwise be deprived of an economic right to which the Limited Members had agreed at inception.

**Wentwood is an Aggregator Within the Low-Income Housing Tax Credit Industry**

39.     The Wentwood Companies, which includes both Wentwood Capital and Wentwood ORC, are what is known as an "aggregator." As an aggregator, the various entities try to acquire or control investor interests in low income tax credit housing and then use that power to obtain unfair and improper payments from the housing developer. This tactic was described in a recent report by the Washington State Housing Finance Commission:

> Recently, however, a number of private firms have been challenging LIHTC project transfer rights across the country as a way of obtaining additional profit from these deals at the back end [*i.e.*, after the 15-year compliance period closes]. These firms appear to be aggregating investor interests in LIHTC partnerships; asserting myriad claims and arguments against project transfers, including transfers to nonprofits; and **extracting value from the project or nonprofit in the shadow of protracted litigation. As noted, some in the LIHTC industry have dubbed these firms "aggregators**."

*Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program: An Emerging Threat to Affordable Housing*, Washington State Housing Finance Commission, p. 5 (September 2019), http://www.wshfc.org/admin/Reporton15YearTransferDisputes.pdf (last visited June 15, 2020) (emphasis supplied) (observing that firms like the Wentwood Companies often use burdensome tactics, like litigation, to take advantage of resource disparities in order to leverage economies of scale in hopes of overwhelming their counterparts and preventing rights like the Purchase Options, as defined in the Operating Agreement). A true and correct copy of the report detailing such activities is attached here as **Exhibit B**.

40.     An aggregator, like Wentwood ORC and Wentwood Capital, collects or otherwise controls investor interests in LIHTC deals and then challenges the contractual transfer rights for the LIHTC projects after the end of the 15-year compliance period with the goal of extracting additional unfair and improper profits out of the deals, profits that were not negotiated for, expected, nor intended by the original participants in the transaction. Aggregators use a variety of improper methods, such as forcing protracted litigation and leveraging economies of scale to, and in hopes of, overwhelming their counterparts who have been waiting for years to exercise their purchase rights.

41.     In fact, Wentwood Capital and its affiliates are involved in multiple lawsuits currently addressing its interference with the transfer rights under the agreements of other LIHTC projects.[1]

42.     On its website at the time of the dispute between Centennial Partners and the Limited Members, the Wentwood Companies boasted of such activity when they promoted

---

[1] *See Urban 2004 Holding Co. v. Nationwide Affordable Housing Fund 27, LLC*, 20-CV-2243 (N.D. Ill.); *Nationwide Affordable Housing Fund 4, LLC v. Urban 8 Danville Corp.*, 19-CV-7259 (N.D. Ill.); *Urban 8 Fox Lake Corp. v. Nationwide Affordable Housing Fund 4, LLC*, 18-CV-6109 (N.D. Ill.).

themselves as an "aggressive" manager of LIHTC investments to maximize their investor's equity investments. In particular, the Wentwood Companies' entities such as Wentwood Capital and Wentwood ORC aligned their interest with themselves and their own investors, not the underlying objectives of the LIHTC program or corresponding projects (such as The Apartments here). They called these activities "The Wentwood Advantage" and claimed to have produced millions in receivables and settlement funds from "enforcing" the terms of various LIHTC limited partnership and membership agreements. These tactics impact LIHTC projects throughout the United States due to the self-described investment portfolio of the Wentwood Companies' with properties located in 49 states, Washington D.C. and Puerto Rico. Since the prior litigation, this information has been removed from the website and information regarding the services provided to investors is now accessible only through a password protected investor portal.

43.     Wentwood Capital and Wentwood ORC's business strategies interfered with Centennial Partners' contract rights and resulted in two-and-a-half years of very costly litigation between Centennial Partners and the Limited Members.

### The Centennial

44.     In 1999, the Affordable Housing Company was organized for the purpose of acquiring, developing and operating The Apartments.

45.     The Apartments were to be acquired, developed, and operated in such a manner as to qualify for the Tax Credits.

46.     Pursuant to the Amended and Restated Operating Agreement dated August 1, 2000, Banc One was admitted to the Affordable Housing Company as the Investor Limited Member, BOC was admitted as the Special Limited Member, and Plaintiff's appointment as Managing

Member was confirmed.  The terms of the Operating Agreement set forth the various obligations and duties of Plaintiff and the Limited Members.

47.     To help finance the development and construction of The Apartments, the Affordable Housing Company obtained a $4 million permanent loan from Bank Mutual (the "Permanent Loan") and a $4.3 million construction loan.  The owners of Centennial Partners, LLC personally guaranteed the construction loan.  The Permanent Loan matured and was payable in full on June 11, 2018.  Under the terms of the Operating Agreement, as long as the Limited Members retained their interests in the Affordable Housing Company their consent was needed to refinance the Permanent Loan.

48.     The Operating Agreement included an option to purchase either The Apartments or the Limited Members' interests in the Affordable Housing Company as a going-concern following the end of the Compliance Period (the "Purchase Option").

49.     The option to acquire the Limited Members' interest was a material inducement for Centennial Partners to enter into the Operating Agreement.

50.     Centennial Partners negotiated the terms of the Operating Agreement with Dave Martin, who represented the investor in the project.  Mr. Martin assured Centennial Partners that the estimated $1,080,338.00 positive capital account balance in Year 15 would be written off upon Centennial Partners exercise of its option to purchase the Limited Members interests.  Mr. Martin stated that the tax credit investor was interested in tax savings and not creating another taxable event.  The parties thus negotiated the Purchase Option specifically to avoid triggering a Capital Transaction, as that term is defined in the Operating Agreement, because a Capital Transaction would trigger the return to the Limited Members of their positive capital account balances.

51.     Centennial Partners insisted that financial forecasts be included as an exhibit to the Operating Agreement, and that they show the write off of the capital account balance in Year 15. That forecast is included as Exhibit 2 to the Operating Agreement, and it shows a positive ending capital account of $1,080,338.00 being written off at a 35% tax rate, which creates a $378,118.00 tax benefit for the Limited Members.

52.     In March 2012, twelve years into the deal and with almost all tax credit benefits already received, an affiliate of Wentwood Capital and Wentwood ORC purchased a portfolio of investments and, as part of that transaction, Wentwood ORC became the sole member of the Special Limited Member and purchased the managing member interest in the Investor Limited Member.   Wentwood Capital became the contractual asset manager for the Investor Limited Member, and upon information and belief, also provided asset management services for the Special Limited Member and to Wentwood ORC.

### The Dispute Over the Purchase Option

53.     For more than fifteen years, the parties to the Operating Agreement operated pursuant to the understanding that the contract permitted the Limited Members to receive numerous tax credits and other benefits over the course of the fifteen-year compliance period, and that Centennial Partners held an option to purchase the Limited Members interests in the Affordable Housing Company at the conclusion of the fifteen years.

54.     The Purchase Option allowed Centennial Partners to exercise its option during a defined period, from three months prior to the end of the Compliance Period until one year following the end of the Compliance Period.

55.     The Compliance Period for The Apartments ended on December 31, 2016.

56.     On June 19, 2017, in accordance with the terms of the Operating Agreement, Plaintiff exercised its Purchase Option by delivering a notice of such exercise, specifying that Centennial Partners intended to purchase the Limited Members' interests in the Affordable Housing Company, and stating that it was not exercising the option to purchase The Apartments.

57.     In its notice of exercise of its Purchase Option, Centennial Partners further suggested a qualified appraiser and requested that the Special Limited Member respond with its acceptance of the appraiser by June 27, 2017.  A true and correct copy of Plaintiff's notice of exercise of its option, together with its accompanying cover letter, is attached as **Exhibit C**.

58.     Wentwood Capital's assistant general counsel responded to the notice of exercise by letter dated July 5, 2017 and refused to honor Centennial Partners' exercise of its option to purchase the interests of the Limited Members.  Rather than directly respond to the notice of exercise of Centennial Partner's Purchase Option, the letter demanded that The Apartments be marketed for sale.  A true and correct copy of the July 5, 2017 letter is attached as **Exhibit D**.

59.     The July 5 letter recognized Centennial Partners' exercise of the Purchase Option and did not object to the notice of exercise as being deficient in any way, it did not reject the notice, and it did not object to the appraiser suggested by Centennial Partners.

60.     As it concerned Centennial Partners' notice of exercise of its Purchase Option and the tasks of the appraiser that has been selected, the July 5 letter contended that the appraisal of the Limited Members' interests had to take into consideration the "rights" of the Limited Members to request a sale of The Apartments and proceeds that would purportedly be realized by the Limited Members in the event of a sale.

61.     But any right of the Special Limited Member to request a sale of The Apartments was subordinate to and conditional upon Centennial Partners' Purchase Option, and extinguished when Centennial Partners exercised its Purchase Option.

62.     On July 26, 2017, Centennial Partners confirmed and supplemented its June 19 notice of exercise by delivering a supplemental notice of exercise of its Purchase Option.  A true and correct copy of Plaintiff's July 26, 2017 Supplemental Exercise of Managing Members' Option Under § 6.16.A, together with its accompanying cover letter, is attached as **Exhibit E**.

63.     Under the Operating Agreement, Fair Market Value was to be determined by a qualified appraiser "jointly selected" by Centennial Partners and the Special Limited Member.

64.     Centennial Partners, pursuant to the Operating Agreement, suggested a qualified appraiser and received no objection to that appraiser in the July 5, 2017 letter.

65.     Centennial Partners properly exercised its Purchase Option, thus binding the Limited Members to sell their interests in the Affordable Housing Company to Centennial Partners for fair market value in accordance with the Operating Agreement.  Wentwood Capital and Wentwood ORC interfered with that right, causing two-and-a-half years of litigation between Centennial Partners and the Limited Members.

**The Lawsuit Between Centennial Partners and the Limited Members**

66.     On July 27, 2017, Centennial Partners filed suit to protect its right under the Operating Agreement and defend itself against the attempt by Wentwood Capital and Wentwood ORC to force Centennial Partners to market The Apartments for sale.  The case proceeded as Milwaukee County Case No. 17-CV-6214.

67.     In their roles as managing member of the Investor Limited Member, sole member of the Special Limited Member, and asset manager to both, Wentwood Capital and Wentwood

17

ORC directed the Limited Members' actions both before and during the lawsuit. At all relevant times Wentwood Capital was acting as Wentwood ORC's agent.

68.     Wentwood ORC and Wentwood Capital's actions seriously interfered with Centennial Partners' right to purchase the Limited Members' interests for fair market value and threatened its right to operate The Apartments.

69.     Wentwood ORC and Wentwood Capital caused the Limited Members to refuse to jointly agree on an appraiser with Centennial Partners.

70.     Wentwood ORC and Wentwood Capital insisted that any appraisal of the Limited Members' interests take into account an alleged right to sell The Apartments that had been extinguished when Centennial Partners exercised its Purchase Option.

71.     Wentwood ORC and Wentwood Capital insisted that—contrary to the Exhibits to the Operating Agreement—the Limited Members were entitled to a return of their capital account balances, instead of having those accounts written off upon Centennial Partners purchase of the interests of the Limited Members.

72.     Upon information and belief, Wentwood ORC and Wentwood Capital came up with the idea that the Limited Members were entitled to a return of the capital account, which was directly contrary to the financial forecasts attached to the Operating Agreement.

73.     After Centennial Partners had exercised its Purchase Option, Wentwood ORC and Wentwood Capital caused the Limited Members wrongfully to try and force Centennial Partners to market The Apartments for sale, which would have deprived Centennial Partners of its right to own and manage The Apartments going forward.

74.     Wentwood ORC and Wentwood Capital also used the wrongful attempt to force the sale of The Apartments to argue that if The Apartments were not sold within a year of July 5,

2017, then the Limited Members were entitled to an additional 30% of cash flows from The Apartments. Defendants wrongfully tried to trigger this provision by causing the Limited Members to refuse to cooperate in the selection of an appraiser or consummate the sale of their interests to Centennial Partners and dragging out the dispute. This tactic was carried through even to closing arguments to the jury, when Wentwood Capital's assistant general counsel argued that the value of the Limited Members' interests should take into account a right to receive 50% of the cash flows, a provision that was only arguably triggered by Wentwood ORC and Wentwood Capital's wrongful conduct.

75. After Centennial Partners obtained appraisal reports regarding the value of the Limited Members' interests and notified Wentwood Capital and Wentwood ORC that a closing was scheduled to purchase the Limited Members' interests, Defendants caused the Limited Members to refuse to sell their interests in the Affordable Housing Company to Centennial Partners and again demanded that Centennial Partners sell The Apartments.

76. Even after the court ruled that the purchase of the Limited Members interest was not a Capital Transaction (as that term was defined in the Operating Agreement), which would have required the return of the Limited Members capital account balances, Wentwood ORC and Wentwood Capital caused the Limited Members to argue that the capital accounts should still be returned.

77. Wentwood ORC and Wentwood Capital insisted that any valuation of the Limited Members' interest should be based on a hypothetical sale of The Apartments, even though Centennial Partners was exercising its right to purchase the Limited Members interest, not The Apartments. This position made no sense because both before and after the purchase, the Centennial would still continue to own The Apartments and operate them as a going concern.

78.     Ultimately, it took over two years of litigation before Centennial Partners was able to exercise its option and purchase the interests of the Limited Members and definitively stop Wentwood ORC and Wentwood Capital from trying to force Centennial Partners to market The Apartments for sale and otherwise try and force Centennial Partners to capitulate.

79.     During a discovery dispute in the litigation, the President of Wentwood Capital and Wentwood ORC submitted a declaration stating that neither Wentwood ORC nor Wentwood Capital were parties to the Operating Agreement.  Instead, he stated that the rights and obligations of Wentwood ORC and Wentwood Capital were governed by the operating agreement for ORC Fund 10, and a contractual asset management agreement, which were separate, distinct, and independent of the rights of the Limited Members, which flowed from the Operating Agreement.

80.     Following a week-long trial, it took only 40 minutes for the jury to return a verdict in favor of Centennial Partners, finding that the Limited Members (1) had breached the Operating Agreement; and (2) had breached their duty of good faith and fair dealing.  The jury also determined the fair market value of the Limited Members' interest in the Affordable Housing Company was $500,005.00, and awarded damages to Centennial Partners of $470,000.00 based on various losses and expenses that it had suffered as a result of the delays in purchasing the Limited Members interests, including the lost opportunity to reinvest excess loan proceeds, excess interest payments, lost tax deductions, and cash flow and deprecation benefits that flowed to the Limited Members instead of Centennial Partners.  The damages thus almost completely offset the amount the Limited Members were owed for their interest.

81.     Between July 5, 2017, and the return of the jury's verdict, Wentwood ORC and Wentwood Capital intentionally interfered with the Operating Agreement by refusing to honor Centennial Partners' exercise of its Purchase Option, refusing to work or cooperate in good faith

with Centennial Partners in the exercise and consummation of its Purchase Option, frustrating and preventing Centennial Partners contractual rights, threatening to force Centennial Partners to market The Apartments for sale, and otherwise causing the Limited Members to breach their contract with Centennial Partners and breach their duty to act with good faith and fair dealing.

## Defendants' Improper Motive and Means

82.     Wentwood ORC and Wentwood Capital acted with both an improper motive and through improper means when they wrongfully used their power over the Limited Members in order to serve their own interests.  Wentwood ORC and Wentwood Capital induced the Limited Members to breach their contract with Centennial Partners for their own improper motive, which was to further their own individual pecuniary gain, as opposed to acting for the protection of the interests of the Limited Members, and in particular, the Investor Limited Member.  The Defendants improper motive to cause the Limited Members to breach the Operating Agreement for their own personal gain destroys any conditional privilege they may have enjoyed.

83.     The actions of Wentwood ORC and Wentwood Capital were antithetic to the best interests of Investor Limited Member, on whose behalf they were supposed to working.  As a result, they were not acting in good faith and were functioning outside the scope of their official duties as the managing member and contractual asset manager to the Investor Limited Member. This breached their fiduciary duties to the Investor Limited Member and constitutes improper means not subject to privilege.

84.     By virtue of their responsibilities to the Investor Limited Member, Wentwood ORC and Wentwood Capital were disabled from simply seeking their own profit.  They were required to act on behalf of the best interests of ORC Fund 10.  They did not, and by seeking to further their

own individual interests at the expense of ORC Fund 10's interests, they acted with improper motive and through improper means, damaging Centennial Partners.

85.     Moreover, the position Wentwood Capital and Wentwood ORC forced the Limited Members to adopt was not an honest disagreement about the terms of the Operating Agreement, which specifically showed that capital accounts would not be returned at the end of the transaction, but instead written off, generating an additional tax benefit for the Limited Members.  Wentwood Capital and Wentwood ORC pushed an improper and wrong interpretation of the Operating Agreement for the purpose of delaying the sale of the Limited Members' interests, leveraging time and expense and to try and force Plaintiff to capitulate and agree to their terms and pay more than what had been agreed upon when the transaction began.

86.     The CEO of Wentwood Capital and Wentwood ORC testified that they had not purchased an equity interest in the Centennial, but instead had purchased the right to receive a fee stream, consisting of asset management and other fees, pursuant to an upper-tier operating agreement that was unrelated to the Centennial's Operating Agreement.  To the extent Wentwood ORC owned any interest in the Investor Limited Member, it was de minimis.  Similarly, SCDC's interest in the Centennial was de minimis.  As he described, the purchase did not involve really any equity purchases, it was just based upon future fee streams and receivables.

87.     Wentwood ORC and Wentwood Capital sought to extract a large cash payment from Centennial Partners after the end of the Compliance Period through the Purchase Option, rather than secure additional tax benefits for the Investor Limited Member, because it was in the financial best interests of Defendants to do so.

88.     In so doing, Wentwood ORC and Wentwood Capital were not acting to protect any financial interest they had in the Limited Partners, but to wrongfully extract additional payments

from Centennial Partners beyond what was provided for in the Operating Agreement. The Operating Agreement did not threaten any harm to Defendants or any interests they may have had in the Limited Members. The Defendants did not interfere with the Operating Agreement to protect themselves from harm, but rather to try and extract an additional improper payment from Centennial Partners beyond what the Operating Agreement called for.

89.     If the price of the Purchase Option included payment of capital account balances, then Wentwood ORC and Wentwood Capital, and their owners would have benefitted financially from such consideration of capital accounts rather than, or more so than, the Investor Limited Member.

90.     Wentwood ORC and Wentwood Capital sought to otherwise prevent the transfer of the Limited Members' interests to Centennial Partners after the end of the Compliance Period and force a sale of The Apartments because it was in financial best interests of Defendants to do so, and as a tactic to artificially increase the cash flow to Wentwood ORC, and then on to its affiliates, including the owners of Wentwood Capital. Attempting to extort additional payments for themselves and their investors, to the detriment of Centennial Partners, is a manifestation of the Wentwood Advantage, as described supra in paragraph 42.

91.     If Wentwood ORC and Wentwood Capital were able to force the sale of The Apartments, or the Limited Members' interests were appraised to assume a capital transaction, then the financial best interests of Defendants would have been advanced, rather than, or more so than, the financial best interests of the Investor Limited Member.

92.     Wentwood ORC and Wentwood Capital were trying, among other things, to deprive Centennial Partners of its right to exercise the Purchase Option in order to force a sale of

The Apartments and attempt to garner greater financial returns from the disposition of The Apartments than were negotiated for by the original parties to the Operating Agreement.

93.     Wentwood ORC and Wentwood Capital further intentionally and tortiously interfered with the Operating Agreement by causing the Limited Members to refuse to honor their obligations under the Operating Agreement in an attempt to increase financial benefits for Wentwood ORC and Wentwood Capital and to the detriment of the Investor Limited Member.

94.     Wentwood ORC's compensation—which ultimately flows to the owners of Wentwood Capital—is, in part, performance based and thus Wentwood ORC and Wentwood Capital had an incentive to interfere to benefit themselves.

95.     The President and the CEO of Wentwood Capital and Wentwood ORC testified that ORC Fund 10's structure allowed for additional payments to Wentwood ORC if certain rules or benchmarks for distributions or payments were met.  This included the payment of asset management fees, deferred asset management fees, and potentially disposition fees.

96.     By artificially increasing the price paid for the Limited Members' interest in the Affordable Housing Company, Wentwood ORC and Wentwood Capital could make it more likely that those benchmarks would be satisfied, resulting in additional payments to Wentwood ORC, which would flow to the owners of Wentwood Capital.  This gave them an incentive to improperly argue that the price paid for the Limited Members' interests should be inflated to include the Limited Members' capital account balance or consider a hypothetical sale of The Apartments.

97.     Because the Purchase Option did not involve a capital transaction, the price to be ultimately paid to the Limited Members pursuant to the Purchase Option, and therefore the amount to be distributed to Wentwood ORC and Wentwood Capital pursuant to the operating agreement

for ORC Fund 10 and/or the asset management agreements for Wentwood Capital, would likely be less than the amount to be paid upon a sale of The Apartments.

98.    Wentwood ORC and Wentwood Capital were attempting to maximize their own cash payments to themselves and their owners by artificially and improperly increasing the cash to be distributed upon a sale of the Limited Member interests to Centennial Partners.  This was done at the expense of Centennial Partners and the Investor Limited Member.

99.    Wentwood ORC and Wentwood Capital's conduct was to the detriment of the Limited Members as it caused them to breach the Operating Agreement and act with a lack of good faith and fair dealing.  The resulting damages from Defendants actions reduced the amount the Investor Limited Member received from Centennial Partners from the sale of its membership interests in the Affordable Housing Company by 94%.

100.    The President of Wentwood ORC and Wentwood Capital previously admitted that the Wentwood companies managing ORC Fund 10—Wentwood ORC and Wentwood Capital— owed ORC Fund 10 fiduciary duties.

101.    Wentwood ORC and Wentwood Capital leveraged their fiduciary relationship with the Limited Members to try and extort additional money from Plaintiff for their own benefit.  This included causing the Limited Members to not agree to an appraiser and trying to force the sale of The Apartments.  Their actions effectively delayed Plaintiff from refinancing the Permanent Loan in January 2018 on a long-term basis at a time when interest rates were particularly advantageous.  If Wentwood ORC and Wentwood Capital had at least been acting in good faith or to protect the interests of the Limited Members, they would have at least caused them to engage in the appraisal process.  By wrongfully causing the Limited Members to withhold their consent to the appraiser or engage in any step of the sale process, and instead try to force Plaintiff to sell The Apartments,

Wentwood ORC and Wentwood Capital were trying leverage time and pressure to force Plaintiff to pay more than was required for the Limited Members interests.

102.     Wentwood ORC and Wentwood Capital tried to use the expense and delays caused by their conduct to put Plaintiff under undue duress and pressure and extort additional money from Plaintiff than the Operating Agreement called for.  Wentwood ORC and Wentwood Capital were hoping that Plaintiff would capitulate and agree to their exorbitant demands.  This is precisely the sort of aggregator conduct described in the Exhibit B.  They tried to put Plaintiff into a vise and effectively delayed it from freeing up capital for other projects and investments to improperly try and force Plaintiff to agree to their demands.  Moreover, they did this full well knowing that the Operating Agreement specifically showed capital accounts would not be returned but would instead be written off for a further tax credit.

103.     By their actions, Wentwood ORC and Wentwood Capital breached their fiduciary duties.  They gambled with and lost the money owed to the Limited Members for their shares in the Affordable Housing Company in an attempt to extract additional money that would have flowed to Wentwood ORC and Wentwood Capital.  Instead of working to protect and further the Investor Limited Member's interests, they forced it to breach the Operating Agreement for their own personal gain.  Without the interference by Wentwood ORC and Wentwood Capital, the Investor Limited Member would have been entitled to almost $500,000.00 for its shares in the Affordable Housing Company.  But as a result of the interference, almost all of this amount was offset by the $470,000.00 in damages caused by the Limited Members breaching the Operating Agreement and acting with a lack of good faith and fair dealing.  This conduct described above constitutes both improper motive and improper means.

104. Because both Limited Members were formed under the laws of Ohio, Wis. Stat. § 183.0304 does not apply to Wentwood ORC or Wentwood Capital. By its terms, Wis. Stat. § 183.0304 applies only to members and managers of limited liability companies that are organized under Wis. Stat. Ch. 183, it does not apply to the members and managers of foreign limited liability companies such as the Limited Members. *See* Wis. Stat. §§ 183.0102(8) (defining "limited liability company"), (10) (defining "foreign limited liability company"), 183.0304 (using the term "limited liability company"); *see also Peters v. AstraZeneca LP*, 244 Fed. Appx. 503, 507 (7th Cir. 2007) (stating that Wis. Stat. § 183.0304 "applies only to officers of limited liability companies organized under the laws of Wisconsin").

**Defendants Are Liable for Centennial Partners Attorneys' Fees and Other Damages**

105. Wisconsin recognizes an exception to the American Rule on recovery of attorneys' fees, which is referred to as the "third-party litigation exception" and/or "the *Weinhagen* rule." The exception applies where the wrongful acts of the defendant have involved the Plaintiff in litigation with others or placed him in such relation with others as to make it necessary to incur expense to protect his interest. In cases such as this, the costs and expense of the litigation against the third parties is treated as the legal consequences of the original wrongful act.

106. As described above, the President of Wentwood ORC and Wentwood Capital stated that they were not parties to the Operating Agreement.

107. By acting for their own personal self-interest and antithetically to the best interests of the Investor Limited Member, Wentwood ORC and Wentwood Capital were acting beyond their official duties as managing member and contractual asset manager for the Investor Limited Member. Wentwood ORC and Wentwood Capital's wrongful motive and means, as described above, caused the litigation between the Limited Members and Plaintiff.

108.    Moreover, because Wentwood ORC and Wentwood Capital were not acting in the best interests of the Limited Members, and acted with both an improper motive and through improper means (e.g., breaching their fiduciary duties, improperly leveraging their control over the Limited Members to the detriment of Plaintiff, and other items to be identified in discovery) they should not be protected from liability by a principal-agent relationship with the Limited Members.  Whatever force that argument may have when a member or manager is acting in the best interests of the prior defendants, it is not applicable when the third party acts to improperly further its own pecuniary interests and to the detriment of the party whom it was obligated to represent.

109.    Wisconsin law respects the rule that separate legal entities are to be treated as such, and there is no basis to pierce the corporate veil and treat Wentwood ORC and/or Wentwood Capital as the alter egos of the Limited Members, and there are no equitable grounds for piercing the corporate veil to treat them as the same entities for purposes of the present lawsuit.

110.    Wentwood ORC and Wentwood Capital's conduct involved Centennial Partners in litigation with the Limited Members and made it necessary for Centennial Partners to incur significant expenses to protect its interests.

111.    Centennial Partners' legal fees and expenses from the lawsuit with the Limited Members exceeded $800,000.00.  Centennial Partners was also damaged by Wentwood ORC and Wentwood Capital's actions because of the significant amount of internal time and resources it was forced to devote to the litigation.

112.    These fees and expenses were caused by Defendant's tortious interference with the Operating Agreement, which forced Centennial Partners into time-consuming and expensive litigation with the Limited Members.

## Count I: Tortious Interference with Contract

113.    Plaintiff incorporates the above paragraphs by reference as if fully stated herein.

114.    Centennial Partners and the Limited Members were parties to a valid and enforceable contract, the Operating Agreement.

115.    Wentwood ORC and Wentwood Capital were aware of the Operating Agreement and the Limited Members' duties and obligations thereunder, and of Centennial Partners' rights under the Operating Agreement.  Wentwood ORC and Wentwood Capital knew that by attempting to extract additional payments from Centennial Partners than called for by the Operating Agreement they would necessarily be harming Centennial Partners and interfering with the Operating Agreement.

116.    By the conduct described above, Wentwood ORC and Wentwood Capital intentionally and unjustifiably interfered with the Operating Agreement and caused the Limited Members to breach the Operating Agreement and act with a lack of good faith and fair dealing. Defendants' conduct was intentional and not privileged.

117.    Wentwood ORC and Wentwood Capital's conduct significantly increased the expense and burden of exercising the Purchase Option and enforcing and protecting Centennial Partners' rights under the Operating Agreement.

118.    Wentwood ORC and Wentwood Capital acted with improper motive when they interfered with the Operating Agreement.  Upon information and belief, Defendants induced the Limited Members to breach the Operating Agreement and act with a lack of good faith and fair dealing to further their own financial gain and the financial gain of their owners, and despite such actions being contrary to the best interests of the Limited Members, in particular, the Investor Limited Member.

119. Wentwood ORC and Wentwood Capital actions constitute improper means. They breached their fiduciary duties to the Limited Members, and in particular, the Investor Limited Member. They acted recklessly and/or intentionally out of their own self-interest, to the detriment of the Investor Limited Member and in opposition to the best interests of the Investor Limited Member. They improperly leveraged their position with respect to the Limited Members to try and extort additional money from Plaintiff for the Limited Members' interests and abused their fiduciary relationship and breached their fiduciary duties.

120. The Northern District of Illinois recently found that similar allegations against Wentwood Capital were sufficient to state a claim for tortious interference. *See Urban 8 Fox Lake Corp. v. Nationwide Affordable Housing Fund 4, LLC*, 18-CV-6109 (N.D. Ill., Dkt. 51 at 10-12). Under Wisconsin law, Wentwood ORC and Wentwood Capital's improper motive to further their own pecuniary gain destroys any conditional privilege to their actions. Further, Wentwood ORC and Wentwood Capital used improper means to further their own pecuniary gain at the expense of at least the Investor Limited Member, which breached their fiduciary duties.

121. As a result of Defendants' tortious interference with the Operating Agreement Centennial Partners suffered damages. This includes, but is not limited to, over $800,000.00 in fees and expenses it incurred in the lawsuit against the Limited Members, as well as the costs of the internal time and resources Centennial Partners devoted to the litigation.

122. The conduct described above fits perfectly within the standards of Wisconsin's punitive damages statute, Wis. Stat. § 895.043. The entire scheme was aimed at disregarding the rights of Centennial Partners in order to personally extract improper excess returns beyond what the parties had negotiated. This fits squarely within the intentional disregard of Centennial Partners' rights, and discovery may show that it was also malicious.

123.    Defendants' acted with a purpose to disregard Centennial Partners' rights and were aware conduct was specifically geared at hurting Centennial Partners, because hurting Centennial Partners was the only way that Wentwood ORC and Wentwood Capital would benefit.

124.    Defendants' conduct entitles Centennial Partners to recover punitive damages pursuant to Wis. Stat. § 895.043.

WHEREFORE, Centennial Partners requests:

a.    Judgement in an amount to be proven at trial or summary judgment;

b.    An award of punitive damages;

c    An award of attorneys' fees and costs; and

d.    Such other relief as the Court deems just.

### PLAINTIFF DEMANDS A JURY TRIAL

Dated this 27th day of August, 2020.

GASS WEBER MULLINS LLC
Attorneys for Plaintiff Centennial Partners, LLC

*Electronically Signed by Ralph A. Weber*
Ralph A. Weber (SBN 1001563)
weber@gwmlaw.com
Stephen T. Trigg (SBN 1075718)
trigg@gwmlaw.com

241 North Broadway, Suite 300
Milwaukee, WI 53202
414-223-3300 T
414-224-6116 F