# Exhibit A

CENTENNIAL, LLC

AMENDED AND RESTATED OPERATING AGREEMENT

Dated as of August 1, 2000

# CENTENNIAL, LLC

## TABLE OF CONTENTS

ARTICLE I -- Preliminary Statement ........................................................................................... 1

ARTICLE II -- Continuation; Name; and Purpose .................................................................... 1
  Section 2.1 Continuation ....................................................................................................... 1
  Section 2.2 Name and Office .................................................................................................. 1
  Section 2.3 Purpose ................................................................................................................ 1
  Section 2.4 Authorized Acts .................................................................................................. 2
  Section 2.5 Term and Dissolution ......................................................................................... 2

ARTICLE III -- Members; Capital ............................................................................................ 3
  Section 3.1 Managing Members/Withdrawing Members ...................................................... 3
  Section 3.2 Limited Members ................................................................................................ 3
  Section 3.3 Company Capital ................................................................................................. 3
  Section 3.4 Withdrawal of Capital ........................................................................................ 4
  Section 3.5 Liability of Limited Members ............................................................................ 4
  Section 3.6 Additional Limited Members ............................................................................. 4

ARTICLE IV -- Limited Member Capital Contributions ........................................................ 5
  Section 4.1 Payments .............................................................................................................. 5
  Section 4.2 Special Adjustments ............................................................................................ 6
  Section 4.3 Repurchase Obligation of the Managing Members ........................................... 10

ARTICLE V -- Profits, Losses and Distributions ................................................................... 11
  Section 5.1 Profits, Losses and Tax Credits ......................................................................... 11
  Section 5.2 Distributions Prior to Dissolution ..................................................................... 12
  Section 5.3 Distributions Upon Dissolution ......................................................................... 14
  Section 5.4 Special Provisions .............................................................................................. 14

ARTICLE VI -- Managing Member Rights, Powers and Duties ............................................ 17
  Section 6.1 Restrictions on Authority ................................................................................... 17
  Section 6.2 Personal Services ............................................................................................... 18
  Section 6.3 Business Management and Control; Tax Matters Partner ................................. 18
  Section 6.4 Authority of Managing Members ...................................................................... 19
  Section 6.5 Duties and Obligations ...................................................................................... 19
  Section 6.6 Representations and Warranties ........................................................................ 22
  Section 6.7 Liability .............................................................................................................. 25
  Section 6.8 Indemnification .................................................................................................. 25
  Section 6.9 Development Completion Obligation ................................................................. 26
  Section 6.10 Operating Expense Obligation ........................................................................ 27
  Section 6.11 Development Services ....................................................................................... 27
  Section 6.12 Property Management ....................................................................................... 28
  Section 6.13 Borrowings ....................................................................................................... 29
  Section 6.14 Reserves ........................................................................................................... 30
  Section 6.15 Sales Preparation Fee ....................................................................................... 30
  Section 6.16 Option to Acquire Property or Interest of Limited Members/Right of First Refusal 31

ARTICLE VII -- Books and Records, Accounting and Reports ............................................. 32
  Section 7.1 Books and Records ............................................................................................. 32
  Section 7.2 Bank Accounts ................................................................................................... 32
  Section 7.3 Fiscal Year and Accounting Method .................................................................. 32

i

Section 7.4  Accountants.................................................................................32
Section 7.5  Annual Financial Statements, Tax Returns ..............................32
Section 7.6  Other Reports, Financial Statements, Reports and Information Tax Returns.............33
Section 7.7  Site Visits....................................................................................35
Section 7.8  Tenant File Review ....................................................................35
Section 7.9  Tax Elections ..............................................................................36
Section 7.10  Asset Manager, Asset Management Fee and Reimbursement .......................36

ARTICLE VIII -- Retirement of a Managing Member.................................................37

Section 8.1  Retirement...................................................................................37
Section 8.2  Obligation to Continue ..............................................................37
Section 8.3  Retirement of a Sole Managing Member ....................................38
Section 8.4  Interest of Retired Managing Member........................................38
Section 8.5  Designation of New Managing Members ...................................39
Section 8.6  Additional and Substitute Managing Members ..........................39
Section 8.7  Amendment of Articles of Organization ....................................41

ARTICLE IX -- Limited Member Transfers ..............................................................41

Section 9.1  Assignments.................................................................................41
Section 9.2  Substitute Limited Members.......................................................41
Section 9.3  Restrictions ..................................................................................42
Section 9.4  Other Limited Members .............................................................42

ARTICLE X -- General Provisions...........................................................................42

Section 10.1  Amendments to Articles of Organization..................................42
Section 10.2  Notices.......................................................................................42
Section 10.3  Word Meanings .........................................................................43
Section 10.4  Binding Provisions.....................................................................43
Section 10.5  Applicable Law ..........................................................................43
Section 10.6  Counterparts...............................................................................43
Section 10.7  Separability of Provisions ..........................................................43
Section 10.8  Paragraph Titles.........................................................................43
Section 10.9  Amendments ..............................................................................44
Section 10.10  Time of Admission ...................................................................44

ARTICLE XI -- Defined Terms................................................................................44

Exhibit 1 -- Legal Description of Property............................................................58

Exhibit 2 -- Financial Forecast .............................................................................59

Exhibit 3 .............................................................................................................60

Schedule A -- Schedule of Members ....................................................................61

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 4 of 89   Document 14-1

CENTENNIAL, LLC

AMENDED AND RESTATED OPERATING AGREEMENT

ARTICLE I -- Preliminary Statement

CENTENNIAL, LLC (the "Company") was formed as a limited liability company under the laws of the State of Wisconsin pursuant to the Articles of Organization of the Company executed on June 25, 1999 and filed with the Filing Office at 12:20 p.m. on June 28, 1999, as amended by Articles of Amendment to Articles of Organization of the Company executed on August 9, 2000, and filed with the Filing Office on August 16, 2000. A Memorandum of Organization of the Company dated June 28, 1999 (the "Original Agreement") was entered into by and among Centennial Partners, LLC, a Wisconsin limited liability company ("Centennial Partners"); Mark J. Wimmer, an individual resident of the State ("Mark Wimmer"); and John J. Wimmer, an individual resident of the State ("John Wimmer"), as the sole Members of the Company.

The purposes of this amendment to and restatement of the Original Agreement are to (i) admit Banc One Tax Credit Fund IX, LLC, an Ohio limited liability company, as the Investor Limited Member and to admit BOC IX Asset Management, LLC, an Ohio limited liability company, as the Special Limited Member; (ii) provide for the withdrawal of John Wimmer and Mark Wimmer as Members of the Company; (iii) confirm the appointment of Centennial Partners as the Managing Member of the Company; and (iv) set out more fully the rights, obligations and duties of the Managing Members and the Limited Members and to restate the Original Agreement in its entirety.

It is hereby agreed that the Original Agreement is hereby amended and fully restated as provided herein. Capitalized terms not defined in the text hereof shall have the meanings set forth in Article XI.

ARTICLE II -- Continuation; Name; and Purpose

Section 2.1  Continuation

The parties hereto hereby agree to continue the limited liability company known as Centennial, LLC, formed pursuant to the provisions of the Uniform Act.

Section 2.2  Name and Office

The Company shall continue to be conducted under the name of Centennial, LLC. The principal office of the Company shall be at 5300 South 108th Street, Suite 1, Hales Corners, WI 53130, and the Company may also maintain offices at the Property. The resident agent for service of process on the Company shall be CT Corporation, 44 East Mifflin Street, Madison, Wisconsin 53703. The Managing Members may at any time change the location of a Company office or the identity or address of its resident agent in the State and shall give due notice of any such change to the Limited Members.

Section 2.3  Purpose

The purpose of the Company is to acquire, construct, develop, improve, own, maintain, operate, manage, lease, sell, and otherwise deal with the Property. The Company and the Managing Members shall operate the Property in accordance with the Property Documents and any applicable governmental regulations. The Company shall not engage in any other business or activity.

1

Section 2.4 <u>Authorized Acts</u>

In furtherance of its purposes, but subject to all other provisions of this Agreement including, but not limited to, Article VI, the Company is hereby authorized, and the Managing Members shall have full power, authority and discretion to cause the Company:

(i)     To acquire by purchase, lease or otherwise any real or personal property which may be necessary, convenient or incidental to the accomplishment of the purposes of the Company.

(ii)     To construct, operate, maintain, finance and improve, and to own, sell, convey, assign, mortgage or lease any real estate and any personal property necessary, convenient or incidental to the accomplishment of the purposes of the Company.

(iii)     To borrow money and issue evidences of indebtedness in furtherance of any or all of the purposes of the Company, and to secure the same by mortgage, pledge or other lien on the Property or any other assets of the Company.

(iv)     To employ a Management Agent, including an Affiliate, to manage the Property, and to pay reasonable compensation for such services.

(v)     To enter into, perform and carry out contracts of any kind, including contracts with Affiliates, necessary to, in connection with or incidental to, the accomplishment of the purposes of the Company, specifically including, but not limited to, the execution and delivery of the Property Documents, and all other agreements, certificates, instruments or documents required by the Lenders in connection with the Property Documents and the acquisition, construction, development, improvement, maintenance and operation of the Property or otherwise required by the Lenders in connection with the Property.

(vi)     To enter into any kind of activity and to perform and carry out contracts of any kind necessary to, or in connection with, or incidental to, the accomplishment of the purposes of the Company, so long as said activities and contracts may be lawfully carried on or performed by a partnership under the laws of the State.

Section 2.5 <u>Term and Dissolution</u>

The Company shall continue in full force and effect until December 31, 2050, except that the Company shall be dissolved prior to such date upon the happening of any of the following events:

A.     The sale or other disposition of all or substantially all the assets of the Company; or

B.     The Retirement of a Managing Member if no Managing Member remains and the Company is not reconstituted with a successor Managing Member pursuant to Section 8.3.

Upon dissolution of the Company, unless the Company is reconstituted pursuant to Section 8.3, the Managing Members (or their trustees, receivers, successors, or legal representatives) shall cause the cancellation of the Company's articles of organization as then in force, and shall liquidate the Company assets and apply and distribute the proceeds thereof in accordance with Section 5.3. Notwithstanding the foregoing, in the event such liquidating Managing Members shall determine that an immediate sale of part or all of the Company's assets would cause undue loss to the Members, the liquidating Managing Members may, with the prior Consent of the Special Limited Member, in order to avoid such loss, either (i) delay liquidation of, and withhold from distribution for a reasonable time, any assets of the Company except those necessary to satisfy Company debts and obligations other than debts provided for in Section 5.2.B, Clauses Second and following, or

2

(ii) distribute the assets to the Members in kind.

ARTICLE III -- Members; Capital

Section 3.1  Managing Members/Withdrawing Members

A.  Managing Members. The sole Managing Member of the Company as of the date hereof is Centennial Partners, at the address set forth on Schedule A.  At all times when there is only one Managing Member of the Company, the term "Managing Members" shall refer to such sole Managing Member alone.  The Managing Members have made a Capital Contribution to the Company in the total amount of $100.00.  The Managing Members shall not be obligated or permitted to make additional Capital Contributions to the Company, except that the Managing Members shall be obligated to make such additional Capital Contributions (a) to meet Development Cost shortfalls as provided in Section 6.9.B and (b) in an amount sufficient to enable the Company to pay any outstanding balance of the Deferred Development Cost Payment in full on the date set forth in Section 6.9.C.

B.  Withdrawing Members.  John Wimmer and Mark Wimmer each hereby withdraws as a Member of the Company, effective on the Admission Date, and each acknowledges that as of the Admission Date (i) he has received a return of his capital contribution in his capacity as Withdrawing Member; and (ii) he no longer has any interest in, or rights or claims against, the Company in his capacity as Withdrawing Member or for unpaid fees or compensation earned prior to the Admission Date.

Section 3.2  Limited Members

A.  On the Admission Date, BOC IX Asset Management LLC, an Ohio limited liability company, shall be admitted to the Company as the Special Limited Member, Banc One Tax Credit Fund IX, LLC, an Ohio limited liability company, shall be admitted to the Company as the Investor Limited Member, and thenceforth the Limited Members shall be those Limited Members shown on Schedule A.  The addresses of each of the Limited Members shall be as set forth on Schedule A.

Section 3.3  Company Capital

A.  The capital of the Company shall be the aggregate amount of the cash and the agreed value of property contributed by the Managing Members, and the aggregate amount of the cash contributed by the Limited Members, which amounts are hereby agreed to be those set forth in Schedule A.  Schedule A shall be amended from time to time to reflect the withdrawal or admission of Members, any changes in the Company interests held by a Member arising from the transfer of a Company interest to or by such Member and any change in the amounts to be contributed or agreed to be contributed by any Member; provided that no funds provided by a Member shall be deemed to be additional Capital Contributions unless payment thereof is pursuant to a specific provision of this Agreement requiring or permitting the making of additional Capital Contributions.

B. An individual Capital Account shall be established and maintained for each Member, including any additional or substituted Member who shall hereafter receive an interest in the Company.  The Capital Account of each Member shall consist of (a) the amount of cash such Member contributes to the Company, plus (b) the fair market value of any property such Member contributes to the Company net of any liabilities assumed by the Company or to which such property is subject, plus (c) the amount of profits and gain and tax exempt income allocated to such Member, minus (d) the amount of losses and deductions allocated to such Member, minus (e) the amount of all cash distributed to such Member, minus (f) the fair market value of any property distributed to such Member net of any liabilities assumed by such Member or to which such property is subject, minus

3

(g) the amount of any other expenditures which are not deductible by the Company for Federal income tax purposes or which are not allowable as additions to the basis of Company property and which are allocated to such Member. Each Capital Account shall also be subject to such other adjustments as may be required under the Code and Treasury Regulations. The Capital Account of a Member shall not be affected by any adjustments to basis made pursuant to Section 743 of the Code.

C.      The original Capital Account established for any substituted Member shall be in the same amount as, and shall replace, the Capital Account of the Member which such substituted Member succeeds, and, for the purposes of this Agreement, such substituted Member shall be deemed to have made the Capital Contribution, to the extent actually paid in, of the Member which such substituted Member succeeds. The term "substituted Member", as used in this paragraph, shall mean a Person who shall become entitled to receive a share of the profits, losses and distributions of the Company by reason of such Person succeeding to the interest in the Company of a Member by assignment of all or any part of a Member's interest in the Company. To the extent a substituted Member receives less than 100% of the interest in the Company of a Member he succeeds, the original Capital Account of such substituted Member and his Capital Contribution shall be in proportion to the interest he receives and the Capital Account of the Member who retains a partial interest in the Company and his Capital Contribution shall continue, and not be replaced, in proportion to the interest he retains. Nothing in this Section 3.3 shall affect the limitations on transferability of Company interests set forth in this Agreement.

Section 3.4  Withdrawal of Capital

Except as may be specifically provided in Article V hereof, no Member shall have the right to withdraw from the Company all or any part of his Capital Contribution. No Member shall have any right to demand and receive property or cash of the Company in return of his Capital Contribution except as may be specifically provided in this Agreement.

Section 3.5  Liability of Members

No Member shall be liable for any debts, liabilities, contracts or obligations of the Company except to the extent such Member shall undertake such liability pursuant to a separate written instrument. A Member shall be liable to the Company only to make payments of its Capital Contribution as and when due hereunder, and, after its Capital Contribution shall be fully paid, no Member shall, except as otherwise required by the Uniform Act, be required to make any further Capital Contributions or lend any funds to the Company.

Section 3.6  Additional Limited Members

A.      Except as may be expressly provided elsewhere in this Agreement, the Managing Members shall have no right or authority to admit Limited Members other than those being admitted pursuant to Section 3.2 unless such admission shall have received the Consent of the Special Limited Member.

B.      Any incoming Limited Member shall, as a condition of receiving any interest in Company property, agree to be bound by the Property Documents to the same extent and on the same terms as all other Members of the same class. Any incoming Limited Member shall also agree to be bound by the provisions of this Agreement.

C.      Upon the admission of any additional Limited Members, Schedule A shall be amended to reflect the names, addresses and Capital Contributions of such additional Limited Members, and the date each Limited Member is admitted to the Company.

4

## ARTICLE IV – Limited Member Capital Contributions

Section 4.1 Payments

A.       The Special Limited Member shall pay its entire Capital Contribution of $100.00 to the Company in cash on the Admission Date.  The Investor Limited Member shall make its Capital Contributions in the total amount of $4,226,865, which shall be paid in three Installments (subject to the provision of Section 4.2.B) as set forth in the following payment schedule (the "Payment Schedule") and upon satisfaction of the conditions set forth in Section 4.1.B:

(1)       The first installment in the amount of $100 (the "First Installment") shall be paid on the Admission Date.

(2)       The second installment in the amount of $4,015,422 (the "Second Installment") shall be paid on the later of (a) Full Completion, or (b) satisfaction of all conditions to the payment of the First Installment.

(3)       The third installment in the amount of $211,343 (the "Third Installment") shall be paid on the latest of (a) Permanent Mortgage Commencement, (b) the payment in full of all Development Costs (except for the Deferred Development Cost Payment) such that the Property shall be subject to no liens other than the lien securing the Mortgages, (c) Basis Certification, (d) Stabilized Operations, or (e) satisfaction of all conditions to the payment of the First and Second Installments.

All Capital Contributions received by the Company shall be used only for Company purposes permitted by this Agreement.

B.       The obligation of the Investor Limited Member to pay to the Company each Installment (and each portion of any Installment payable in portions) is subject to the conditions that (i) each of the preceding Installments shall have become due and payable; and (ii) the delivery by the Managing Members to the Special Limited Member of their written certificate (the "Certificate"), which shall be addressed to the Special Limited Member and the Investor Limited Member and which shall state that, as of the date of execution of such Certificate, (a) the Installment in question is due and payable to the Company (except with regard to the mere passage of time to any certain date set forth in the Payment Schedule), (b) all preconditions (except with regard to the mere passage of time to any certain date set forth in the Payment Schedule), representations, warranties and agreements applicable to such Installment set forth in Sections 4.1 and 6.6 and elsewhere in this Agreement have been satisfied, or are true and correct in all material respects, as the case may be; and (c) the representations, warranties, disclosures and certifications contained in the Managing Member Closing Certificate remain true and correct in all material respects on the date of the Certificate.  The Certificate shall include as exhibits thereto (a) a copy of the title insurance policy (or, in connection with the Certificate with respect to the First Installment, a title insurance commitment) for the Property including all endorsements (the most recent of which must be dated within 15 days of the date of the Certificate) evidencing the accuracy of the representation set forth in Section 6.6(10), and (b) in connection with the Certificate with respect to the Third Installment, an "as built" survey of the Property following Full Completion in form and substance reasonably satisfactory to the Special Limited Member and prepared and certified as of a date within sixty (60) days of Full Completion by a surveyor licensed to practice in the state in which the Property is located.  The Certificate delivered with respect to the First Installment shall be dated as of the Admission Date, and the Certificate delivered with respect to each subsequent Installment shall be dated no earlier than 15 days prior to the date on which the Managing Members request payment of such Installment.  By acceptance of such Installment on behalf of the Company, the Managing Members shall be deemed to have reaffirmed and ratified the Certificate and the Managing Member Closing Certificate in all material respects as of the date such Installment is paid to the Company.

5

C. If as of the date when any Installment or portion thereof would otherwise be payable to the Company pursuant to the Payment Schedule, the Certificate required under Section 4.1.B cannot truthfully be given, then the Installment shall not be payable to the Company unless and until (a) the Managing Members shall resolve the circumstances which prevent delivery of such Certificate, (b) such resolution shall have been effected in a manner and under circumstances such that the Investor Limited Member shall not have irrevocably lost any substantial part of the benefits of this Agreement, (c) the Managing Members shall not otherwise be in material default hereunder and (d) the Certificate shall be delivered in compliance with the provisions of Section 4.1.B.

Section 4.2 Special Adjustments

Upon occurrence of the events set forth in the following paragraphs, the following adjustments shall be made:

A. Low Income Housing Credit Adjustment.

(1) If the Annual Reported Credit which will apply to each year of the Credit Period (as determined pursuant to Section 4.2.A(6) below) is less than the amount set forth in Section 4.2.A(4) for such year, then the Managing Members shall pay to the Investor Limited Member upon each such determination, in the manner provided in Section 4.2.B below, an Adjustment Amount equal to 80% of the excess of (a) the sum of the Projected Credit for all years included in the table in the definition of "Projected Credit" over (b) the sum of the Low Income Housing Credit which will be allocated to the Investor Limited Member for all such years based on the Annual Reported Credit.

(2) In the event that the Actual Credit for 2002 is less than the Projected Credit for such years (after the Projected Credit has been revised by any adjustment made pursuant to Section 4.2.A(1) above) and the shortfall will be deferred pursuant to Section 42(f)(2)(B) of the Code, then the Managing Members shall pay to the Investor Limited Member, in the manner provided in Section 4.2.B below, an Adjustment Amount equal to 65% of the total shortfall in Projected Credit, and the Projected Credit for 2012 shall be correspondingly increased.

(3) If for any reason the amount of Actual Credit for any year is less than the Projected Credit for such year (after the Projected Credit has been revised by any adjustments made pursuant to Sections 4.2.A(1) or 4.2.A(2) above), then the Managing Members shall pay to the Investor Limited Member, in the manner provided in Section 4.2.B below, an Adjustment Amount equal to the sum of (a) the shortfall in Projected Credit for such year and the total of the present value of the corresponding shortfall for each future year which will also occur due to the circumstances in question (such present value shall be determined by discounting, at an annual rate of 10%, such shortfall from the end of the year in which it occurs back to the date such circumstances occur), plus (b) the amount of any Low Income Housing Credit recapture amount (as defined in Code Section 42(j), including any interest and/or penalties due to the Internal Revenue Service) and an amount sufficient to pay any tax liability required to be paid by the Limited Members resulting from receipt of the foregoing amounts.

(4) "Projected Credit" shall mean the amount for each year expected to be allocated to the Investor Limited Member as set forth in the table below:

6

| Year | Projected Credit |
|------|------------------|
| 2002 | $488,409 |
| 2003 and each year thereafter through 2011 | $528,358 |
| 2012 | $39,949 |

The amount of "Projected Credit" set forth above for years 2002 and 2003 has been calculated based on construction commencing on or before September 1, 2000, and with the following assumptions: (a) Full Completion will occur on September 1, 2001 and the first 18 Low Income Units will be occupied by Qualified Tenants on or before the last day of the month of Full Completion; (b) an additional ten (10) Low Income Units will be occupied by Qualified Tenants on the last day of October, 2001; (c) an additional nine (9) Low Income Units will be occupied by Qualified Tenants on the last day of each calendar month for the months of November, 2001 through March, 2002 (inclusive); (d) an additional ten (10) Low Income Units will be occupied by Qualified Tenants on the last day of April, 2002; and (e) an additional six (6) Low Income Units will be occupied by Qualified Tenants by the last day of May, 2002. If Full Completion is delayed and the Second Installment has not been paid by September 1, 2001, the Special Limited Member agrees to re-calculate the amount of "Projected Credit" for years 2002 and any year thereafter. Any re-calculation by the Special Limited Member to determine a new "Projected Credit" amount for years 2002 and any year thereafter pursuant to the immediately preceding sentence shall be computed with the same assumptions and projections utilized in the Financial Forecast set forth in Exhibit 2 to determine the initial amount of "Projected Credit" for such years, but modified to reflect the actual Full Completion date, any additional allocation of Tax Credits for the Property received from the Credit Agency and any amount of the Low Income Housing Credit available for each year after the Credit Period but within the Compliance Period arising as a result of the "2/3 Rule" set forth in Section 42(f)(3) of the Code when re-calculating the Projected Credit pursuant to this Section 4.2.A; provided, however, that in no event will the Special Limited Member be required to adjust the amount of "Projected Credit" for years 2002 or any year thereafter to the extent that such adjustment will adversely affect the internal rate of return to the Limited Members for their investment in the Company as identified in the Financial Forecast set forth in Exhibit 2, which internal rate of return is 9.26% (the "IRR"). If the Limited Members determine that any adjustment to the amount of "Projected Credit" as a result of a re-calculation pursuant to this paragraph will adversely affect the IRR, the Limited Members shall be permitted to reduce their Capital Contributions by an amount necessary to adjust the amount of "Projected Credit" without reducing the IRR. Any reduction of the Capital Contribution in order to maintain the IRR of the Limited Members shall occur at the time of payment of the Second Installment. In the event that the amount of Projected Credit for year 2002 or any year thereafter is reduced pursuant to this paragraph, the amount of Projected Credit for 2012 (or any later year(s) during the Compliance Period) shall be correspondingly increased. The Limited Members and their Affiliates shall be reimbursed for all costs and expenses associated with recalculating the Projected Credit as described above, and any determination by the Special Limited Member of a new "Projected Credit" amount for year 2002 or any year thereafter pursuant to this paragraph shall be final and binding on the Members and the Company.

If the Annual Reported Credit during the Credit Period is reduced as a result of the "two-thirds rule" set forth in Section 42(f)(3) of the Code, the Annual Reported Credit for each tax year of the Compliance Period shall be recalculated as set forth in the preceding paragraph in order to maintain the IRR (taking into account, to the extent applicable, any reduction in Low Income Housing Credit during each year of the Credit Period and any increase in Low Income Housing Credit for each tax year after the Credit Period but within the Compliance Period arising by reason of the deferral provisions of the Section 42(f)(2) of the Code), and assuming that any apartment units not initially occupied during such first tax year are so occupied during the next tax year pursuant to a schedule agreed to by the Managing Members and the Special Limited Member. In the event that any re-calculation resulting from the "two-thirds rule" adversely affects the IRR, the Investor Limited

Case 2:20-cv-01169-BHL    Filed 08/27/20    Page 11 of 89    Document 14-1

Member shall be permitted to reduce its Capital Contribution by an amount necessary to maintain the IRR; provided, however, if any recalculation resulting from the "two-thirds rule" is made after the payment of the Second Installment and the amount of the Third Installment is less than the amount of any reduction in the Capital Contribution necessary to maintain the IRR, the Managing Members shall cause the Company to promptly pay the Investor Limited Member any such shortfall. If Company funds are insufficient to return such shortfall to the Investor Limited Member, the Managing Members shall be required to make a Capital Contribution to the Company in the amount of such shortfall and the Company shall promptly distribute the proceeds of such Capital Contribution to the Investor Limited Member.

When any adjustment is made pursuant to this Section 4.2.A, the "Projected Credit" for such year shall be revised to equal the Actual Credit for such year for purposes of any future adjustment.

(5)  "Actual Credit" means, with respect to any tax year, the total amount of Low Income Housing Credit actually reported by the Company on its tax return for that tax year and allocated to the Investor Limited Member (or, if less, such total amount determined after an audit by the Internal Revenue Service), as subsequently adjusted (if applicable) by any Tax Credit recapture amounts (as defined in Section 42(j)(2) of the Code).

(6)  "Annual Reported Credit" means the annual amount of Low Income Housing Credit which is expected to be allocated by the Company to the Investor Limited Member on the Company tax return for each year of the Credit Period (subject only to timing adjustments such as placed in service, occupancy and Member Admission Dates), as determined and reflected in a statement to be prepared by the Accountants after Full Completion and again upon 8609 Issuance if the Annual Reported Credit set forth on Form 8609 is different than the Annual Reported Credit set forth in the statement prepared by the Accountants and which (a) shall assume that the Property will consist of 89 Low Income Units, (b) shall be based on an audit by the Accountants of Development Costs, (c) shall include supporting documentation and/or certifications from the Managing Members and the Accountants indicating the date when each building comprising the Property was placed in service and indicating the number and percentage of tenants occupying units in the Property who are Qualified Tenants, and (d) on which the Accountants shall express a favorable opinion as to fair presentation. In no event shall the amount of the Development Services Fee which is taken into account in computing the Annual Reported Credit exceed the lesser of (i) the amount of such fee actually paid or to be paid pursuant to Section 6.11 and (ii) the amount allowable by the Credit Agency.

(7)  If the sum of the Projected Credit for all years during the Compliance Period (as determined from time to time pursuant to Section 4.2A(6) above) is more than $5,283,580, then the Investor Limited Member shall agree to make an additional Capital Contribution to the Company (the "Additional Capital Contribution") upon such determination in an amount equal to 80% of the excess of (a) the sum of the Low Income Housing Credit which will be allocated to the Investor Limited Member for all years during the Compliance Period based on the receipt by the Special Limited Member of a valid and binding carryover allocation from the Credit Agency and satisfactory documentation from the Accountants evidencing that Company costs are sufficient to generate the additional Low Income Housing Credits set forth in the carryover allocation, minus (b) the sum of the Projected Credit for all years included in the table in the definition of "Projected Credit" set forth in Section 4.2.A(4); provided, however, that the Additional Capital Contribution pursuant to this Section 4.2A(7) shall never exceed $380,000; and provided, further that such Additional Capital Contribution determined pursuant to this Section 4.2A(7) shall be determined no later than March 1, 2002. In the event that the Additional Capital Contribution determined pursuant to this Section 4.2A(7) shall be determined after March 1, 2002, the Investor Limited Member shall have the option to either (a) make the Additional Capital Contribution in accordance with the provisions of this Section 4.2A(7) (directly or indirectly through one or more Affiliates), or (b) revise its allocations of profits, losses and credits from the Company to such percentages as shall permit it to realize its proportionate share of the full amount of the Projected Credit for all years included in the table in the definition of "Projected

Credit" set forth in Section 4.2A(4). Notwithstanding anything to the contrary set forth in Section 4.2, any Additional Capital Contribution determined in accordance with this Section 4.2A(7) shall be subject to all terms and conditions set forth in this Agreement, and shall be paid by the Investor Limited Member to the Company ratably over the remaining installments due to be paid by the Investor Limited Member, unless otherwise determined by the Investor Limited Member in its sole discretion; provided, however, that if no further Installments remain to be paid, then the entire Additional Capital Contribution due under this Section 4.2A(7) shall be made by the Special Limited member to the Company within forty –five (45) days after the Special Limited Member has determined the amount of such Additional Capital Contribution.

The Managing Members agree that, in the situation described above in this Section 4.2A(7), the Company shall pay all costs associated with the preparation of documents necessary or desirable to implement the foregoing provisions of this Section 4.2A(7), including the reasonable fees and expenses of Nixon Peabody LLP, as counsel to the Investor Limited Member.

B.    Adjustment Procedure.

(1)    When an "Adjustment Amount" shall become due from the Managing Members pursuant to this Section 4.2, it shall constitute indemnification paid to the Investor Limited Member by the Managing Members for breach of warranty of the availability of the full Projected Credit; except as provided for in Section 4.2.C below, shall not constitute a Capital Contribution, loan or advance by the Managing Members and shall not be reimbursable or repayable to the Managing Members by the Company or the Investor Limited Member; and shall bear interest, at the annual rate of 1% above the Designated Prime Rate and, except as provided in Section 4.2.C(2) below, from (a) the date the lost Low-Income Housing Credit which resulted in the Adjustment Amount would have been available to the Investor Limited Member to (b) the date paid. Except as provided in Section 4.2 C below, the Adjustment Amount plus interest shall be paid within 10 business days after the amount thereof is determined, and any portion thereof which is due but unpaid, at the time the next Installment is payable by the Investor Limited Member shall be an offset against such Installment payment and shall be paid by the Managing Members to the Company in satisfaction of the Investor Limited Member's obligation to pay the offset amount. Unpaid Adjustment Amounts shall also be payable to the Investor Limited Member as set forth in Sections 5.2.A and 5.2.B. If the Managing Members shall default in making such payment to the Company, the Company's remedies shall be only against the Managing Members and the Investor Limited Member shall nevertheless be deemed to have paid its entire Installment in full. If any Adjustment Amount is not paid to the Investor Limited Member by the date required in this Section 4.2.B, then the interest rate accruing on the Adjustment Amount shall be increased to the rate of 18% per annum retroactively to the beginning of the interest accrual period.

(2)    Notwithstanding the provisions of Section 4.2.B(1) above, however, if the total Adjustment Amount arising under section 4.2.A(2) and 4.2.A(3) exceeds $388,000, then the excess Adjustment Amount (plus the interest accruing thereon) shall not be payable as a breach of warranty payment by the Managing Members but instead shall be payable by the Company as a return of Capital from Cash Flow as set forth in Section 5.2.A or Capital Transaction proceeds as set forth in Section 5.2.B.

C.    Special Provisions. Notwithstanding the provisions of this Section 4.2:

(1)    No Installment Adjustment shall be made pursuant to Section 4.2.A for any difference in Actual Credit compared to Projected Credit or for any difference in Annual Reported Credit compared to Projected Credit, to the extent such difference is attributable to: (i) any change in the Code or any regulations thereunder occurring after the Admission Date; (ii) any action taken by the Limited Members in violation of this Agreement; or (iii) any sale, transfer, assignment or disposition of all or a portion of the Company interest of either Limited Member (or of any interest in a Limited

9

Member); and

(2)     In the event that an Adjustment Amount is determined in accordance with Section 4.2.A and the Capital Contributions of the Investor Limited Member have not been paid in full, the Adjustment Amount (not to exceed an amount equal to the unpaid Investment Limited Member's Capital Contributions) shall be deducted from the unpaid Capital Contribution. In the event that the Capital Contribution is reduced pursuant to the immediately preceding sentence, the unpaid portions of the Second or Third Installments, in order, shall be reduced by a corresponding amount; provided, however, if either (i) all Installments have already been paid or designated to pay Development Costs other than the Development Services Fee; or (ii) the Special Limited Member determines that an unpaid Installment will not become due and payable within one hundred eighty (180) days of the determination of the Adjustment Amount pursuant to Section 4.2.A, then the Managing Members agree that the unpaid Capital Contribution shall not be reduced and the Managing Members shall be required to pay such Adjustment Amount. Notwithstanding the above, in no event shall an Adjustment Amount determined in accordance with Section 4.2.A remain unpaid after one hundred eighty (180) days from the date such Adjustment Amount was determined. In the event that any unpaid Adjustment Amount is deducted from the unpaid Capital Contribution as described above, the unpaid Adjustment Amount shall bear interest at the annual rate of 1% above the Designated Prime Rate beginning on the 90th day after the Adjustment Amount was determined until the date paid. In the event that an Adjustment Amount is applied to reduce the Capital Contribution of the Investment Limited Member, the reduction of the Capital Contribution shall not constitute a Capital Contribution, loan or advance by the Managing Members, and shall not be reimbursable or repayable to the Managing Members.

Section 4.3  Repurchase Obligation of the Managing Members

A.     Upon the occurrence of any of the Repurchase Events set forth below, each Limited Member shall have the right to elect to sell its interest in the Company by sending written notice (the "Election Notice") thereof to the Managing Members at any time (provided that such notice must be sent within 90 days after receipt by such Limited Member of notice of the occurrence of a Repurchase Event from the Managing Members, and the Managing Members shall be obligated to promptly give notice of the occurrence of a Repurchase Event to each Limited Member). The purchase shall be made by the Managing Members within 30 days after the receipt of the Election Notice.

B.     The "Repurchase Events" which shall create the aforesaid right to be repurchased shall be any of the following:

(1)     The failure of the Company to achieve Full Completion by December 31, 2001 or the commencement of foreclosure proceedings on the Construction Mortgage Loan by the Construction Lender; or

(2)     Any of: (a) the failure by the Managing Members to submit to the Credit Agency all documentation necessary to obtain 8609 Issuance by May 1, 2002; (b) the failure of 8609 Issuance to occur by November 30, 2002; or (c) the allocation to the Company on Forms(s) 8609 of Low Income Credit in an amount less than 80.0% of the maximum annual Projected Credit;

(3)     The failure of the Company to execute and record by December 31, 2001, a valid extended use agreement as required pursuant to Section 42 of the Code.

(4)     Either: (a) the maturity of the Construction Mortgage Loan or expiration of the commitment letter for the Permanent Mortgage Loan occurs prior to Permanent Mortgage Commencement; or (b) Permanent Mortgage Commencement shall not have occurred prior to August 30, 2002 (or any later date determined by the Permanent Mortgage Lender in

10

accordance with the commitment letter dated August 1, 2000 in connection with the Permanent Mortgage Loan) and the Managing Members have defaulted on their obligations to make payments under Sections 4.2, 6.9, or 6.10; or

(5)     The failure of the Company to achieve Minimum Set-Aside by December 31, 2001 and the Managing Members have defaulted on their obligations to make payments under Sections 4.2, 6.9 or 6.10.

C.     The purchase price for any of the purchases described above shall be an amount in cash equal to the Outstanding Capital of each selling Limited Member plus interest at the annual rate equal to the Designated Prime Rate plus 2% beginning on the 90th day from the occurrence of the Repurchase Event through the date the purchase price is paid. If at the time of such repurchase, the payment of the purchase price plus interest to the selling Limited Members constitutes a violation of the Uniform Act, the Managing Members shall (i) contribute sufficient additional Capital to the Company to permit such repurchase without constituting such a violation, and (ii) shall indemnify and hold harmless each selling Limited Member against all loss and damage by reason of such repurchase being in violation of the Uniform Act.

D.     Upon the purchase of such interest the Managing Members shall become Substitute Investor Limited Members to the extent of the Limited Member interest acquired by them, and the interest as a Limited Member of each selling Limited Member shall terminate; provided that the Managing Members shall remain liable to indemnify each of the Limited Members against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by such Limited Member other than claims made against such Limited Member by its own investors resulting from the occurrence of the Repurchase Event (including reasonable attorneys' fees, fines, damages and similar payments) in connection with the Company or its affairs. Upon the occurrence of any event which requires the Managing Members to give notice of the obligation of the Managing Members to purchase the interest of the Limited Members, as herein described, the Investor Limited Member shall have no further obligation to pay any subsequent Installment of its Capital Contribution unless the Investor Limited Member fails to elect, within the time described above, to have its interest repurchased.

## ARTICLE V -- Profits, Losses and Distributions

### Section 5.1 Profits, Losses and Tax Credits

A.     Except as otherwise provided in this Article V, for each fiscal year or portion thereof, all profits, tax-exempt income, gains, losses, nondeductible expenditures and tax credits incurred and/or accrued by the Company, other than those arising from a Capital Transaction, shall be allocated 0.01% to the Managing Members, and 99.99% to the Investor Limited Member.

B.     Except as otherwise provided in this Article V, all profits and losses arising from a Capital Transaction shall be shared by the Members, as of the end of the fiscal year in which such Capital Transaction occurs, as follows:

### As to profits:

First, an amount of profit equal to the aggregate negative balances (if any) in the Capital Accounts of all Members having negative Capital Accounts shall be allocated to such Members in proportion to the negative Capital Account balances until all such Capital Accounts shall have a zero balance; and

Second, an amount of profits shall be allocated to each of the Members until the positive

11

balance in the Capital Account of each Member equals the amount of cash which would be distributed to such Member in accordance with the provisions of Clauses Fifth, Seventh, Eleventh and Twelfth of Section 5.2.B if the aggregate amount of such Capital Accounts balances were cash available for distribution.

As to losses:

First, an amount of losses equal to the aggregate positive balances (if any) in the Capital Accounts of all Members having positive balance Capital Accounts shall be allocated to such Members in proportion to their positive Capital Account balances until all such Capital Accounts shall have zero balances; provided, however, that if the amount of losses so to be allocated is less than the sum of the positive balances in the Capital Accounts of those Members having positive balances in their Capital Accounts, then such losses shall be allocated to the Members in such proportions and in such amounts so that the Capital Account balances of each Member shall equal, as nearly as possible, the amount such Member would receive if an amount equal to the excess of (a) the sum of all Members' balances in their Capital Accounts computed prior to the allocation of losses under this clause First over (b) the aggregate amount of losses to be allocated to the Members pursuant to this clause First were distributed to the Members in accordance with the provisions of Clauses Fifth, Seventh, Eleventh and Twelfth of Section 5.2.B; and

Second, the balance, if any of such losses, to those Members and in those percentage shares set forth in Section 5.1.A.

C. Notwithstanding the foregoing provisions of Sections 5.1.A and 5.1.B, in no event shall any losses be allocated to a Limited Member if and to the extent that such allocation would cause, as of the end of the Company taxable year, the negative balance in such Limited Member's Capital Account to exceed such Limited Member's obligation, if any, to restore deficits in his Capital Account pursuant to Section 5.3.A or deemed under Treasury Regulation Section 1.704-1(b)(2)(ii)(c) plus such Limited Member's share of Company Minimum Gain plus such Limited Member's share of Member Non-Recourse Debt Minimum Gain. Any losses which are not allocated to the Limited Members by virtue of the application of this Section 5.1.C shall be allocated to the Managing Members. For purposes of this Section, a Member's Capital Account shall be treated as reduced by Qualified Income Offset Items.

D. The terms "profits" and "losses" used in this Agreement shall mean income and losses, and each item of income, gain, loss, deduction or credit entering into the computation thereof, as determined in accordance with the accounting methods followed by the Company computed in a manner consistent with Treasury Regulation Section 1.704-1(b)(2)(iv). Profits and losses for federal income tax purposes shall be allocated in the same manner as profits and losses in this Section 5.1 subject to Section 5.4.A.

Section 5.2 Distributions Prior to Dissolution

A. Distributions of Cash Flow. Cash Flow for each fiscal year (or fractional portion thereof) following the Admission Date shall be applied as follows:

(1) To the payment of the Asset Management Fee payable pursuant to Section 7.10.B, and then to all accrued but unpaid Asset Management Fees(s) for any prior year(s);

(2) To the payment in full of any outstanding Limited Member Loans, together with any accrued but unpaid interest thereon;

(3) To the payment of any outstanding Adjustment Amount determined in accordance with Section 4.2.B;

(4)     To payment of the Deferred Development Cost Payment until paid in full;

(5)     To the payment of the Subordinated Management Fee payable in accordance with Section 6.12.C for such year, and then to the payment of all accrued but unpaid Subordinated Management Fee(s) for any prior year(s);

(6)     To the payment of outstanding Managing Member Loans, and then to Operating Deficits Loans;

(7)     Eighty percent (80.0%) of remaining Cash Flow shall be applied in the following priority:

(a)     To the payment of the Incentive Management Fee; and then

(b)     To a distribution to the Managing Members; and

(8)     All remaining Cash Flow shall be distributed to the Limited Members.

The distribution of Cash Flow to the Members with respect to each Company fiscal year, and payment of any fee the amount of which is determined based on the amount of Cash Flow for such fiscal year, shall be made following the end of such fiscal year and only if supported by the financial statements for such fiscal year provided for in Section 7.5.A.

B.      Distributions of Capital Transaction Proceeds. Prior to dissolution, if the Managing Members shall determine from time to time that there are cash proceeds available for distribution from a Capital Transaction, such cash proceeds shall be applied or distributed, as the case may be, as follows:

First, to the discharge, to the extent required by any lender or creditor, of debts and obligations of the Company, but excluding debts and obligations provided for below in this Section 5.2.B;

Second, to fund reserves for contingent liabilities to the extent deemed reasonable by the Managing Members, the Special Limited Member and the Accountants;

Third, to the payment of any unpaid Asset Management Fees;

Fourth, to the repayment of any outstanding Limited Member Loans, together with any accrued but unpaid interest thereon;

Fifth, to the payment of any outstanding Adjustment Amount determined in accordance with Section 4.2.B;

Sixth, to the payment in full of any outstanding Deferred Development Cost Payment;

Seventh, distribute to the Members an amount equal to any Exit Taxes arising from such Capital Transaction;

Eighth, to the payment of any unpaid Subordinated Management Fee(s);

Ninth, to the payment of outstanding Managing Members Loans, and then to outstanding Operating Deficit Loans;

Tenth, to the payment of the Sales Preparation Fee to the Managing Members

13

pursuant to Section 6.15;

Eleventh, to the Investor Limited Member an amount equal to its Positive Capital Account; and

Twelfth, any balance thereof, 80% to the Managing Members and 20% to the Limited Members.

### Section 5.3 Distributions Upon Dissolution

A.      Upon dissolution and termination, after payment of, or adequate provision for, the debts and obligations of the Company, the remaining assets of the Company (or the proceeds of sales or other dispositions in liquidation of the Company assets, as may be determined by the remaining or surviving Managing Members) shall be distributed to the Members in accordance with the positive balances in their Capital Accounts after taking into account all Capital Account adjustments for the Company taxable year, including adjustments to Capital Accounts pursuant to Sections 5.1.B and 5.3.B.  In the event that a Managing Member has a negative balance in its Capital Account following the liquidation of the Company or its interest in the Company after taking into account all Capital Account adjustments for the Company taxable year in which the liquidation occurs, such Managing Member shall pay to the Company in cash an amount equal to the negative balance in its Capital Account.  Such payment shall be made by the end of such taxable year (or, if later, within 90 days after the date of such liquidation) and shall, upon liquidation of the Company, be paid to recourse creditors of the Company or distributed to other Members in accordance with the positive balances in their Capital Accounts.

B.      With respect to assets distributed in kind to the Members in liquidation or otherwise, (i) any unrealized appreciation or unrealized depreciation in the values of such assets shall be deemed to be profits and losses realized by the Company immediately prior to the liquidation or other distribution event; and (ii) such profits and losses shall be allocated to the Members in accordance with Section 5.1.B hereof, and any property so distributed shall be treated as a distribution of an amount in cash equal to the excess of such fair market value over the outstanding principal balance of and accrued interest on any debt by which the property is encumbered.  For the purposes of this Section 5.3.B, "unrealized appreciation" or "unrealized depreciation" shall mean the difference between the fair market value of such assets, taking into account the fair market value of the associated financing (but subject to Section 7701(g) of the Code), and the Company's adjusted basis in such assets computed in accordance with Treasury Regulation Section 1.704-1(b).  This Section 5.3.B is merely intended to provide a rule for allocating unrealized gains and losses upon liquidation or other distribution event, and nothing contained in this Section 5.3.B or elsewhere in this Agreement is intended to treat or cause such distributions to be treated as sales for value.  The fair market value of such assets shall be determined by an appraiser to be selected by the Managing Members with the Consent of the Special Limited Member.

### Section 5.4 Special Provisions

Notwithstanding the foregoing provisions in this Article V:

A.      For federal income tax purposes, income, gain, loss and deduction with respect to property which has a variation between its basis computed in accordance with Treasury Regulation Section 1.704-1(b) and its basis computed for federal income tax purposes shall be shared among Members so as to take account of such variation in a manner consistent with the principles of Section 704(c) of the Code.

B.      Except as otherwise provided in this Article V where profits, losses or distributions are allocated according to Capital Account balances, all profits, losses, credits and distributions shared by

the Members in each class of Members (e.g., the Managing Member class or the Limited Member class) shall be shared by each Member in such class in the percentages set forth on Schedule A.

C.1.    If (i) the Company incurs recourse obligations or Member Non-Recourse Debt to the Managing Members or their Related Persons (including without limitation Operating Deficit Loans) or (ii) the Company incurs losses from extraordinary events which are not recovered from insurance or otherwise (collectively "Recourse Obligations") in respect of any Company taxable year, then at the election of the Special Limited Member the calculation and allocation of profits and losses shall be adjusted as follows: first, an amount of deductions (consisting of operating expenses but not cost recovery deductions) attributable to the Recourse Obligations shall be allocated to the Managing Members; and second, the balance of such deductions shall be allocated as provided in Section 5.1.A.

C.2.    If the Company makes any payment with respect to an obligation with respect to which a special allocation of deductions was made under Section 5.4.C.1, then the calculation and allocation of profit and losses in respect of the Company taxable year of such payment shall be adjusted as follows: first, an allocation of gross income shall be allocated to the Member or Members to whom the deductions were allocated under Section 5.4.C.1 in an amount equal to the lesser of (i) the amount of such deductions minus all previous allocations with respect to such deductions under this Section 5.4.C.2 or (ii) the amount of such payment; and second, the balance of such gross income shall be allocated as provided in Section 5.1.A.

D.    If there is a net decrease in Member Non-Recourse Debt Minimum Gain during a Company taxable year, then each Member with a share of the minimum gain attributable to such debt at the beginning of such year will be allocated items of income and gain (including gross income if necessary) for such year (and, if necessary, subsequent years) in proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Member Non-Recourse Debt Minimum Gain during the year. A Member is not subject to this Member Non-Recourse Debt Minimum Gain chargeback to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(i)(4) applied consistently with Treasury Regulation Section 1.704-2(f)(2)-(5) apply. Such allocations shall be made in a manner consistent with the requirements of Treasury Regulation Section 1.704-2(i)(4) under Section 704 of the Code.

E.    If the Company shall receive any purchase money indebtedness in partial payment of the purchase price of the Property and such indebtedness is distributed to the Members pursuant to the provisions of Section 5.2.B or Section 5.3, the distributions of the cash portion of such purchase price and the principal amount of such purchase money indebtedness hereunder shall be allocated among the Members in the following manner. On the basis of the sum of the principal amount of the purchase money indebtedness and cash payments received on the sale (net of amounts required to pay Company obligations and fund reasonable reserves), there shall be calculated the percentage of the total net proceeds distributable to each class of Members based on Section 5.2.B or under Section 5.3, as applicable, treating cash payments and purchase money indebtedness principal fungibly for this purpose, and the respective classes shall receive such respective percentages of the net cash purchase price and purchase money principal. Payments on such purchase money indebtedness retained by the Company shall be distributed in accordance with the respective portions of principal allocated to the respective classes of Member in accordance with the preceding sentence, and if any such purchase money indebtedness shall be sold, the sale proceeds shall be allocated in the same proportion.

F.    If there is a net decrease in Company Minimum Gain during a Company taxable year, each Member will be allocated items of income and gain (including gross income if necessary) for such year (and, if necessary, subsequent years) in the proportion to, and to the extent of, an amount equal to such Member's share of the net decrease in Company Minimum Gain during the year. A Member is not subject to this Company Minimum Gain chargeback to the extent that any of the exceptions provided in Treasury Regulation Section 1.704-2(f)(2)-(5) apply. Such allocations shall be made in a manner consistent with the requirements of Treasury Regulation Section 1.704-2(f) under Section 704

15

of the Code.

G.      If a Limited Member unexpectedly receives (1) an allocation of loss or deduction or expenditures described in Section 705(a)(2)(B) of the Code made (a) pursuant to Section 704(e)(2) of the Code to a donee of an interest in the Company, (b) pursuant to Section 706(d) of the Code as the result of a change in any Member's interest in the Company, or (c) pursuant to Regulation Section 1.751-1(b)(2)(ii) as a result of a distribution by the Company of unrealized receivables or inventory items or (2) a distribution, and such allocation and/or distribution would cause the negative balance in such Member's Capital Account to exceed such Member's obligation, if any, to restore deficits in its Capital Account pursuant to Section 5.3.A or deemed under Treasury Regulation Section 1.704-1(b)(2)(ii)(c) plus its share of Member Non-Recourse Debt Minimum Gain plus its share of Company Minimum Gain, then such Member shall be allocated items of income and gain (including gross income if necessary) in an amount and manner sufficient to eliminate such negative balance as quickly as possible. For purposes of this Section, a Member's Capital Account shall be treated as reduced by Qualified Income Offset Items.

H.      Notwithstanding anything to the contrary herein, it is the intention of the Company to conform to the requirements of any Treasury regulations issued with respect to the allocation of Company items, in a manner maximizing the benefits to the Limited Members, particularly with regard to any special provisions with respect to nonrecourse indebtedness. The Managing Members may, with the Consent of the Special Limited Member, amend Article V to comply with any such regulations.

I.      If any portion of the Property is deemed to be tax-exempt use property within the meaning of Section 168(h) of the Code, then depreciation deductions with respect to the Property shall be allocated as follows: first, to those Members who are not tax-exempt entities or who are entitled to the exception provided in Section 514(c)(9) of the Code, an amount of depreciation equal to their share of depreciation as if no part of the depreciation of the Property were required to be computed under Section 168(g) of the Code, and, second, the remainder of the depreciation deductions with respect to the Property shall be allocated to those Members which are tax-exempt entities not entitled to the exception under Section 514(c)(9) of the Code.

J.      In applying the provisions of Article V with respect to distributions and allocations, the following ordering of priorities shall apply:

(1)      Capital Accounts shall be deemed to be reduced by Qualified Income Offset Items.

(2)      Capital Accounts shall be reduced by distributions of Cash Flow under Section 5.2.A.

(3)      Capital Accounts shall be reduced by distributions from Capital Transactions under Section 5.2.B.

(4)      Capital Accounts shall be increased by any Minimum Gain chargeback under Section 5.4.D or 5.4.F.

(5)      Capital Accounts shall be increased by any Qualified Income Offset under Section 5.4.G.

(6)      Capital Accounts shall be increased by allocations of profits under Section 5.1.A.

(7)      Capital Accounts shall be reduced by allocations of losses under Section 5.1.A.

16

(8)     Capital Accounts shall be reduced by allocations of losses under Section 5.1.B.

(9)     Capital Accounts shall be increased by allocations of profits under Section 5.1.B.

K.     To the maximum extent permitted under the Code, allocations of profits and losses shall be modified so that the Members' Capital Accounts reflect the amount they would have reflected if adjustments required by Sections 5.4.D, 5.4.F and 5.4.G had not occurred.


ARTICLE VI – Managing Member Rights, Powers and Duties

Section 6.1  Restrictions on Authority

Notwithstanding any other provisions of this Agreement, the Managing Members shall have no authority (a) to perform any act in violation of (i) any applicable law or regulations, or (ii) any 'agreement between the Company and the Lenders; or (b) to do any act required to be approved or ratified by the Limited Members under the Uniform Act unless such approval or ratification is given in advance; or (c) to perform any act in violation of the Property Documents if such violation may have a material adverse effect on the Company, the Property or the Limited Members.  The Managing Members shall not have any authority to do any of the following specific acts without the Consent of the Special Limited Member:

(1)     following completion of construction of the Property, to construct any new capital improvements, or to replace any existing capital improvements, which construction or replacement would substantially alter the character or use of the Property, or

(2)     to acquire any real property in addition to the Property, other than fee title or easements to de minimis parcels of land for the purpose of correcting record title to the Property, or

(3)     except to the extent permitted under Section 6.13.B, if any, to be personally liable on, or to guarantee, or to permit any Related Person of a Member of the Company to be personally liable on, to guarantee or otherwise bear the Economic Risk of Loss with respect to, the Mortgages, or

(4)     except as otherwise provided in Section 6.13.D and Section 6.16, to (a) refinance any Company indebtedness, (b) sell, convey or mortgage the Property, (c) materially amend or modify any Mortgage or Property Document if such amendment or modification may have a material adverse effect on the Company, the Property or the Limited Members, (d) submit any application to refinance any Company indebtedness, or (e) market the Property for sale; or

(5)     to permit the occupancy of dwelling units in the Property in violation of Minimum Set Aside, the Credit Agency Set-Aside or any other requirement which must be complied with to enable the Property to generate the Projected Credit, or

(6)     to lease (i) pursuant to one lease (or pursuant to a series of leases which are negotiated as part of one transaction) more than 10% of the Property as an entity or (ii) the Property in such a manner as to cause the Property or any part thereof to be treated as tax-exempt use property within the meaning of Section 168(h) of the Code, or

(7)     to borrow on the general credit of the Company, except as specifically

17

permitted hereunder as to Operating Deficit Loans and pursuant to Section 6.13, or

(8)     to cause the Company to operate any business on the Property other than the business of renting dwelling units, or to rent any portion of the Property other than for occupancy as a dwelling unit, or

(9)     to cause the Company to take any action referred to in clause (ii) of the definition of "Event of Bankruptcy" in Article XI.

Section 6.2  Personal Services

No Affiliate shall receive any compensation from the Company for services rendered to the Company in connection with the construction or operation of the Property or any other aspect of the business of the Company unless such compensation is provided for in Article VI or, if for services not compensated for pursuant to Article VI, such compensation is reasonable, does not exceed fees which would be payable on an arms-length basis to a non-Affiliate in the business of supplying such services, and complies with Lender regulations. Any Member may engage independently or with others in 'other business ventures of every nature and description including, without limitation, the ownership, operation, management, syndication and development of real estate, including real estate which may be in competition with the Property and neither the Company nor any Member shall have any rights by virtue of this Agreement in and to such independent ventures or the income or profits derived therefrom.

Section 6.3  Business Management and Control; Tax Matters Partner

A.     The Managing Members shall have the exclusive right to manage the business of the Company and, subject to all provisions of this Agreement including without limitation Articles III and VI, shall have full power, authority and discretion to cause the Company to do any of the acts described in Section 2.4 hereof.  No Limited Member (except one who may also be a Managing Member, and then only in his capacity as Managing Member) shall participate in or have control over the Company business, except as provided in Article VIII hereof or as permitted by law. The Members hereby consent to the exercise by the Managing Members of the powers conferred on them by this Agreement.  No Limited Member (except one who may also be a Managing Member, and then only in his capacity as a Managing Member) shall have any authority or right to act for or to bind the Company.

B.     All Members hereby agree that, as long as it shall be a Managing Member, Centennial Partners shall be the "Tax Matters Partner."  The Tax Matters Partner shall employ experienced tax counsel to represent the Company in connection with any audit or investigation of the Company by the Internal Revenue Service, and in connection with all subsequent administrative and judicial proceedings arising out of such audit, and the fees of counsel shall be a Company expense.  The Tax Matters Partner shall keep the Members informed of all administrative and judicial proceedings, as required by Section 6223(g) of the Code, shall furnish to each Member (within five (5) days after receipt) a copy of each notice or other communication received by the Tax Matters Partner from the Internal Revenue Service, and shall not respond to any notice or other communication from the Internal Revenue Service which questions or challenges any item which has been or may be reported on a Company tax return until after the Special Limited Member has reviewed and commented on the proposed response.  The Tax Matters Partner shall have no authority, without the Consent of the Special Limited Member, to (i) enter into a settlement agreement with the Internal Revenue Service which purports to bind Members other than the Tax Matters Partner, (ii) file a petition as contemplated in Section 6226(a) or 6228 of the Code, (iii) intervene in any action as contemplated in Section 6226(b) of the Code, (iv) file any request contemplated in Section 6227(b) of the Code, (v) enter into an agreement extending the period of limitations as contemplated in Section 6229(b)(1)(B) of the Code, (vi) to file any tax related litigation in a court other than the United States

18

Tax Court, or (vii) to engage in any communication (written or oral) with the Internal Revenue Service, or submit any report or other correspondence to the Internal Revenue Service. In addition, the Managing Members shall send to the Special Limited Member corresponding copies of any written correspondence to the Credit Agency relating to the Company or the Property, and shall promptly advise the Special Limited Member of any oral communication with the Credit Agency that may have a material adverse effect on the Company, the Property or the Limited Members.

Section 6.4 <u>Authority of Managing Members</u>

A.     Every contract, deed, mortgage, lease and other instrument executed by a Managing Member shall be conclusive evidence in favor of every Person relying thereon or claiming thereunder that, at the time of the delivery thereof (except as shown in certificates or other instruments duly filed with the Filing Office), (a) the Company was in existence, (b) this Agreement had not been terminated or canceled or amended in any manner so as to restrict such authority, and (c) such Managing Member was duly authorized to execute such instrument. Except as otherwise provided in a certificate or other instrument filed in the Filing Office with respect to the Company, any Person dealing with the Company or the Managing Members may always rely on a certificate signed by the Managing Members hereunder:

(1)     as to who are the Managing Members or Limited Members hereunder,

(2)     as to the existence or nonexistence of any fact or facts which constitute conditions precedent to acts by the Managing Members or are in any other manner germane to the affairs of the Company,

(3)     as to who is authorized to execute and deliver any instrument or document of the Company,

(4)     as to the authenticity of any copy of this Agreement and amendments thereto, or

(5)     as to any act or failure to act by the Company or as to any other matter whatsoever involving the Company or any Member.

B.     If there shall be more than one Managing Member serving hereunder, each Managing Member (with the Consent of the Special Limited Member and subject to the provisions of Section 8.6) may from time to time, by an instrument in writing or by a provision in this Agreement, delegate its powers and authority hereunder to another Managing Member or Managing Members to the extent stated therein. Such writing shall fully authorize such other Managing Member to act alone without the requirement of any act or signature of the delegating Managing Member and to take any action of any type and to do anything and everything which a Managing Member may be authorized to take or do hereunder, and the delegating Managing Member thereafter shall have no right, power or authority to act for the Company with respect to the powers or authority so delegated. No such delegation shall relieve the delegating Managing Member of any of its duties or obligations under this Agreement or otherwise with respect to the Company.

Section 6.5 <u>Duties and Obligations</u>

A.     The Managing Members shall promptly take all actions which may be necessary or appropriate for the completion of construction of the Property and the proper maintenance and operation of the Property in accordance with the provisions of this Agreement, the Property

Documents, applicable laws and regulations, and in compliance with the representations and warranties in Section 6.6 and the description of the business of the Company set forth in the Property Summary attached hereto as Exhibit 1, and shall conduct the affairs of the Company in compliance with Mortgage requirements and in a manner consistent with the fiduciary obligations of the Managing Members under law. The Managing Members shall devote to the Company such time as may be necessary for the proper performance of their duties. The Managing Members shall cause the project architect and any inspecting architect to use only those Plans and Specifications approved in writing by the Special Limited Member, and shall also make their best efforts to cause all reports and certifications prepared by the inspecting architect to be addressed directly to the Limited Members.

B. The Managing Members shall (a) cause the Property to be insured against fire and other risks covered by such insurance in the maximum amount required by any Lender, the Credit Agency, the Special Limited Member and by good management practices, and in any event in an amount equal to the full replacement value of the Property (other than the land), (b) obtain and keep in force adequate business or rental interruption and worker's compensation insurance satisfactory to each Lender, the Credit Agency and the Special Limited Member, (c) obtain and keep in force public liability insurance for the benefit of the Company and its Members in amounts from time to time acceptable to the Credit Agency, the Lenders and the Special Limited Member and in any event providing coverage at least equivalent to a combined single limit bodily injury and property damage liability insurance policy in the amount of not less than $5,000,000 (of which up to $4,000,000 may be provided under an "umbrella" policy). All of the foregoing insurance policies shall be written by insurance companies rated A or better by Best's, include the Investor and Special Limited Members as named insureds, and include a provision requiring the insurance company to notify the Special Limited Member in writing 30 days prior to the cancellation of any such policy. The Managing Members shall promptly provide the Special Limited Member with copies of such insurance policies upon request from time to time. In the event of any casualty and provided that the insurance proceeds shall be made available therefor and such restoration is permitted by the Lenders and receives the Consent of the Special Limited Member, the Managing Members shall repair any damage to the Property which was caused by such event, so as to restore the Property (as nearly as possible) to the condition and market value thereof immediately prior to such occurrence.

C. The Managing Members shall obtain an owner's policy insuring title to the Property in favor of the Company in an amount sufficient to cover the sum of the outstanding amount of the Permanent Mortgage Loan, the outstanding Capital of all Members and the anticipated Deferred Development Cost Payment (which sum is hereby agreed to be $647,765), which policy shall include so-called "non-imputation" and "Fairways" endorsements and be subject to no exceptions other than those referred to in Section 6.6(10).

D. The Managing Members shall take such actions as are necessary to make the Company eligible for the full amount of the available Low Income Housing Credit (including without limitation the renting of all Low Income Units in accordance with the requirements of Section 42 of the Code and all rules and regulations thereunder). The Managing Members shall operate the Property such that the right of each tenant to occupancy of a dwelling unit shall be pursuant to an agreement and for a charge which shall be separate from the agreements and charges for the right of such tenant to receive any services or any other benefits, and no tenant shall be required to receive or pay for any of such other benefits as a condition of occupancy. Upon not less than three (3) days prior written notice, the Managing Members shall cause the Company and the Management Agent to make available, to representatives of the Special Limited Member at the offices of the Management Agent during regular business hours (or, at the option of the Special Limited Member, to send copies of such documents to the Special Limited Member), all tenant files and leasing practices and procedures of the Property for review of compliance with the Section 42 of the Code and the rules and regulations thereunder, the Property Documents, rules and policies of the Credit Agency and applicable file maintenance procedures. The Managing Members will cause the Management Agent to cure all deficiencies in the tenant files or practices and procedures identified by the Special Limited Member.

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 24 of 89   Document 14-1

E.     The Managing Members shall elect to commence the Credit Period for each building including Low Income Units at the time such building is placed in service, except that the Managing Members shall be permitted to elect, for any building in which all Low Income Units are not occupied by Qualified Tenants by the end of the calendar year in which such building is placed in service, to defer commencement of the Credit Period for such building to January 1 of the next year so long as all Adjustment Amounts determined in accordance with Section 4.2 have been paid in full.

F.     The Managing Members shall (i) not store (except in compliance with applicable Hazardous Waste Laws) or dispose of any Hazardous Material at the Property, or at or on any other Facility or Vessel owned, occupied, or operated either by any Managing Member or any Affiliate thereof whose liability may result in a lien on the Property; (ii) not transport or arrange for the transport of any Hazardous Material (except in compliance with applicable Hazardous Waste Laws); (iii) provide the Special Limited Member with written notice (x) upon any Managing Member's obtaining knowledge of any potential or known release, or threat of release, of any Hazardous Material at or from the Property or any other Facility or Vessel owned, occupied, or operated by any Managing Member or any Affiliate thereof whose liability may result in a lien on the Property; (y) upon any Managing Member's receipt of any notice to such effect from any Federal, state, or other governmental authority; and (z) upon any Managing Member's obtaining knowledge of any incurrence of any expense or loss by any such governmental authority in connection with the assessment, containment, or removal of any Hazardous Material for which expense or loss any Managing Member may be liable or for which expense or loss a lien may be imposed on the Property; and (iv) indemnify and hold harmless the Company and the other Members against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by any of said indemnities (including reasonable attorneys' fees, fines, damages and similar payments) in connection with the violation by the Managing Members of any of the foregoing covenants or with the presence of any Hazardous Material at the Property.

G.     If requested to do so by the Special Limited Member at any time after the expiration of the fourteenth year of the Compliance Period or any later date to which the Company may have agreed with the Credit Agency to defer its opportunity to make such submission, the Managing Members shall submit a written request to the Credit Agency to find a Person to acquire the Company's interest in the Property and/or take such other action permitted or required by the Code as the Special Limited Member may reasonably request to effect a sale of the Property or to terminate the extended use commitment of Section 42(h)(6)(B) of the Code.

H.     If requested to do so by the Special Limited Member at any time after the expiration of the Compliance Period (the "Offering Period") , the Managing Members shall offer the Property for sale. If such a sale shall not be approved by the Members and consummated within one year after the Special Limited Member so requests (including any circumstances where an offer is received by the Company that is satisfactory to the Special Limited Member but unsatisfactory to the Managing Members), then, the Special Limited Member may either (i) extend the Offering Period for an additional year, or (ii) permit the Managing Members to continue operating the Property in accordance with this Agreement. If the Special Limited Member elects not to extend the Offering Period, then Cash Flow (after payment of the Base Management Fee, Asset Management Fee, and repayment of any loans made by the Limited Members) will be shared equally between the Managing Members and the Investor Limited Member (with Section 5.2A(7) being amended so that the reference to "80%" is substituted with a reference to "50%"); provided, however any modifications to the provisions with respect to the distribution of Cash Flow shall be subject to the approval by the accountants of the Limited Members.

I.     The Managing Members shall operate the Company and the Property strictly in accordance with the Tax Credit Application, and all rules and regulations promulgated by the Credit Agency, including without limitation, the Wisconsin qualified allocation plan.

21

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 25 of 89   Document 14-1

J. By written notice delivered to the Special Limited Member by certified or registered mail or by overnight courier (with proof or receipt) at lease three (3) weeks in advance, the Managing Members will invite the Limited Members, and their investors and representatives, to attend any groundbreaking, ribbon-cutting or other public relations ceremony or event for the Property or Company, and shall duly recognize the Limited Partners, and their investors and representatives, at such ceremony or event.

K. The Managing Members shall be responsible for organizing the Company, causing the Company to acquire the Property, processing necessary documents with the Credit Agency in connection with the Tax Credits, arranging the permanent mortgage financing for the Property and arranging for the admission to the Company of the Limited Members. In consideration for their services set forth in this Section 6.5.K, the Managing Members have received their interest in the profits of the Company as set forth in Section 5.1.

L. Each Managing Member shall, during and after the period in which it is a Member, provide the Company with such information and sign such documents as are necessary for the Company to make timely, accurate and complete submissions of federal and state income tax returns as a partnership for federal and state income tax purposes, including the transmission of Form K-1's to each Member.

M. As among the Members, each Managing Member shall observe and perform the same standards of duty and care, accept and perform the same financial obligations, and act in all respects on behalf of and with respect to the Company, as if it were the general partner of a limited partnership and the Limited Members were limited partners of such limited partnership.

N. The Managing Members shall cause the Company to engage Capital Associates to review and approve each initial tenant file prior to accepting a new tenant, and to review all tenant files and annual recertifications prepared by the Management Agent during the period beginning on Full Completion and ending on the 24-month anniversary of Initial Qualified Occupancy Date, or such longer period if required by the Special Limited Member in its reasonable discretion. Notwithstanding the previous sentence of this Section 6.5.N, the Company shall not be required to utilize Capital Associates for annual tenant recertifications if the Management Agent hires, during such 24-month period a qualified person to review annual recertifications and the Managing Members obtain the Consent of the Special Limited Member, which Consent shall not be unreasonably withheld.

O. Each obligation of the Managing Members hereunder shall be the joint and several obligation of each Managing Member. In the event of a default by the Managing Members in the performance of any of their obligations under this Agreement, then the amount in default shall be offset against all payments from the Company to the Managing Members, including repayments of loans, returns of Capital Contributions and payments of fees. Nothing in Sections 6.7 or 6.8 shall have the effect of relieving the Managing Members of any liability for any of their obligations set forth in this Agreement.

Section 6.6 Representations and Warranties

The Managing Members hereby represent and warrant to each Limited Member that as a condition to the payment of each Installment as provided in Section 4.1.B, the following are true and will be true in all material respects on the due date for payment to the Company of each of such Installments, and that they will use their best efforts to maintain the truth of such representations and warranties which are then applicable to the Company at all other times (except as otherwise provided):

(1) The Company is a duly organized limited liability company validly existing under the

22

laws of the State and has complied with all filing requirements necessary for the protection of the Limited Members and to maintain the limited liability of the Limited Members in the manner provided in Section 3.5.

(2)     Each of the Managing Members is a duly organized entity validly existing under the laws of the State.

(3)     Construction of the Property will be or has been completed in substantial conformity with the Property Documents.

(4)     All Development Costs will be paid or provided for by, or for the account of, the Company utilizing only those sources of funds referred to in Section 6.9.

(5)     No event, occurrence or proceeding is pending or threatened which would (a) materially adversely affect the Company or its properties, (b) materially adversely affect the ability of the Managing Members, the Guarantors or any Affiliate to perform their respective obligations hereunder or under any other agreement with respect to the Company or the Property, or (c) prevent the completion of construction of the Property in substantial conformity with the Property Documents. This subparagraph shall be deemed to include, but not be limited to, the following: (x) legal actions or proceedings before any court, commission, administrative body or other governmental authority having jurisdiction over the zoning applicable to the Property, (y) labor disputes and (z) acts of any governmental authority.

(6)     No material default (or event which, with the giving of notice or the passage of time or both, would constitute a material default) has occurred and is continuing on the part of the Managing Members under this Agreement or on the part of the Managing Members or the Company under any of the Property Documents or any other agreement affecting the Property, the same are in full force and effect, and no material default by the Company, the Managing Members or an Affiliate under any of the Property Documents has been asserted by any party thereto.

(7)     The Property is being operated in compliance with the requirements of this Agreement and the Property Documents in all material respects, including without limitation the requirements of Section 6.5 hereof.

(8)     Except to the extent permitted under Section 6.13.B, if any, no Member or Related Person of a Member of the Company has any personal liability or otherwise bears the Economic Risk of Loss with respect to the payment of principal or interest with respect to the debt evidenced by any of the Mortgages.

(9)     There is no material violation by the Company or the Managing Members of any zoning, environmental or similar regulation applicable to the Property; all necessary building and other applicable permits have been obtained or will be obtained to permit the construction of the Property; all permits necessary to operate the Property for its intended use have been or will be obtained; and the Company has complied with or will comply with all applicable municipal and other laws, ordinances and regulations relating to such construction and use of the Property.

(10)     The Company owns the fee simple interest in the Property, subject to no material liens, charges or encumbrances other than the Permitted Loans and those which (a) are both permitted by the Property Documents and noted or excepted on Schedule B of the owner's title insurance commitment no. 1101638 effective July 31, 2000, issued by Chicago Title Insurance Company and (b) do not materially interfere with the use of the Property or any part thereof for its intended purpose or have a material adverse effect on the value of the Property.

(11)     All appropriate and material roadways and public utilities, including, without

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 27 of 89   Document 14-1

limitation, sanitary and storm sewers, water, telephone and electricity, are available to the Property, and easements required in connection therewith have been or will be timely obtained and filed of public record.

(12) The execution and delivery of all instruments and the performance of all acts heretofore or hereafter made or taken or to be made or taken pertaining to the Company or the Property by each Managing Member and each Affiliate of a Managing Member which is a partnership, a limited liability company or a corporation have been or will be duly authorized by all necessary action by such Entity and the consummation of any such transactions with or on behalf of the Company will not constitute a breach or violation of, or a default under, the partnership agreement, operating agreement, charter, by-laws or comparable organizational documents of said Entity or any agreement by which such Entity or any of its properties is bound, nor constitute a violation of any applicable law, administrative regulation or court decree.

(13) The financial assumptions upon which the financial forecast attached hereto as Exhibit 2 are based, are reasonable and based upon information currently available.

(14) The Company is not liable (nor has any claim been made against it) for any expense, debt, cost, liability or other charge other than costs incurred in connection with the acquisition, development and construction of the Property, operating expenses arising in the normal course of business and those relating to the Permitted Loans.

(15) Prior to Permanent Mortgage Commencement, the commitment for the Permanent Mortgage Loan is in full force and effect and no circumstance has occurred or is likely to occur which would permit the Permanent Mortgage Lender not to fund the Permanent Mortgage Loan.

(16) No Event of Bankruptcy has occurred with respect to any Managing Member, any Guarantor or any Affiliate of a Managing Member.

(17) The Managing Members and the Guarantors shall be in compliance with the requirements of Section 8.1.B.

(18) None of those Persons named in Section 3.1 hereof as Managing Members have Retired other than as permitted in Section 8.1, no grounds for removal of a Managing Member pursuant to Section 8.6 exist, and no grounds for termination of the Management Agent pursuant to Section 6.12 exist.

(19) No Lender approval is required (or, if required, such approval has been obtained) with respect to the execution or delivery of this Agreement or the admission to the Company of the Limited Members.

(20) No Person or Entity holds any equity interest in the Property other than the Company.

(21) The Company has the sole responsibility to pay all maintenance and operating costs, including all taxes levied and all insurance costs, attributable to the Property.

(22) The Company, except to the extent it is protected by insurance and excluding any risk borne by Lenders, bears the sole risk of loss if the Property is destroyed or condemned or there is a diminution in the value of the Property.

(23) No Person or Entity except the Company has the right to any proceeds, after payment of all indebtedness, from the sale, refinancing or leasing of the Property.

24

(24)    The Property does not receive assistance under the HUD Section 8 Moderate Rehabilitation Program.

(25)    The Company shall have either elected to fix the "applicable percentage" pursuant to Section 42(b)(2)(A)(ii)(I) of the Code or shall have established the "applicable percentage" as to each building comprising the Property as of the date such building is placed in service as provided in Section 42(b)(A)(i) of the Code.

(26)    The Company's basis in the Property as of December 31, 1999 (or any earlier date required by the Credit Agency) was more than 10% of the Company's reasonably expected aggregate basis in the Property as of December 31, 2001, and each building of the Property will be placed in service not later than December 31, 2001.

(27)    1999 low-income housing tax credit allocation in the amount of at least $528,411 per annum for the Property has been obtained by the Company from the tax credit agency of the State of Wisconsin and is in full force and effect.

(28)    The factual information contained in the Property Summary set forth as Exhibit 1 hereto is accurate and complete in all material respects.

(29)    The Company shall achieve Full Completion by October 1, 2000 (or such later date fixed by the Managing Members with the Consent of the Special Limited Member, which Consent shall not be unreasonably withheld.)

(30)    The Company is operating itself and the Property strictly in accordance with the Tax Credit Application, and all rules and regulations promulgated by the Credit Agency, including without limitation, the Wisconsin qualified allocation plan.

Section 6.7  Liability

The Managing Members shall indemnify and hold harmless the Company and the other Members against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by any of said indemnities (including reasonable attorneys' fees, fines, damages and similar payments) in connection with the Company, provided, however, that no Managing Member or Affiliate shall be liable, responsible or accountable for damages or otherwise to the Company or any Member for any act performed under this Agreement or for any failure to act, on its own part or that of any of its Affiliates, if such course of conduct did not constitute willful misconduct, gross negligence, material misrepresentation or material breach of covenant, warranty or fiduciary duty to the Limited Members and such Managing Member or Affiliate reasonably believed in good faith that such course of conduct was in the best interest of the Company and the Members.

Section 6.8  Indemnification

A Managing Member and its Affiliates shall be indemnified and held harmless by the Company against any losses, judgments, liabilities, expenses and amounts paid in settlement of any claims sustained by them (including reasonable attorneys fees, fines, damages and similar payments) in connection with the Company, provided that the same were not the result of a course of conduct constituting willful misconduct, gross negligence, material misrepresentation or material breach of covenant, warranty or fiduciary duty.

Notwithstanding the above, a Managing Member, its Affiliates and any person acting as a broker-dealer in connection with the offering and sale of interests in the Company shall not be indemnified by the Company for any losses, liabilities or expenses arising from or out of an alleged violation of Federal or state securities laws unless (1) there has been a successful adjudication on the

merits of each count involving alleged securities law violations as to the particular indemnitee; or (2) such claims have been dismissed with prejudice on the merits by a court of competent jurisdiction as to the particular indemnitee; or (3) a court of competent jurisdiction approves a settlement of the claims against a particular indemnitee.

In any claim for indemnification for Federal or state securities law violations, the party seeking indemnification shall place before the court the position of the Securities and Exchange Commission with respect to the issue of indemnification for securities law violations.

The Company shall not incur the cost of the portion of any insurance, other than public liability insurance, which insures any party against any liability the indemnification of which is herein prohibited.

Any indemnity under this Section 6.8 shall be provided out of and to the extent of Company assets only, and no Limited Member shall have any personal liability on account thereof.

Section 6.9 <u>Development Completion Obligation</u>

A.      The Managing Members guarantee to the Company and the other Members to cause the Property to be acquired and to complete development of the Property and achieve Full Completion for a fixed turnkey price of $6,024,067 (the "Guaranteed Development Cost"), which obligation (the "Development Completion Obligation") shall include without limitation (i) by December 1, 2001 (or any later date permitted by the Credit Agency but in no event later than December 31, 2001), acquisition of fee simple title to the Property subject only to those liens, restrictions and encumbrances referred to in Section 6.6(10), (ii) by December 1, 2001 (or any later date permitted by the Credit Agency but in no event later than December 31, 2001), completion of construction of the Property substantially in accordance with the Property Documents and, if there are any defects in the construction of the Property or variances in construction from the Plans and Specifications which in each case are or should have been discovered within two years after Full Completion, the Managing Members shall promptly remedy such defects after Full Completion, (iii) achievement of Stabilized Operations and payment of all Operating Expenses and Debt Service in excess of Operating Revenues through the Development Expiration Date, (iv) payment of all costs and funding of all reserves and escrows necessary to close the Permitted Loans and to fund the Operating Reserve, (v) repayment in full of the Construction Mortgage Loan and (vi) payment in full of the Development Services Fee other than the portion permitted to be deferred pursuant to this Section 6.9 (collectively "Development Costs").

B.      All funds (collectively "Development Funds") constituting the proceeds of Permitted Loans and the Capital Contributions paid by or on behalf of the Investor Limited Member plus Operating Revenues prior to the Development Expiration Date shall be applied to pay when due all payments and expenses required to carry out the Development Completion Obligation. If Development Costs due at any time exceed available Development Funds plus Operating Revenues prior to the Development Expiration Date, then such excess Development Costs shall be paid from funds which the Managing Members shall be required to furnish promptly to meet such Development Costs, and such funds shall be returned to the Managing Members from any Development Funds which thereafter become available. If Development Funds are not sufficient to return all funds to the Managing Members, then the shortfall shall be treated as follows:

1.      Any shortfall attributable to cash deficiencies resulting from payments made pursuant to Section 6.9.A(iii) above (payments of Operating Expenses and Debt Service in

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 30 of 89   Document 14-1

excess of Operating Revenue through the Development Expiration Date) shall be repaid as a Managing Member Loan, which Managing Member Loan shall bear interest at the Long Term Applicable Federal Rate in effect on the date of such advance;

2. In the event that any portion of the shortfall results from additional construction costs in excess of the Guaranteed Development Cost (the "Construction Cost Overruns"), any shortfall attributable to the Construction Cost Overruns shall be repaid as a Managing Member Loan payable without interest; provided, however, that any Managing Member Loan payable pursuant to this Section 6.9.B.(2) shall not exceed $301,203 (5% of the Guaranteed Development Cost); and

3. Any shortfall not included in Section 6.9.B(1) or (2) above shall be repaid as follows (a) the shortfall shall be repaid as a Deferred Development Cost Payment up to a maximum of the lesser of (i) $301,203 (an additional 5% of the Guaranteed Development Cost), or (ii) any maximum Deferred Development Cost Payment permitted by the Credit Agency; and (b) any remaining shortfall shall constitute a Capital Contribution to the Company by the Managing Members.

C. The Deferred Development Cost Payment shall be a deferred payment obligation of the Company which shall not be secured and bear interest at the Long term "Applicable Federal Rate" in effect on the date that the Deferred Development Cost Payment has been determined, shall be repaid only from the sources and in the manner set forth in Sections 3.1 and 5.2 and shall be paid in full no later than the 15th anniversary of Full Completion.

Section 6.10  Operating Expense Obligation

If the Company incurs an Operating Deficit (determined after deferral of payment of the Management Fee required pursuant to Section 6.12.C) attributable to any time following the Development Expiration Date and which cannot be met from funds available in the Operating Reserve, then such Operating Deficit shall be paid from advances ("Operating Deficit Loans") which the Managing Members shall be required to make to the Company, provided that (i) Operating Deficit Loans shall be made only to pay Operating Deficits attributable to the period (1) commencing on the Development Expiration Date and (2) ending on the sixty (60) month anniversary of the Development Expiration Date (provided, however, that such obligation shall not terminate at any time during which the Company or the Managing Members are in material default under this Agreement), and (ii) the Managing Members shall not be obligated to make an Operating Deficit Loan to the extent that such Operating Deficit Loan would cause the aggregate principal amount of Operating Deficit Loans then outstanding to exceed twelve (12) months of Operating Expenses as reflected on the Financial Forecast attached as Exhibit 2. Operating Deficit Loans shall bear interest at the Long Term Applicable Federal Rate in effect on the date of such advance, and shall be repayable only to the extent provided in Article V.

Section 6.11  Development Services

The Company has engaged the Developer to perform, or to engage and supervise others to perform services in connection with the negotiating, coordinating and supervising the planning, architectural, engineering and construction activities necessary to complete construction of the Property in accordance with the Plans and Specifications. The Company shall pay the Development Services Fee of $790,000 to the Developer in return for such services, which Development Services Fee shall be capitalized to the depreciable basis of the Property. Pursuant to the Development Services Agreement, a $158,000 portion of the Development Services Fee was earned on or before December 1, 1999 for services performed prior to December 1, 1999, and the remaining portion shall be earned as development of the Property progresses and shall be fully earned no later than Full Completion, and shall be paid after payment of all other Development Costs.

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 31 of 89   Document 14-1

The Development Services Fee shall be payable as follows: $142,235 at the time of payment of the Third Installment (subject to the availability of funds after payment of all Development Completion Obligations), with the $647,765 (or such greater amount permitted to be deferred pursuant to Section 6.9.B) balance payable as the Deferred Development Cost Payment in accordance with Section 6.9.C.

Section 6.12 <u>Property Management</u>

A.     The Managing Members shall have overall responsibility for managing the Property and obtaining a Management Agent. Wimmer Brothers Realty, Inc., a Wisconsin corporation, shall serve as the initial Management Agent. The Management Agreement shall be terminable at any time after Full Completion on no more than 30 days notice by the Company for cause (which shall include without limitation (a) the failure at any one time of five or more of the Low Income Units in the Property to meet the requirements for a Low-Income Unit and the failure of the Managing Members to make payments under Sections 4.2, 6.9 or 6.10 (the number of units being automatically reduced from five to three upon expiration of the Operating Expense Obligation set forth in Section 6.10 or upon any default by the Managing Members under Sections 4.2 or 6.10 of this Agreement), (b) the existence at the Property of a material building code violation which is not timely cured within the earlier of 15 days or such other date required by the local jurisdiction issuing the building code violation on the Property, (c) the failure by the Management Agent to comply with any applicable compliance rule and/or reporting requirement under Section 42 of the Code which is not timely cured within 45 days, and the failure of the Managing Members to make payments under Sections 4.2, 6.9 or 6.10, (d) the willful misconduct or gross negligence of the Management Agent which has a material adverse effect on the Company, the Property or the Limited Members, (e) the occurrence of an Operating Deficit for any period of six consecutive months commencing six months after Full Completion and the failure of the Managing Members to make payments under Sections 4.2, 6.9 or 6.10, (f) the Retirement of a Managing Member or the occurrence of an Event of Default as to a Managing Member as provided in Article VIII, (g) the transfer of the controlling interest in the Management Agent, or (h) the expiration of any applicable cure period with respect to the failure to collect, organize, and disseminate information necessary to produce timely reports as required under Article VII). Upon the occurrence of an event which would constitute cause for termination, the Managing Members shall forthwith give notice of such event to the Limited Members and thereafter the Managing Members shall forthwith cause the Company to terminate the Management Agreement with the Management Agent, unless the Consent of the Special Limited Member is obtained to the retention of the Management Agent as the manager of the Property. If the Management Agreement is terminated as aforesaid or for any other reason, the Managing Members shall immediately proceed to select a new Management Agent for the Property which selection shall be subject to the Consent of the Special Limited Member.

B.     The Company shall not enter into any Management Agreement which does not provide for deferral of the Management Fee under the circumstances set forth in Section 6.12.C and termination by the Company (a) under the circumstances set forth in Section 6.12.A, (b) in the event of other malfeasance or nonperformance on the part of the Management Agent, or (c) upon the Retirement from the Company in violation of Section 8.1 of any Managing Member as to whom the Management Agent is an Affiliate. The Managing Members shall have the duty to manage the Property during any period when there is no Management Agent, and shall be entitled to the Management Fee with respect to any period during which they so manage, and must comply with the provisions of this Agreement which would be applicable to the Management Agent.

C.     The Management Agent shall receive from the Company the Management Fee provided for in the Management Agreement from time to time in accordance with a reasonable and competitive fee arrangement, provided that the Management Fee payable to any Management Agent shall not exceed 6% of Operating Revenues, payable as follows: (i) a portion of the Management Fee

28

equal to 5% of Operating Revenues shall be payable as an Operating Expense, and (ii) the remaining portion of the Management Fee equal to 1% of Operating Revenues (the "Subordinated Management Fee") shall be payable from available Cash Flow and/or Capital Transaction proceeds as provided in Section 5.2. Furthermore, any Management Agent which is an Affiliate of a Managing Member shall be obligated to defer payment of its Management Fee (after application of any funds available in the Operating Reserve to pay such fee) to the extent necessary for any year so that the Company will not incur an Operating Deficit for such year, and the deferred amount shall then be payable in any future year in which such payment, together with payment of all other Operating Expenses and Debt Service for such future year, will not result in an Operating Deficit for such future year.

     D.     The Company shall pay to the Managing Members for their services in supervising and monitoring the performance of the Management Agent pursuant to the Management Agreement an annual Incentive Management Fee (which Fee shall be treated as a Company expense). The Incentive Management Fee for each fiscal year shall be the amount available for payment thereof from Cash Flow pursuant to Section 5.2.A(7) up to a maximum which will not cause the total sum of the Management Fee and the Incentive Management Fee for such year to exceed 10% of Operating Revenue for such year.

     E.     [Intentionally omitted]

Section 6.13 <u>Borrowings</u>

     A.     All Company borrowings shall be subject to the terms of this Agreement, including the restrictions set forth in Section 6.1. To the extent borrowings are permitted, such borrowings may be made from any source, including Members and Affiliates, except as otherwise provided in this Agreement. No funds provided to the Company by any Member shall be deemed to be a loan by such Member if such Member then owes funds to the Company under this Agreement. If any Member or Affiliate shall lend any monies to the Company, the amount of any such loan shall not be an increase of his Capital Contribution nor affect in any way his share of the profits, losses or distributions of the Company, and, if such loan is an Operating Deficit Loan, shall be unsecured. Any loans which are made, other than Operating Deficit Loans or Managing Member Loans made to satisfy obligations under Section 6.9.B(2), shall bear interest and be on such other terms no less favorable to the Company than comparable loans from non-Affiliates. Any Member making any loan to the Company shall be considered as a general creditor of the Company and not as a Member. Any loan made hereunder by a Limited Member or Managing Member shall be repayable as provided in Sections 5.2.A and 5.2.B. A Loan made by a Limited Member shall constitute a "Limited Member Loan"; a Loan made by a Managing Member or an Affiliate of a Managing Member shall constitute a "Managing Member Loan".

     B.     Subject to the provisions of this Agreement, the Company may borrow pursuant to the Permitted Loans such amounts as may be required for the acquisition, development, and construction of the Property and to meet the expenses of operating the Property. Any other borrowings (excluding (a) normal trade payables outstanding in the ordinary course of business and (b) borrowings to meet Company expenditures to remedy emergency circumstances) which are not contemplated by this Agreement and which are in excess of $25,000 must receive the Consent of the Special Limited Member. Except with respect to the Construction Mortgage Loan, all Mortgage Loans shall provide that no Member or Related Person of a Member of the Company shall bear the Economic Risk of Loss with respect to all or any part of principal or interest due with respect to the debt evidenced by such Mortgage.

     C.     Each Managing Member shall be bound by the terms of the Property Documents and any other documents required in connection therewith, but in no event shall any Member or Related Person be personally liable for the debt evidenced by any Mortgage except to the extent permitted under Section 6.13.B, if any. Any incoming Managing Member shall as a condition of receiving any

interest in the Company property agree to be bound by the Property Documents and any other documents required by the Lenders in connection therewith to the same extent and on the same terms as the other Managing Member(s).

D.     The Managing Members may amend, modify or refinance a Mortgage (including any required transfer or conveyance of Company assets for security or mortgage purposes), and sell, lease, exchange or otherwise transfer or convey all or any substantial portion of the assets of the Company, provided, however, that the terms of any refinancing, amendment or modification of a Mortgage or any such sale, exchange or other transfer or conveyance must receive the Consent of the Special Limited Member before such transaction shall be binding on the Company.

Section 6.14 Reserves

A.     The Managing Members shall cause the Company to establish the Operating Reserve which shall be funded in the amount of $26,500 (the "Target Amount") as a Development Cost from the proceeds of the Third Installment. Operating Reserve funds shall be maintained in a Company account under the control of the Managing Members, and prudently invested at the direction of the Managing Members. All earnings shall remain in the Operating Reserve and be available for the purpose thereof. Withdrawals from the Operating Reserve shall be made to fund Operating Deficits arising from and after the date on which the Operating Deficit Loan obligation set forth in Section 6.10 commences, and shall not require the Consent of the Special Limited Member. The Managing Members shall be required to notify the Limited Members prior to making any withdrawal from the Operating Reserve if such withdrawal will result in the balance of the Operating Reserve being reduced to an amount less than $15,000. If the balance in the Operating Reserve is less than the Target Amount at the close of any fiscal year, then the Operating Reserve shall be replenished from Cash Flow to the extent available for such purpose as provided in Section 5.2.A until such balance equals the Target Amount. Upon the sale of the Property any balance in the Operating Reserve shall be disbursed as Capital Transaction Proceeds.

B.     From and after Full Completion the Managing Members shall cause the Company to establish the Replacement Reserve which shall be funded with monthly deposits from Operating Revenue at the annualized rate of $175 per apartment unit per year (such funding requirement shall be inclusive of any reserve funding requirement set forth in the Permanent Mortgage Loan for the same purpose as the Replacement Reserve). Replacement Reserve funds shall be maintained in a Company account and shall be prudently invested at the direction of the Managing Members. All earnings shall remain in the Replacement Reserve and be available for the purpose thereof. Withdrawals from the Replacement Reserve shall not require the Consent of the Special Limited Partner so long as such withdrawals are applied to fund capital repairs and replacements for the Property which have been included in the annual capital and operating budgets approved by the Limited Members. The Consent of the Special Limited Member shall be required for any withdrawals from the Replacement Reserve for expenditures which have not been included in the annual capital and operating budgets approved by the Special Limited Member. Notwithstanding the above, in the event that the Permanent Mortgage Lender shall require deposits into the Replacement Reserve in amounts greater than those set forth in this Section 6.14.B and/or other changes in the terms and conditions applicable to the funding, maintenance and/or employment of the Replacement Reserve, such requirements of the Permanent Mortgage Lender shall control.

Section 6.15 Sales Preparation Fee

Upon any sale of the Property or any portion thereof, the Company shall pay a sales preparation fee to the Managing Members or an Affiliate thereof (the "Sales Preparation Fee"), in consideration of their services in arranging for and negotiating such sale, in an amount equal to six percent (6%) of the gross sale price of the Property, as provided in Section 5.2.B; provided, however, that the total compensation paid by or on behalf of the Company to all Persons with respect to

brokerage services or related fees in connection with the sale of the Property, or any portion thereof, shall not exceed six percent (6%) of the contract price for the sale of the Property (or such portion thereof) and, if and to the extent that any other payment(s) are made by or on behalf of the Company to any Person(s) with respect to any such sale of the Property (or any portion thereof), the Sales Preparation Fee shall, if necessary, be reduced to such amount as, when added to the aggregate amount of all other such payment(s), does not exceed six percent (6%) of the contract price for the sale of the Property (or such portion thereof). The Sales Preparation Fee shall be due and payable on a one-time basis only. In addition, if the Managing Member (or an Affiliate thereof) purchases the Property, the Sales Preparation Fee shall be allowed as a credit to the purchase price.

Section 6.16 Option to Acquire Property or Interest of Limited Members/Right of First Refusal

A.    Subject to any required Consent or approval of the Lenders and/or the Credit Agency, the Managing Members shall have the option to purchase either the Property or the Interest of the Limited Members at any time subsequent to the expiration of the Compliance Period, on the terms and conditions set forth in this Section 6.16. The Managing Members shall exercise the option by delivering to the Limited Members at any time during the period beginning ninety (90) days prior to the expiration of the Compliance Period and ending twelve (12) months after the expiration of the Compliance Period, written notice of such exercise; such notice of exercise shall specify whether the option is being exercised with respect to the Property or the Interest of the Limited Members, and that the option otherwise is exercised without condition or qualification. The purchase price for the Property or the Interest of the Limited Members under the option shall be the fair market value of the applicable asset at the time of the exercise of the option (in either case, the "Fair Market Value"). The Fair Market Value shall be determined by an appraisal of the applicable asset performed by an appraiser selected jointly by the Managing Members and the Special Limited Member. Any appraiser so selected shall be an MAI appraiser, with at least five (5) years of relevant experience. In conducting the appraisal, the appraiser shall take into account any requirements that the Property remain dedicated for the use of low-income households pursuant to any restrictions under any loan agreements and/or regulatory agreements, or otherwise, and shall take into account any tax benefits or other subsidy or financing benefits available with respect to the Property. The Managing Members shall pay all costs of the appraiser and the appraisal. The sale of the applicable asset shall occur within sixty (60) days of the receipt by the Limited Members and the Managing Members of the appraiser's appraisal report. The Managing Members shall pay the purchase price for the applicable asset in cash or other immediately available funds at the closing; provided, however, that if the asset being purchased is the Property, the Managing Members may assume any outstanding debts of the Company secured by mortgages or deeds of trust, on the Property, subject to the consent to such assumption by any applicable lender(s) in a manner reasonably satisfactory to the Special Limited Member, with the balance of the purchase price being payable in immediately available funds.

B.    In addition to the option set forth in Section 6.16.A above, the Managing Members shall also have a right of first refusal to purchase the Property at any time subsequent to the expiration of the Compliance Period. If, during the term of the right of first refusal, the Company receives a bona fide third party written offer (an "Offer") to purchase the Property at a purchase price greater than or equal to the fair market value of the Property, the Managing Members shall then have the option to thereupon exercise their right of first refusal within thirty (30) days of receipt of the Offer by the Company, upon the precise terms set forth in the Offer. If the Managing Members do not so exercise their right of first refusal within this thirty-day period, then the right of first refusal shall terminate and the Company may proceed to sell the Property to the maker of the Offer pursuant to the terms set forth in the Offer. The exercise of the right of first refusal pursuant to this section 6.16.B shall be subject to any required Lender and/or Agency approval.

31

ARTICLE VII -- Books and Records, Accounting and Reports

Section 7.1 Books and Records

The Managing Members shall keep or cause to be kept at the principal office of the Company complete and accurate books and records of the Company (including a list of the names and addresses of all Members) which shall be maintained in accordance with sound accounting practices, the Uniform Act and the requirements of the Lenders and the Credit Agency. The Company may maintain such other books and records and may provide such other financial or other statements as the Managing Members deem advisable. The Managing Members shall (and shall cause the Management Agent to): (i) afford to the Special Limited Member access to all of the books and records of the Company and the Property upon reasonable request during normal business hours; (ii) make available to the Special Limited Member upon reasonable request during normal business hours, the employees, agents and representatives of the Managing Members and the Management Agent for the purpose of responding to questions concerning the business and affairs of the Company and the Property and providing the Special Limited Member with reasonable physical access to the Property; and (iii) provide copies of documents and other information to the Special Limited Member.

Section 7.2 Bank Accounts

The bank accounts of the Company shall be maintained in such banking institutions as the Managing Members shall determine with the Consent of the Special Limited Member, and withdrawals shall be made only in the regular course of business on such signature or signatures, subject to the requirements of Section 8.6, as the Managing Members shall determine. All deposits and other funds not needed in the operation of the business shall be deposited in interest-bearing accounts or invested in short-term United States Government or municipal obligations maturing within one year.

Section 7.3 Fiscal Year and Accounting Method

The fiscal year of the Company shall be the calendar year. The books of the Company shall be kept on the accrual basis.

Section 7.4 Accountants

The Accountants for the Company shall be Suby, Von Haden & Associates, S.C., CPAs, of Madison, Wisconsin, or such other certified public accountants as shall be engaged by the Managing Members with the Consent of the Special Limited Member.

Section 7.5 Annual Financial Statements, Tax Returns

A.    The Managing Members shall cause the Accountants to prepare financial statements for each fiscal year of the Company, which shall include a balance sheet as of the end of each such year and statements of income, members' equity and cash flows for such year. Such financial statements shall include a note setting forth a schedule of all loans to the Company, the Section of this Agreement under which such debt was incurred and the purpose for which such loan was applied by the Company. Such schedule shall demonstrate that loans have been made, used, carried on the books of the Company (and repaid, if applicable) in accordance with the provisions of this Agreement. In addition to the financial statements, the Accountants shall simultaneously provide (i) a schedule computing the amount of Cash Flow distributable to the Members for such fiscal year and the amount of each fee payable by the Company the amount of which is based on the amount of Cash Flow; and (ii) for the fiscal year in which Full Completion occurs shall a depreciation schedule for that year and all future years, along with the depreciation worksheet. The books of the Company shall be examined in accordance with generally accepted auditing standards as of the end of each fiscal year of the

32

Company by the Accountants, who shall then express their opinion that the aforesaid balance sheet and statements have been prepared in accordance with generally accepted accounting principles applied consistently with prior periods except as to any matters to which the Accountants take exception and stating, to the extent practicable, the effect of each such exception on such financial statements. The Managing Members shall, promptly upon receipt of such balance sheet, statements and opinion and in any event by February 28 after the end of each fiscal year, transmit copies thereof to the Special Limited Member for its review (and review by any accounting firm designated by the Special Limited Member at its expense), and shall cause the Accountants to consider in good faith any modifications and corrections proposed by the Special Limited Member and make any revisions thereto which are reasonably appropriate.

B.     The Accountants shall prepare the Federal and state income tax returns of the Company. The Managing Members shall complete the books of the Company in such time as will allow the Accountants to complete (subject to the following review by the Special Limited Member) such tax returns by February 28 after the end of such fiscal year. The Managing Members shall cause the Accountants to (1) submit the completed tax returns on or before February 28 to the Special Limited Member for its review (and review by any accounting firm designated by the Special Limited Member at its expense), (2) consider in good faith any modifications and corrections proposed by the Special Limited Member within 10 days after receipt by the Special Limited Member of the tax returns and make any revisions thereto which are reasonably appropriate, (3) file such tax returns by April 15 (and in any event within the time periods required by law), and (4) immediately upon the filing thereof transmit to the Limited Members a copy of each of the Federal and state income tax returns, Federal Form K-1 and the appropriate state analogs to Form K-1.

C.     Together with the financial statements to be delivered pursuant to Section 7.5.A, the Managing Members shall send to the Special Limited Member comparable financial statements (including a balance sheet and statement of income) for each Managing Member and Guarantor relating to the same period which need not be audited.

Section 7.6  Other Reports, Financial Statements, Reports and Information Tax Returns

A.     Within 21 days following the end of each of the first three quarters of each fiscal year after the Completion Date, the Managing Members shall send to the Special Limited Member one or more reports which, taken together, provide the following information (which need not be audited): (i) a balance sheet as of the end of such quarter; (ii) a statement of income for such quarter; (iii) a statement of cash available for distribution and reserves for such quarter; (iv) a statement describing (a) any new agreement, contract or arrangement between the Company and a Managing Member or an Affiliate of a Managing Member, and (b) the amount of all fees and other compensation and distributions and reimbursed expenses paid by the Company for the quarter to any Managing Member or Affiliate of a Managing Member, (v) a summary report providing year-to-date operating income and expense detail, together with corresponding year-to-date budgeted projections, and (vi) a report of the significant activities of the Company during the fiscal quarter.

B.     The Managing Members shall cause the Management Agent to furnish to the Special Limited Member, in such form and detail as reasonably requested by the Special Limited Member and within 21 days after the end of each month of each fiscal year, (1) a monthly general ledger related to the Property's operating income and expense detail, (2) a rent roll for the Property specifically identifying all new tenants, all changes in tenant status and any units that are not rented in compliance with the Rent Restrictions as of the end of the preceding period, and (3) a summary operating statement for the preceding month. The Managing Members shall cause the Management Agent to (a) respond promptly to reasonable additional inquiry or review by the Special Limited Member with respect to any transactions which appear unusual or extraordinary in nature, and (b) notify the Managing Members and the Special Limited Member promptly upon the occurrence of any change in the individual(s) who (i) control the business of the Management Agent or (ii) have decision making

33

responsibility with respect to the operation of the Property.

C.     The Managing Members shall provide the Special Limited Member with (i) a copy of each draw request for construction or development costs as such requests are made to the Lender; (ii) a copy of each inspection report, evaluation or similar report issued to the Company by the Credit Agency or the Lender promptly upon receipt thereof; (iii) a copy of each Low Income Housing Credit compliance report delivered to or prepared by the Credit Agency with respect to the Property; (iv) prompt notice of any casualty or other significant adverse event relating to the Company and (v) such other information as the Special Limited Member may specifically and reasonably request from time to time with regard to the progress of construction, initial leaseup or any other matters concerning the business or operations of the Company.

D.     An annual operating budget for each full calendar year after Full Completion shall be prepared by the Managing Members and furnished to the Special Limited Member no later than 45 days prior to the beginning of such calendar year.  In addition, the Managing Members shall prepare at the expense of the Company and furnish to the Special Limited Member an estimate of the profits and losses of the Company for Federal income tax purposes for the current fiscal year not later than September 30 of each year.

E.     The Managing Members shall forward annually to the Special Limited Member renewal policies for the insurance required to be maintained pursuant to Section 6.5.B.

F.     Prior to commencement of lease-up of the Property, the Managing Members shall cause the Management Agent to submit to the Special Limited Member for review and comment all of the forms and written policies, practices and procedures to be used by the Management Agent in the leasing and management of the Property, and to make such modifications in such forms and written policies, practices and procedures as may be reasonable in order to assure effective compliance with the Property Documents, applicable laws and regulations and accepted property management practices with respect to apartment properties generating Low Income Housing Credits, and shall cause the Management Agent to submit all proposed additions or modifications of such forms and written policies, practices and procedures to the Special Limited Member for such review, comment and revision.

G.     The Managing Members will cause the Management Agent to: (i) notify the Special Limited Member of each audit of, review of, or site visit to the Property by or on behalf of the Credit Agency, and provide the Special Limited Member with copies of any written report or correspondence from the Credit Agency with respect to any such audit, visit or review; and (ii) provide the Special Limited Member with copies of all reports, or correspondence submitted by or with respect to the Company to the Credit Agency.

H.     The Managing Members shall notify the Special Limited Member of any event that constitutes, or with lapse of time, notice or both will constitute, an event of default by the Company with respect to any component of the Permitted Loans.

I.     The Managing Members shall keep the Special Limited Member informed concerning the general state of the business and financial condition of the Company and shall, upon reasonable request of the Special Limited Member, furnish full information, accounts and documentation concerning the general state of the business and financial condition of the Company.

J.     Except as otherwise expressly provided for in this Agreement, the fees, costs and expenses related to preparation of the statements, returns, forms and reports and the performance of any other duties called for in this Article VII by the Company, the Managing Members and/or the

34

Accountants shall be an expense of the Company.

K.     If the Managing Members fail, within the time periods set forth in Sections 7.5.A, 7.5.B and 7.6.A, to file and/or distribute copies of the statements, returns, forms and reports provided for in said Sections (a "Reporting Default"), the Managing Members shall, upon the request of the Special Limited Member and assuming that no Limited Member has caused such delay, pay as damages the sum of $100 per day to the Investor Limited Member, commencing on the eleventh calendar day after the occurrence of the Reporting Default (or such later date determined by the Special Limited Member in its reasonable discretion) and continuing until the item in question has been filed and/or distributed. Such damages shall be paid forthwith by the Managing Members and failure to so pay shall constitute a default of the Managing Members under Section 8.6 hereof. In addition, if the Managing Members fail to so pay, the Managing Members and their Affiliates shall forthwith cease to be entitled to the amounts otherwise payable to them pursuant to Section 5.2.A. Such Section 5.2.A payments shall accrue but only be paid upon the payment of such damages in full and any amount of such damages not so paid shall be deducted against such Section 5.2.A payments otherwise due to the Managing Members or their Affiliates. In addition, if a Reporting Default shall occur, the Special Limited Member may select a firm of accountants who shall prepare the statements, returns, forms and reports required under Sections 7.5.A, 7.5.B and 7.6.A, and the fees and expenses of such accountants shall be paid by the Company. The Managing Members shall immediately furnish to such accountants all documentation and other information necessary to prepare such statements, returns, forms and reports.

Section 7.7   Site Visits

The Managing Members shall cooperate with and assist (and shall cause the Management Agent to so cooperate with and assist) the Special Limited Member in making periodic site visits to the Property and the principal office of the Company, during which the Managing Members and the Management Agent shall make available to the Special Limited Member: (i) the site and all buildings comprising the Property for physical inspection; (ii) all relevant construction documents including building inspection reports, evidence of utility availability, evidence of zoning compliance and as built Plans and Specifications; (iii) the maintenance and repair records for the Property; (iv) the Property's rent rolls, waiting list, advertising materials, standard lease and tenant qualification documentation and management practices and procedures; (v) the incident report files with respect to the Property; and (vi) the resident manager for the Property and the Management Agent's supervisor with respect to the Property for purposes of answering questions and providing additional information. Such site visits shall occur within three days following written notice by the Special Limited Member to the Managing Members. The Special Limited Member expects to make an initial site visit within 45 days after Full Completion and thereafter on an annual basis, but shall have the right to make more frequent site visits in its reasonable discretion.

Section 7.8   Tenant File Review

The Managing Members shall cooperate with and assist (and shall cause the Management Agent to so cooperate with and assist) the Special Limited Member in making periodic reviews of the Company's tenant files for the purpose of assessing compliance with respect to the Property's leasing practices under the Code and the requirements of the Credit Agency. During each review the Managing Members and the Management Agent shall make available to the Special Limited Member either at the office of the Management Agent during regular business hours or, if so requested by the Special Limited Partner, by sending photocopies to the Special Limited Partner, all tenant files and leasing practices and procedures of the Property. Such reviews (or sending of photocopies) shall occur within three days following written notice by the Special Limited Member to the Managing Members; the Special Limited Member expects to make reviews periodically during initial lease up of the Property and thereafter on an annual basis, but shall have the right to make more frequent reviews in its reasonable discretion. Neither the making of such reviews nor the existence of the right to make

35

such reviews shall relieve the Managing Members of their sole obligation (or constitute a defense against breach of such obligation) to maintain the Property in compliance with all rules and requirements under the Code and of the Credit Agency. The Managing Members shall cause the Management Agent to cure all deficiencies in tenant files or practices and procedures identified by the Special Limited Member as a result of such reviews.

Section 7.9  Tax Elections

A.      If requested to do so by the transferee of a Company interest, the Managing Members shall make the election under Section 754 of the Code, on behalf of the Company, at such time and in such manner as to obtain all the benefits provided for by such Section; provided that the transferee will pay all costs associated therewith and neither the Company nor the Managing Members shall be held responsible or liable for the failure to make such elections if the Managing Members are not given notice of the event giving rise to an adjustment for which such election is needed at or prior to the close of the fiscal year during which the event occurs.

B.      All other elections required or permitted to be made by the Company under the Code shall be made by the Managing Members in such manner as will, in the opinion of the Accountants, be most advantageous to the Investor Limited Member but shall not create additional obligations on the part of the Managing Members.

Section 7.10  Asset Manager, Asset Management Fee and Reimbursement

A.      The Special Limited Member shall have the right from time to time to appoint its Affiliate (and from time to time to substitute another Affiliate) to exercise on its behalf any or all of the rights and to perform any or all of its functions of either or both of the Limited Members under this Agreement (such appointee is herein referred to as the "Asset Manager"), and all rights, authority and Consents of any Limited Member hereunder, when exercised by the Asset Manager, shall have the same force and effect as if exercised by such Limited Member. Pursuant to the foregoing, the Special Limited Member hereby appoints Banc One Capital Funding Corporation to be the Asset Manager, and the Managing Members hereby recognize such appointment. The Limited Members (and the Asset Manager) shall have the right to engage lawyers, accountants, appraisers and consultants to assist in the performance of its functions under this Agreement, and the Managing Members and the Management Agent shall cooperate with and assist such lawyers, accountants, appraisers and consultants in the performance of their respective engagements.

B.      Beginning in 2000, the Company shall pay to the Asset Manager (or to such other party as the Special Limited Member may designate if no Asset Manager has been appointed) the Asset Management Fee for reviewing the reports provided in Article VII, monitoring the affairs of the Company and the Property, and consulting with the Special Limited Member with respect to Consents which may be requested from it. The annual Asset Management Fee shall be in the amount equal to one percent (1%) of Operating Revenues. The Asset Management Fee shall be due and payable quarterly, in arrears, within 15 days after the end of each calendar quarter; provided, however, that if any fiscal year commencing with 2000, Operating Revenue is insufficient to pay the full amount of the Asset Management Fee, and the Managing Members do not fulfill their obligation to fund any shortfall, the unpaid portion thereof, less any amount funded by the Managing Members pursuant to its obligation to do so as set forth in Sections 6.9 and 6.10, shall accrue and be payable on a cumulative basis prior to any distributions of Cash Flow or Capital Transaction Proceeds pursuant to Sections 5.2.A and 5.2.B, respectively.

C.      The Company shall reimburse the Asset Manager (or such other party as the Special Limited Member may designate if no Asset Manager has been appointed) for reasonable fees and expenses incurred by it, acting in good faith, in connection with the review, investigation and resolution of any event or circumstance which may constitute a material irregularity or material

36

breach of this Agreement in connection with the Company or the Property, including any grounds for removal of the Managing Members under the Company Agreement or the Management Agent under the Company Agreement or Management Agreement, any event that constitutes, or may with the lapse of time, notice or both, constitute an event of default (subject to any applicable cure periods acceptable to the Limited Members) with respect to any component of the Permitted Loans, any potential material breach or noncompliance with any requirements pertaining to the Low Income Housing Credit, any potential material mismanagement of the Property, any proposed refinancing of any component of the Permitted Loans, or any proposed sale or other disposition of the Property, both of which must be covered if necessary by Operating Deficit Loans (if required under Section 6.10), but otherwise will be payable as a Limited Member Loan in accordance with Section 5.2A(2) and Clause Fourth of Section 5.2B.; provided, however, that no reimbursement shall be paid for:

> (1)    the ordinary fees and expenses of accountants engaged by the Asset Manager with respect to the review of the audit of the annual financial statements provided for under Section 7.5.A;

> (2)    the ordinary fees and expenses of accountants engaged by the Asset Manager in connection with the review of tenant files as provided for in Section 7.8 or the review of forms, practices and procedures provided for in Section 7.6.I;

> (3)    the ordinary fees and expenses of the Asset Manager in connection with the site visits provided for in Section 7.7;

> (4)    any fees or expenses incurred by the Asset Manager in connection with the preparation and distribution of reports or other communications to the Investor Limited Member or the Members or members thereof; and

> (5)    any salary or other overhead expense incurred in connection with the ongoing performance of normal review functions under this Agreement.

ARTICLE VIII -- Retirement of a Managing Member

Section 8.1  Retirement

A.    No Managing Member shall Retire (other than by reason of death or adjudication of incompetence or insanity) from the Company or sell, assign, transfer or encumber his interest as a Managing Member without the Consent of the Special Limited Member. In the event of a Retirement of a Managing Member his status and the disposition of his interest in the Company shall be determined in accordance with Section 8.4. In no event shall any Managing Member assign, transfer or sell all or any part of his interest as a Managing Member to any Entity which is a tax-exempt entity as defined in Section 168(h)(2) of the Code.

B.    Upon the Retirement of any of the Managing Members named on Schedule A under circumstances which are in violation of the provisions of Section 8.1, then, requirements of this Section 8.1.B are not met, then at the election of the Special Limited Member exercised at any time thereafter, any or all of the other Managing Members shall also Retire from the Company as Managing Members, and such Retirement shall be deemed to be in violation of Section 8.1 and shall be subject to the consequences thereof as provided in Section 8.4.

Section 8.2  Obligation to Continue

Upon the Retirement of a Managing Member, any remaining Managing Member or Managing

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 41 of 89   Document 14-1

Members, if any, or, if none, the Retired Managing Member or his heirs, successors or assigns, shall immediately send notice of such Retirement (the "Retirement Notice") to each Limited Member, and the Company shall be (i) dissolved if there is no remaining Managing Member and the Company is not reconstituted pursuant to Section 8.3 hereof, or (ii) continued by the remaining Managing Member(s) as provided in the sentence next following. The Managing Members shall have the right, and hereby covenant and agree, unless there is no remaining Managing Member, to elect to continue the business of the Company.

Section 8.3  Retirement of a Sole Managing Member

If, following the Retirement of a Managing Member, there is no remaining Managing Member of the Company, or if there are remaining Managing Members but they shall fail to elect to continue the business of the Company, then the Special Limited Member may designate a Person (which Person may be the Special Limited Member) to become a successor Managing Member of the Company as reconstituted as hereinafter provided.

Section 8.4  Interest of Retired Managing Member

A.      Each Managing Member hereby agrees that at the time of his Retirement if such Retirement is in violation of the provisions of Section 8.1, (a) the Retired Managing Member and all Members who are Affiliates of the Retired Managing Member shall be immediately and automatically withdrawn from the Company and the interest in the Company of the Retired Managing Member and such Affiliates shall be automatically transferred and be deemed transferred to the Company for the benefit of the remaining Members, (b) the right of the Retired Managing Member and such Affiliates to receive all fees, loan repayments and any other amounts from the Company shall terminate and (c) the Retired Managing Member and such Affiliates shall remain liable for the performance of all of their obligations under this Agreement that arose prior to the date of such Retirement. For the purposes of Article V hereof, the effective date of the aforesaid transfers shall be deemed to be the date on which such Retirement occurs.

B.      In the event that a Managing Member shall Retire as a Managing Member under circumstances not in violation of Section 8.1, such Retired Managing Member shall be deemed to have automatically transferred to the remaining or successor Managing Members, in proportion to their respective Managing Member interests, all or such portion of the interest of such Retired Managing Member in each of the profits, losses and distributions of the Company (as set forth in Article V hereof) which, when aggregated with the existing Managing Member interests of all such remaining and successor Managing Members, will be sufficient to assure such remaining and successor Managing Members an aggregate 0.01% interest in all such profits, losses and distributions of Cash Flow and Capital Transactions proceeds of the Company under Article V hereof. No documentation shall be necessary to effectuate such transfer and the same shall be deemed effective upon the Retirement of such Retired Managing Member.) The Retiring Managing Member shall retain the right to be paid all fees, loan repayments and other amounts from the Company which have become due at or following the time of such Retirement, and shall not be liable for any obligations of the Company arising after the date of his Retirement. Those Persons succeeding to the portion of the interest of the Retired Managing Member not transferred to the remaining and successor Managing Members shall become Limited Members hereunder provided that such Persons shall not participate in any of the votes or Consents of the Limited Members set forth herein nor share in any of the profits, losses or distributions of the Company expressly accorded to the Limited Members under Article V, but shall have instead the same share of such Company profits, losses and distributions represented by such interest when held by the Retiring Managing Member after the transfer called for in the first sentence of this Section 8.4.B. Notwithstanding the foregoing, however, all Company interests and all fees, loan payments and other amounts payable which are reserved to the Retired Managing Member and his successors pursuant to this Section 8.4.B shall be subject to offset by any amounts and Company interests which the Company must pay or assign to a competent professional real estate

38

developer/manager to induce it to become a Managing Member in replacement of the Retired Managing Member and to carry out the purposes of the Partnership and assume the Managing Member obligations hereunder.

Section 8.5  Designation of New Managing Members

The Managing Members may, with the approval of the Lenders (if required), and of any other Person required under the Property Documents and with the Consent of each Limited Member, at any time designate additional Managing Members each with such interest as a Managing Member in the Company as the Managing Members may agree upon.

Any incoming Managing Member (other than a Managing Member admitted pursuant to Section 8.6) shall as a condition of receiving any interest in the Company agree to be bound by the Mortgages, all other Property Documents, and any other documents required in connection therewith and by the provisions of this Agreement, to the same extent and on the same terms as any other then Managing Member(s).

Section 8.6  Additional and Substitute Managing Members

A.  Upon the occurrence of any one or more of the Events of Default set forth in Section 8.6.B below, the Special Limited Member shall have the right to cause itself or its Affiliate to be admitted to the Company as an additional Managing Member as provided in Section 8.6.C, and/or to remove the Managing Members as provided in Section 8.6.D. Each of the Members hereby makes, constitutes, and appoints the Special Limited Member, with full power of substitution, the true and lawful attorney of, and in the name, place and stead of, such Member, with power from time to time to take all action and do all things necessary or appropriate to implement and carry out the provisions of this Section 8.6. Such appointment shall constitute a power coupled with an interest, shall be irrevocable, shall survive the death, incompetence or dissolution of any Member and shall be binding on any assignee of all or any portion of the interest of any Member.

B.  The following shall each be an "Event of Default":

(1)  A Managing Member or any Affiliate of such Managing Member (including if applicable the Management Agent) has in connection with the Company or the Property: (a) performed an act or failed to perform any act constituting fraud, willful misconduct, misappropriation or commingling of funds, dishonesty or misrepresentation or non-disclosure of material facts, or (b) performed and act or failed to perform any act constituting gross negligence, violation of law or breach of fiduciary duty and such act or failure to act may have a material adverse effect on the Company, the Property or the Limited Members.

(2)  A Managing Member has breached any written representation or warranty made to the Limited Members and such breach may have a material adverse effect on the Company, the Property or the Limited Members.

(3)  Failure of a Managing Member to observe or perform any material obligation or covenant to be observed or performed under this Agreement by such Managing Member (including without limitation the failure to provide on a timely basis any of the financial statements, tax returns, reports and other items set forth in Article VII).

(4)  The Company shall be in material default of any of its obligations under the Property Documents beyond the expiration of any explicable cure period, which default, in the reasonable judgment of the Special Limited Member, threatens an assignment or foreclosure of any Mortgage.

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 43 of 89   Document 14-1

(5)     The Managing Members fail to enforce the material terms and conditions of the Management Agreement or to supervise the performance by the Management Agent of its duties thereunder.

(6)     At any one time five percent or more of the dwelling units in the Property shall not be in compliance with Section 42 of the Code and the Managing Members have defaulted on their obligations to make payments under Sections 4.2, 6.9 or 6.10.

(7)     An Event of Bankruptcy shall occur with respect to a Managing Member or a Guarantor, a Guarantor shall be in default under its guaranty of the obligations of the Managing Members entered into of even date herewith, or a Managing Member or a Guarantor shall fail to comply with the requirements of Section 8.1.B.

Any dispute or controversy as to whether any of the Events of Default has occurred, or whether such event has been cured or is susceptible of being cured within any grace period specified, shall be initially determined solely by the Special Limited Member, whereupon the Special Limited Member may exercise its rights set forth in this Section 8.6. However, such determination shall be subject to review in a judicial proceeding brought by either (i) the Managing Members in a court of general jurisdiction sitting in Columbus, Ohio or (ii) the Limited Members in a court of general jurisdiction sitting in Milwaukee, Wisconsin. Any judicial findings which are contrary to the determination of the Special Limited Member shall not retroactively impair or otherwise affect the rights and authority of the Special Limited Member hereunder prior to the issuance of such findings. However, the Special Limited Member shall indemnify and hold harmless the Managing Members for all claims, damages, loss and expense arising from its actions as a Managing Member pursuant to this Section 8.6 if such review shall conclude that an Event of Default did not in fact occur. In the event of any judicial proceeding regarding the exercise of rights set forth in this Section 8.6, the unsuccessful party in such judicial proceeding agrees to indemnify the prevailing party for all costs, expenses and reasonable attorney fees incurred by the prevailing party in connection with such litigation (including, without limitation, all travel and related costs and expenses incurred by the prevailing party).

The Special Limited Member shall give notice in writing to the Managing Members of its determination that the Managing Members shall be removed pursuant to this Section 8.6. The Managing Members shall have fifteen (15) days after receipt of such notice (the "Cure Period") to cure any Event of Default or reason for such removal, in which event it shall remain as the Managing Member. If, at the end of the Cure Period (or such later date acceptable to the Special Limited Member in its reasonable discretion upon request by the Managing Members), the Managing Members have not cured any default or other reason for such removal, the Special Limited Member shall be permitted to exercise its rights pursuant to this Section 8.6, the powers and authorities conferred on them as the Managing Members under this Agreement shall cease and the Interest of such Managing Members shall be transferred in accordance with Section 4.4(b).

C.     If the Special Limited Member elects to admit itself or its Affiliate as an additional Managing Member upon the occurrence of an "Event of Default", such admission shall occur automatically and without further action by any Member upon the giving of notice thereof by the Special Limited Member to the Members, and each of the Members hereby agrees and consents in advance to the foregoing admission. Upon the occurrence of such admission, any delegation of authority agreed to between the Managing Members in accordance with Section 6.4.B hereof (whether expressly set forth in this Agreement or otherwise) shall be canceled and of no further force and effect, and instead all of the other Managing Members shall be deemed to have delegated, automatically and without the requirement of a writing or any other action other than as set forth above, all their powers and authority (including, without limitation, all right to deposit to, withdraw from and otherwise control all Company bank accounts) to the Special Limited Member in its capacity as an additional Managing Member as set forth in Section 6.4.B. Notwithstanding its admission to the

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 44 of 89   Document 14-1

Company, said additional Managing Member shall not undertake or assume, or be deemed to have undertaken or assumed, any obligations or liabilities imposed on the Managing Members pursuant to this Agreement or which arise in any other manner with respect to the Company or the Members. Each Member agrees that the Special Limited Member or any Person it causes to be admitted as a Managing Member pursuant to this Section 8.6 may withdraw as a Managing Member without the consent of any other Member.

D.      If the Special Limited Member shall elect to remove one or more of the Managing Members upon the occurrence of an "Event of Default", then such removal shall occur automatically and without further action by any Member upon the giving of notice thereof by the Special Limited Member to the Members. Upon such removal, (1) the removed Managing Member shall have the obligation to sell his Company interest to the Special Limited Member upon payment of the amount of the removed Managing Member's Capital Account less any and all damages suffered by the Company relating to the Event of Default and any amounts which must be paid by the Company to induce a competent professional real estate developer/manager to become a Managing Member and carry out the purposes of the Company and assume the Managing Member obligations hereunder; (2) his right and the right of any Affiliate of such Removed Managing Member, if any, to be paid all fees, repayments of loans and other payments by the Company shall terminate; (3) any delegation of authority agreed to between the removed Managing Member in accordance with Section 6.4.B hereof (whether expressly set forth in this Agreement or otherwise) shall be canceled and of no further force and effect; and (4) the removed Managing Member shall remain liable for all obligations to the Company arising before and after the effective date of his removal.

Section 8.7   Amendment of Articles of Organization

Upon the admission of an additional or replacement Managing Member, Schedule A shall be amended to reflect such admission and an amendment to the articles of organization of the Company, also reflecting such admission, shall be filed in accordance with the Uniform Act.

## ARTICLE IX – Limited Member Transfers

Section 9.1   Assignments

A.      An assignee of a Limited Member who does not become a Substitute Limited Member in accordance with Section 9.2 shall have the right to receive the same share of profits, losses, credits and distributions of the Company to which the assigning Limited Member would have been entitled if no such assignment had been made by such Limited Member.

B.      In the event any assignment of a Limited Member's interest as a Limited Member shall be made, there shall be filed with the Company (and the Company need not recognize such assignment until such filing) a duly executed and acknowledged counterpart of the instrument making such assignment. Such instrument must evidence the written acceptance of the assignee to all the terms and provisions hereof.

C.      Notwithstanding the foregoing, the obligations of any assigning Limited Member to pay Installments to the Company shall be extinguished only by and to the extent of the aggregate amount of Installments paid to the Company by such assigning Limited Member or on its behalf by its assignee.

Section 9.2   Substitute Limited Members

A.      Each Limited Member shall have the right to substitute an assignee as a Limited Member in its place so long as such assignee is an Affiliate of such Limited Member, an Affiliate of any

41

corporate successor of a Limited Member or an entity sponsored or controlled by an Affiliate of the manager of the Investment Limited Member. Each Limited Member shall also have the right to substitute an assignee as a Limited Member in its place in order to assist the Limited Members or their Affiliates with any corporate reorganization or restructuring. Any other substitution shall require the Consent of the Managing Members, which Consent shall not be unreasonably withheld. Any Substitute Limited Member shall, as a condition of receiving any interest in the Company assets, agree to be bound to the extent required under Section 3.6.B.

B.    Upon the admission of a Substitute Limited Member, Schedule A shall be amended to reflect the name and address of such Substitute Limited Member and to eliminate the name and address of the assigning Limited Member, and, if required under the Uniform Act, an amendment to the articles of organization of the Company reflecting such admission shall be filed in accordance with the Uniform Act. Each Substitute Limited Member shall execute such instrument or instruments as shall be required by the Managing Members to signify its agreement to be bound by all the provisions hereof, and shall pay reasonable legal and filing expenses in connection with its substitution as a Limited Member.

Section 9.3  Restrictions

A.  In no event shall all or any part of a Limited Member interest in the Company be assigned or transferred to a minor (other than to a member of a Limited Member's Immediate Family by reason of death) or to an incompetent.

B. Any sale, exchange, transfer or other disposition in contravention of any of the provisions of this Section 9.3 shall be void and ineffectual and shall not bind or be recognized by the Company.

Section 9.4  Other Limited Members

The Special Limited Member shall have the right at any time and from time to time to substitute in its place as Special Limited Member any Person which (a) controls the Special Limited Member, (b) is owned in substantial part by the Special Limited Member or (c) is controlled by the Person controlling the Special Limited Member. Each Member hereby consents to such substitution(s) if and when it occurs, and agrees that the substitute Special Limited Member shall have all the rights, benefits and duties set out in this Agreement for the Special Limited Member.

ARTICLE X -- General Provisions

Section 10.1  Amendments to Articles of Organization

Within 120 days after the end of any fiscal year in which the Limited Members shall have received any distributions of their Capital Contribution under Article V hereof, the Managing Members shall file if required under the law of the State and elsewhere as the Managing Members deem appropriate or required an amendment to the articles of organization of the Company reducing Outstanding Capital of each Limited Member as stated in the last previous amendment to the articles of organization of the Company. Nothing in this Section 10.2 shall authorize, however, any change in Schedule A.

Section 10.2  Notices

Except as otherwise specifically provided herein, all notices, demands or other communications hereunder shall be in writing and shall be deemed to have been given (i) four business days after being deposited in the United States mail and sent by certified or registered mail, postage prepaid, (ii) two business days after being deposited with Federal Express or similar overnight delivery

42

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 46 of 89   Document 14-1

service, (iii) on the business day after the day of transmission by telecopier or other facsimile transmission, or (iv) on the business day following delivery personally, in each case to the parties at the addresses set forth below or at such other addresses as such parties may designate by notice to the Company: If to the Company, at the principal office of the Company set forth in Section 2.2; and if to a Member, at his address set forth in Schedule A, in each case with copies to:

     (i)     The Special Limited Member, BOC IX Asset Management, LLC, c/o Banc One Capital Markets, 150 East Gay Street, Mail Code OH1-1222, 22nd Floor, Columbus, OH 43215 (Attention: Charles W. Ewing, Jr.);

     (ii)     Nixon Peabody LLP, 101 Federal Street, Boston, MA 02110, Attention: Robert H. Adkins, P.C. (file reference 30598-44); and

     (iii)     Reinhart, Boerner, Van Dueren, Norris & Rieselbach, S.C., 1000 North Water Street, Milwaukee, Wisconsin 53202, Attention: William Cummings, Esq.

### Section 10.3 Word Meanings

The words such as "herein," "hereinbefore," "hereinafter," "hereof" and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.

### Section 10.4 Binding Provisions

The covenants and agreements contained herein shall be binding upon, and inure to the benefit of, the heirs, legal representatives, successors and assigns of the respective parties hereto.

### Section 10.5 Applicable Law

This Agreement shall be construed and enforced in accordance with the laws of the State.

### Section 10.6 Counterparts

This Agreement may be executed in several counterparts and all so executed shall constitute one agreement binding on all parties hereto, notwithstanding that all the parties have not signed the original or the same counterpart.

### Section 10.7 Separability of Provisions

Each provision of this Agreement shall be considered separable and (a) if for any reason any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid, or (b) if for any reason any provision or provisions herein would cause the Limited Members to be bound by the obligations of the Company under the laws of the State as the same may now or hereafter exist, such provision or provisions shall be deemed void and of no effect.

### Section 10.8 Paragraph Titles

Paragraph titles are for descriptive purposes only and shall not control or alter the meaning of the Agreement as set forth in the text.

Case 2:20-cv-01169-BHL    Filed 08/27/20    Page 47 of 89    Document 14-1

Section 10.9  Amendments

Except as otherwise provided in Section 5.4.H, this Agreement may not be amended or modified except by a written instrument signed by all of the Members.

Section 10.10  Time of Admission

Each Limited Member shall be deemed to have been admitted to the Company as of the first day of the month during which its actual admission occurs for all purposes of this Agreement including Article V.


ARTICLE XI – Defined Terms

Certain capitalized terms used in this Agreement shall have the meanings specified below:

"Accountants" means the certified public accountant as may be engaged by the Company in accordance with Section 7.4 hereof.

"Additional Capital Contribution" shall have the meaning set forth in Section 4.2.A(7).

"Adjustment Amount" has the meaning set forth in Section 4.2.

"Admission Date" means the date on which this Agreement shall have been fully executed by, delivered among and become binding on all of the Members.

"Affiliate" means, as to any named Person or Persons (or as to every Managing Member if no Person is specifically named): (1) such Person; (2) member of the Immediate Family of such Person; (3) legal representative, successor or assignee of any Person referred to in the preceding clauses (1) or (2); (4) trustee of a trust for the benefit of any Person referred to in the preceding clauses (1) or (2); or (5) any other Person (a) who directly or indirectly controls, is controlled by, or is under common control with such Person, (b) who owns or controls 10% or more of the outstanding voting interests of such Person, (c) of which 10% or more of the outstanding voting interests is owned by such Person or any of the Persons referred to in the foregoing clauses (1) through (3); (d) who is an officer, director, partner or trustee of such Person, or (e) for which such Person acts in the capacity of officer, director, partner or trustee.

"Agreement" means this Amended and Restated Operating Agreement of the Company as it may be amended from time to time.

"Annual Reported Credit" has the meaning set forth in Section 4.2.A(6).

"Asset Management Fee" means the fee payable to the Asset Manager by the Company pursuant to Section 7.10.B.  In the case of any provisions of this Agreement which relate to the payment of the Asset Management Fee, the term "Asset Management Fee" shall be deemed to include the reimbursements payable pursuant to Section 7.10.C.

"Asset Manager" means the party appointed by the Special Limited Member to exercise certain rights and perform certain functions on behalf of the Limited Members pursuant to Section 7.10.A.

"Basis Certification" means the receipt by each Limited Member of a written estimate of the Accountants, in a form and in substance satisfactory to the Special Limited Member, as to the itemized amounts of the construction and development costs of the Property and a reasonable estimate of the "eligible basis" and "applicable percentage" (as defined in the Code) pertaining to each building in the

44

Property following Full Completion.

"Capital Account" has the meaning set forth in Section 3.3.

"Capital Contribution" means the total amount of cash contributed or agreed to be contributed to the Company by each Member as shown in Schedule A, including any amounts which are paid on behalf of the Investor Limited Member pursuant to the provisions of Section 4.2.B herein. Any reference in this Agreement to the Capital Contribution of a then Member shall include a Capital Contribution previously made by any prior Member with respect to the Company interest of such then Member.

"Capital Transaction" means any transaction or other source of funds the proceeds of which are not includable in determining Cash Flow including, without implied limitation, the sale or other disposition of all or substantially all of the assets of the Company and any refinancing of any Mortgage, but excluding the payment of Capital Contributions by the Members.

"Cash Flow" means for any period the excess of (a) Operating Revenues for such period over (b) the sum of Operating Expenses and Debt Service for such period.

"Centennial Partners " shall have the meaning set forth in the Preliminary Statement.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Company" means the limited liability company governed by this Agreement as said limited liability company may from time to time be constituted and amended.

"Company Minimum Gain" means the amount determined by computing, with respect to each Company Non-Recourse Liability, the amount of gain, if any, that would be realized by the Company if it disposed of (in a taxable transaction) the property subject to such liability in full satisfaction of such liability, and by then aggregating the amounts so computed. Such computations shall be made in a manner consistent with Treasury Regulation Section 1.704-2(d).

"Company Non-Recourse Liability" means any Company liability (or portion thereof) for which no Member or Related Person bears the Economic Risk of Loss.

"Compliance Period" means the "compliance period" as defined in Section 42 of the Code for the Property or any building comprising a part of the Property.

"Consent" of any Member means the advance written consent or approval of such Member, which consent or approval shall not be unreasonably withheld or delayed unless otherwise stated in the Agreement.

"Construction Mortgage Lender" means Bank One Wisconsin, N.A. and Wisconsin Housing and Economic Development Authority, in its capacity as maker and holder of the Construction Mortgage Loan, together with its successors and assigns in such capacity.

"Construction Mortgage Loan" means the Mortgage made by the Construction Mortgage Lender in the principal amount of $7,725,522, as evidenced by, and on such other terms as are set forth in, a promissory note, security agreement, and other documents related thereto dated August 30, 2000.

"Construction Mortgage Loan Closing" means the first date upon which (i) the Company shall have received all necessary governmental and other permits and approvals for the construction and operation of the Property in accordance with the Plans and Specifications, (ii) all documents evidencing or related to the Construction Mortgage Loan shall have been executed and delivered by all

parties thereto, and (iii) all requirements to funding the initial disbursement of Construction Mortgage Loan proceeds under the documents evidencing the Construction Mortgage Loan shall have been satisfied.

"CPI Adjustment" means the ratio of (a) the Consumer Price Index most recently published prior to the specified date the CPI Adjustment is to be determined, divided by (b) the Consumer Price Index most recently published prior to the Admission Date. "Consumer Price Index" means the Consumer Price Index for All Urban Consumers, All Cities, for All Items (base 1982-84 = 100) published by the United States Bureau of Labor Statistics. In the event such index is not in existence when any determination relying on such index under this Agreement is to be made, the most comparable governmental index published in lieu thereof shall be substituted therefor.

"Credit Agency" means the Wisconsin Housing and Economic Development Authority.

"Credit Agency Set-Aside" means the set-aside test whereby: (a) all Low Income Units in the Property must be occupied by individuals with income equal to no more than sixty percent (60%) of area median income, as adjusted for family size; (b) at least one (1) Low Income Unit in the Property must be occupied by an individual with income equal to no more than fifty percent (50%) of area median income, as adjusted for family size; (c) at least six (6) of the Low Income Units in the Property must be occupied by individuals with income equal to no more than forty percent (40%) of area median income, as adjusted for family size; and (d) one (1) Low Income Unit in the Property must be occupied by an individual with income equal to no more than thirty percent (30%) of area median income, as adjusted for family size.

"Credit Period" means the "credit period" for the Property or any building comprising a part of the Property, as defined in Section 42 of the Code.

"Debt Service" shall mean all payments of interest, principal and recurring charges due and payable on the Mortgages during a specified period.

"Debt Service Coverage" at a specified percentage shall be deemed to have occurred at the end of the earliest period, commencing on or after Full Completion, of the specified number of consecutive calendar months during which period, as determined by the Accountants, the Net Operating Income for such period divided by all Debt Service required to be paid during such period (or which would have been due if monthly payments of Debt Service on the Permanent Mortgage Loan had been payable during such period) shall equal or exceed the specified percentage. "Net Operating Income" for a particular period shall be the excess of Operating Revenue (excluding rent which is paid by any tenant who is not a Qualified Tenant) actually received during such period by the Company on a cash basis (except that, for Debt Service Coverage purposes only, any rental subsidies payable by a government agency pursuant to Section 8 certificates or comparable subsidy programs shall be included in Operating Revenues on an accrual basis) over all Operating Expenses for such period (Operating Expenses shall be equal to (a) the higher of: (i) the pro forma amount set forth in the financial forecast attached as Exhibit 2 or (ii) actual Operating Expenses, or (b) such other amount reasonably determined by the Special Limited Member based on relevant operating expense information provided by the Managing Members and consistent with the underwriting of operating expenses by the First Mortgage Lender), as determined on an annualized accrual basis including a ratable share of seasonal expenses which are normally incurred on an unequal basis during each month of a full annual period of operation and assuming real estate taxes are paid in the amount due following assessment of the Property after Full Completion. Notwithstanding anything set forth above, the Special Limited Member shall be required to use the Operating Expenses determined by the Permanent Lender for purposes of delivering the Permanent Mortgage Loan to Fannie Mae in connection with the permanent mortgage loan commitment letter dated August 1, 2000.

"Deferred Development Cost Payment" means the deferred payment to be made by the

Company to the Managing Members in partial payment of the Guaranteed Development Cost under the circumstances set forth in Section 6.9 hereof.

"Designated Prime Rate" means the "Prime Rate" established by a preponderance of the largest U.S. banks as announced from time to time in the Wall Street Journal.

"Developer" means Wimmer Brothers Development Company, LLC, a Wisconsin limited liability company, in its capacity as the developer of the Property which has contracted with the Company to perform certain services relating to the development of the Property.

"Development Completion Obligation" means the obligation of the Managing Members to acquire and develop the Property for a fixed turnkey price, as set forth in Section 6.9.

"Development Costs" means those costs related to the development and initial leaseup of the Property as more specifically described in Section 6.9.

"Development Expiration Date" shall mean the first date on which all of the following shall have occurred: (i) Permanent Mortgage Commencement, (ii) the Initial Qualified Occupancy Date, and (iii) Stabilized Operations.

"Development Funds" means those sources of funds available to meet Development Costs as more specifically described in Section 6.9.

"Development Services Agreement" means the Development Agreement dated December 1, 1999, by and between the Company and the Developer.

"Development Services Fee" means the fee payable pursuant to Section 6.11 to the Developer for the development services referred to therein.

"Economic Risk of Loss" has the meaning set forth in Treasury Regulation Section 1.752-2.

"8609 Issuance" means the receipt by the Company from the Credit Agency of Internal Revenue Service Form(s) 8609 with respect to all buildings in the Property and allocating to the Company Low Income Housing Credit in an amount equal to at least 80% of the maximum annual Projected Credit.

"Entity" means any general partnership, limited partnership, limited liability company, corporation, joint venture, trust, business trust, cooperative or association.

"Event of Bankruptcy" means with respect to any Person:

(i) the entry of a decree or order for relief by a court having jurisdiction in respect of such Person in a case under the Federal bankruptcy laws, as now or hereafter constituted, or any other applicable Federal or state bankruptcy, insolvency or other similar law, or the appointment of a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of such Person or for any substantial part of his property, or the issuance of an order for the winding-up or liquidation of his affairs and the continuance of any such decree or order unstayed and in effect for a period of 60 consecutive days; or

(ii) the commencement by such Person of a proceeding seeking any decree, order or appointment referred to in clause (i), the consent by such Person to any such decree, order or the appointment, or taking of any action by such Person in furtherance of any of the foregoing.

"Exit Taxes" means, with respect to the Property, the amount of federal income taxes and (to

the extent applicable) State of Wisconsin income taxes actually payable by the members in the Company (taking into account all applicable deductions and credits attributable to such taxes in each taxing jurisdiction) in connection with such sale or liquidation.

"Facility" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

"Filing Office" means the Department of Financial Institutions of State of the State.

"First Mortgage Loan" means the loan to be made by Banc One Capital Funding Corporation in the principal amount of $3,710,000 pursuant to a certain loan commitment letter dated August 1, 2000. The First Mortgage Loan will be secured by a first mortgage on the Property. The First Mortgage Loan is a component of the Permanent Financing.

"Full Completion" means the occurrence of (a) completion of construction of the entire Property and in compliance with the Property Documents, subject to a reasonable "punch list" satisfactory to the Special Limited Member and the First Mortgage Lender, as such completion is evidenced by the receipt by the Company of (i) written confirmation thereof from the inspecting architects and from the general contractor for the Property and (ii) written approval of occupancy by all state and municipal agencies empowered or required to issue such approval, (b) satisfaction of all material requirements in the Property Documents relating to completion of the entire Property (other than such items set forth in the "punch list" described above), and (c) placement of the Property in service for purposes of the Code and the commencement of continuous and diligent efforts to obtain tenants for the Property.

"Guaranteed Development Cost" means the fixed turnkey cost for which the Managing Members guarantee to complete development of the Property pursuant to Section 6.9.A.

"Guarantors" means John Wimmer and Mark Wimmer, individually, each of whom has executed a guaranty of certain of the obligations of the Managing Members with respect to the Company (if there be only one Guarantor at any time, such term shall refer to such sole Guarantor).

"Hazardous Material" shall have the collective meanings given to the terms "hazardous material," "hazardous substances," "hazardous wastes," "toxic substances" and analogous terms in the Hazardous Waste Laws. In addition, the term "Hazardous Material" shall also include oil and any other substance known to be hazardous.

"Hazardous Waste Laws" means and includes the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Resource Conservation and Recovery Act; the Toxic Substances Control Act and any other federal, state or local statutes, ordinances, regulations or by-laws dealing with Hazardous Material, as the same may be amended from time to time and including any regulations promulgated thereunder.

"Immediate Family" means, with respect to any Person, his spouse, parents, parents-in-law, descendants, nephews, nieces, brothers, sisters, brothers-in-law, sisters-in-law, children-in-law and grandchildren-in-law.

"Incentive Management Fee" means the fee payable by the Company pursuant to Section 6.12.D hereof.

"Initial Qualified Occupancy Date" means the first date following Full Completion on which the Limited Partners shall have received written confirmation from the Managing Members and the Management Agent that 90% of the total units in the Property have been leased to and initially

48

occupied by tenants (Qualified Tenants with respect to the Low Income Units).

"Installment" means a portion of the Capital Contribution due from the Investor Limited Member as more fully set forth in Article IV.

"Interest" means the entire interest of a Partner in the Company at any particular time, including the right of such Member to any and all benefits to which a Member may be entitled hereunder and the obligation os such Member to comply with the terms of this Agreement.

"Investor Limited Member" means Banc One Tax Credit Fund IX, LLC, an Ohio limited liability company, or any Person who becomes a Substitute Investor Limited Member as provided herein, in each such Person's capacity as the Investor Limited Member of the Company.

"John Wimmer" shall have the meaning set forth in the Preliminary Statement.

"Lenders" means the lenders with respect to the Permitted Loans.

"Limited Member" or "Limited Members" means the Investor Limited Member and the Special Limited Member.

"Limited Member Loans" means loans made by the Limited Members pursuant to Section 6.13.A.

"Low Income Housing Credit" means the amount of low-income housing tax credit, as certified by the Accountants, which the Company and/or its Members has or will claim pursuant to Section 42 of the Code (or successor provisions) with respect to the Property.

"Low Income Unit" means one of the eighty nine (89) dwelling units in the Property which shall be occupied by a Qualified Tenant meeting the requirements in clause (b) of the definition of "Qualified Tenant" in Article XI and at a rent level and otherwise in compliance with all requirements such that such dwelling unit will be included in the numerator of the "unit fraction" for purposes of Section 42(c)(1)(C) of the Code.

"Management Agent" means the managing and rental agent for the Property engaged by the Company pursuant to Section 6.12.

"Management Agreement" means the agreement between the Company and the Management Agent in effect from time to time providing for management services to the Property.

"Management Fee" means the amount payable from time to time by the Company to the Management Agent (or to the Managing Members if there shall be no Management Agent serving hereunder) on an annual basis for management services in accordance with the Management Agreement.

"Managing Members" means all Persons designated as Managing Members in Schedule A and all Persons who become Managing Members as provided herein, in each such Person's capacity as a General Member of the Company, and if there be only one General Member at any time, such term shall refer to such sole General Member.

"Managing Member Closing Certificate" means the Managing Member Closing Certificate dated August 30, 2000.

"Managing Member Loan" means a loan by a Managing Member or an Affiliate of a Managing Member referred to in Section 6.13.A.

"Mark Wimmer" shall have the meaning set forth in the Preliminary Statement.

"Market Rate Units" means the eight (8) dwelling units in the Property with respect to which the Partnership is not obligated to comply with the requirements of the Low Income Housing Credit.

"Member" or "Members" means any or all of the Managing Members and the Limited Members.

"Member Non-Recourse Debt" means any Company liability (1) that is considered non-recourse under Regulation Section 1.1001-2 or for which the creditor's right to repayment is limited to one or more assets of the Company and (2) for which any Member or Related Person bears the Economic Risk of Loss.

"Member Non-Recourse Debt Minimum Gain" means the amount of partner non-recourse debt minimum gain and the net increase or decrease in partner non-recourse debt minimum gain determined in a manner consistent with Treasury Regulation Sections 1.704-2(d) and 1.704-2(g)(3).

"Minimum Set-Aside" means occupancy of dwelling units in all of the Property sufficient to satisfy the "40-60 test" set forth in Section 42(g) of the Code within the time period required thereunder.

"Mortgage" or "Mortgages" means any or all of the indebtedness of the Company evidenced by the Permitted Loans, and any other indebtedness secured by a mortgage of the Property. Where the context admits, the term Mortgage shall include any mortgage, deed, note, security agreement or other instrument executed in connection with a Mortgage which is binding on the Company; and in case a Mortgage is replaced or supplemented by any subsequent mortgage or mortgages, such term shall refer to any such subsequent mortgage or mortgages.

"Operating Deficit" means the excess (if any) of the sum of Operating Expenses and Debt Service over Operating Revenues for a particular period, as more specifically described in Section 6.10.

"Operating Deficit Loan" means a loan made to the Company pursuant to Section 6.10 and which is repayable with interest at a rate equal to the Long Term Applicable Federal Rate in effect on the date of such advance, and only as provided under this Agreement.

"Operating Expenses" means all the costs and expenses of any type which are incident to the ownership and operation of the Property, including, without limitation, real estate and other taxes, the cost of capital improvements properly attributable to the period in question, the cost of operations (including the cost of any services provided to residents), maintenance and repairs, the Management Fee (excluding payment of the Subordinated Management Fee), the funding of any reserves required to be maintained by the Lenders or pursuant to Section 6.14.B and all amounts due with respect to Company indebtedness, but specifically excluding Debt Service, the Asset Management Fee, initial funding or replenishment of the Operating Reserve, the cost of those items which are included in Development Costs pursuant to Section 6.9, payments made pursuant to Section 5.2.A or 5.2.B, depreciation and other non-cash charges and cash distributions to Members.

"Operating Reserve" shall mean the reserve maintained pursuant to Section 6.14.A to meet Operating Deficits.

"Operating Revenue" means all rental revenue, laundry income, parking revenue and other incidental revenues which are received by the Company and arise from the operation of the Property as a rental apartment property.

50

"Original Agreement" has the meaning set forth in the Preliminary Statement.

"Original Limited Member" shall have the meaning set forth in the Preliminary Statement.

"Outstanding Capital" means, as to any Member at any point in time, the excess of: (a) the amount of the Capital Contributions paid in by such Member through such time (in the case of the Investor Limited Member, including amounts paid pursuant to Section 4.1 and an additional $50,000 liquidated damages payment and, in the case of the Managing Members, including only amounts paid by the Managing Members pursuant to Section 6.9.C), over (b) in the case of the Investor Limited Member amounts which have previously been distributed to the Investor Limited Member pursuant to Section 5.2.B as distributions in respect of its Positive Capital Account.

"Permanent Mortgage Loan" means the First Mortgage Loan.

"Permanent Mortgage Commencement" shall mean the first date on which all of the following shall have occurred: (a) Full Completion; (b) all conditions with respect to the payment of retainages under the Construction Contract, under all construction subcontracts and under the Construction Mortgage Loan documents shall have been satisfied and all such retainages shall have been disbursed; (c) receipt by the Special Limited Member of fully executed copies of all loan documents evidencing the Permanent Mortgage Loan with such executed documents being in form and substance satisfactory to the Special Limited Member; (d) the principal amount and maturity date of the Permanent Mortgage Loan shall have been finally determined; (e) full disbursement of the proceeds of the Permanent Mortgage Loan and amortization of the Permanent Mortgage Loan shall have commenced; and (f) repayment in full of the Construction Mortgage Loan and discharge of the Construction Mortgage Loan and all liens related thereto.

"Permanent Mortgage Commitment" shall mean the first date upon which the Company shall have received the written commitment of the Permanent Mortgage Lender to make the Permanent Mortgage Loan, with such written commitment being in form and substance satisfactory to the Special Limited Member in its reasonable discretion.

"Permanent Mortgage Lender" means Banc One Capital Funding Corporation, in its capacity as the lender of the Permanent Mortgage Loan, together with its successors and assigns in such capacity.

"Permitted Loans" means the Construction Mortgage Loan and the Permanent Mortgage Loan.

"Person" means any individual or Entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person where the context so admits; and, unless the context otherwise requires, the singular shall include the plural, and the masculine gender shall include the feminine and the neuter and vice versa.

"Plans and Specifications" means the plans and specifications for the Property dated September 15, 1999, which have been delivered to the Special Limited Member together with future revisions thereof approved and certified by the project architect, and in the case of an individual change greater than $25,000 or cumulative changes that exceed $50,000, approved in writing by the Special Limited Member. In no event shall a future modification, revision or any amendment to the Plans and Specifications adversely effecting the quality of amenities or the number of units in the Property be effective unless such modification, revision or amendment has been initialed by both Managing Members and the Special Limited Member.

"Positive Capital Account" means the capital account (if positive) of a Member as computed

51

immediately prior to (and without giving effect to cash distributions from or allocations of taxable profits or loss arising from) a specified Capital Transaction.

"Projected Credit" means the projected amounts of Low Income Housing Credit set forth in the table in Section 4.2.A.

"Property" means the real property located at 400 East Centennial Drive, Oak Creek, Milwaukee, Wisconsin 53154 (Census tract #1602.01) which real property is more fully described in Exhibit 1 attached hereto, together with (i) all buildings and other improvements constructed or to be constructed thereon and (ii) all furnishings, equipment, fixtures and personal property covered by the Mortgages, known or to be known as Centennial Apartments.

"Property Documents" means all promissory notes, mortgages, agreements and other instruments executed in connection with any of the Mortgage Loans; the Plans and Specifications; the Management Agreement; all applications, reservations, carryover allocations, restrictive covenants and extended use agreements and all other agreements and documents related to the Low Income Housing Credit; the Tax Credit Application agreements relating to real estate taxation and assessments relating to the Property; agreements relating to the availability of parking for users of the Property; and any other agreement or instrument relating to the Property or under which the Company is bound.

"Qualified Income Offset Item" means (1) an allocation of loss or deduction that, as of the end of each year, reasonably is expected to be made (a) pursuant to Section 704(e)(2) of the Code to a donee of an interest in the Company, (b) pursuant to Section 706(d) of the Code as the result of a change in any Member's Interest, and (c) pursuant to Regulation Section 1.751-1(b)(2)(ii) as the result of a distribution by the Company of unrealized receivables or inventory items and (2) a distribution that, as of the end of such year, reasonably is expected to be made to a Member to the extent it exceeds offsetting increases to such Member's Capital Account which reasonably are expected to occur during or prior to the Company taxable year in which such distribution reasonably is expected to occur.

"Qualified Tenant" means a tenant (a) who occupies a dwelling unit in the Property pursuant to an executed lease which is for a term of at least six months, requires payment of rent at levels not less than those set forth on Exhibit 2 and conforms to all material requirements of the Property Documents and (b), in the case of a tenant occupying a Low Income Unit, who meets the income requirements for a "low income unit" (as defined in Section 42 of the Code) and will not prevent the Company from obtaining the Low Income Housing Credit with respect to such Low Income Unit.

"Related Person" has the meaning set forth in Treasury Regulation Section 1.752-4(b) or any successor regulation thereto.

"Replacement Reserve" shall mean the reserve maintained pursuant to Section 6.14.B to make capital repairs and improvements.

"Retirement" (including the verb form "Retire" and the adjective form "Retiring") means as to a Managing Member, the occurrence of death, adjudication of insanity or incompetence, Event of Bankruptcy, dissolution, or voluntary or involuntary withdrawal from the Company for any reason, and shall constitute "retirement" for purposes of the Uniform Act. "Retirement" shall also mean the sale, assignment, transfer or encumbrance by a Managing Member of its interest as a Managing Member. A Managing Member which is a corporation, limited liability company or partnership shall be deemed to have sold, assigned, transferred or encumbered its interest as a Managing Member in the event of any sale, assignment, transfer or encumbrance of a controlling interest in a corporate or limited liability company Managing Member. John J. Wimmer and Mark J. Wimmer shall be permitted to transfer up to 99% of the non-managing member interests in the Managing Member for estate planning purposes, so long as John J. Wimmer and Mark J. Wimmer retain the management control of the Managing Member and collectively own at least 1% of the managing member interest in

the Managing Member. In no event shall the death of either Mark Wimmer or John Wimmer constitute a "Retirement" of the Managing Member so long as either Mark Wimmer or John Wimmer retain the management control of the Managing Member.

"Sales Preparation Fee" shall have the meaning set forth in Section 6.15.

"Schedule A" means Schedule A of Members annexed hereto as amended from time to time and as so amended at the time of reference thereto.

"Special Limited Member" means BOC IX Asset Management, LLC, an Ohio limited liability company, or such other Person as it may substitute pursuant to Section 9.4 hereof.

"Stabilized Operations" means the achievement for a period of three consecutive months beginning no earlier than the Initial Qualified Occupancy Date of (i) 110% Debt Service Coverage, and (ii) at least 90% occupancy by tenants (who must be Qualified Tenants paying rent under written leases in good standing in the case of the Low-Income Units); for purposes of Sections 6.9 and 6.10, the occurrence of Stabilized Operations must be verified by the financial statements prepared pursuant to 'Section 7.5.A.

"State" means the State of Wisconsin.

"Subordinated Management Fee" shall have the meaning set forth in Section 6.12.C.

"Substitute Limited Member" means any Person who is admitted to the Company as a Limited Member under the provisions of Sections 9.2 or 9.4.

"Tax Credit Application" means the tax credit application dated February 8, 1999 and submitted to the Credit Agency by the Partnership to obtain the Low Income Housing Credit, as amended and supplemented to date.

"Uniform Act" means the Uniform Limited Liability Company Act as adopted by the State.

"Vessel" shall have the meaning given to it in the Federal Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. Sec. 9601 et seq., as amended, and shall also include any meaning given to analogous property under other Hazardous Waste Laws.

"Voluntary Transfer" means any sale, assignment, transfer, pledge, or hypothecation of any Operating Company Interests by a Partner, except for an Involuntary Transfer.

"Withdrawing Members" means John Wimmer and Mark Wimmer, in their capacity as the original members of the Company, withdrawing as such pursuant to this Agreement.

WITNESS the execution hereof under seal as of the 1st day of August, 2000.

MANAGING MEMBER:

CENTENNIAL PARTNERS, LLC

By: _____
    John J. Wimmer, a Member

By: _____
    Mark J. Wimmer, a Member

INVESTOR LIMITED MEMBER:

BANC ONE TAX CREDIT FUND IX, LLC

By: _____
    Charles W. Ewing, Jr., its authorized
    signatory

SPECIAL LIMITED MEMBER:

BOC IX ASSET MANAGEMENT LLC

By: _____
    Charles W. Ewing, Jr., its authorized
    signatory

WITHDRAWING MEMBERS:

_____
JOHN J. WIMMER

_____
MARK J. WIMMER

## PROPERTY MANAGER
## AGREEMENT AND ACKNOWLEDGMENT

The undersigned executes this Agreement not as a Member but only to confirm that it is bound by the provisions of Sections 6.12.A, 6.12.B and 6.12.C hereof, notwithstanding any provision of the Management Agreement to the contrary.

MANAGEMENT AGENT:

WIMMER BROTHERS REALTY, INC.

By: _____

Name: *John J. Wimmer*

Title: *EVP*

## DEVELOPER
## AGREEMENT AND ACKNOWLEDGMENT

The undersigned executes this Agreement not as a Member but only to confirm that it is bound by the provisions of Section 6.11, notwithstanding any provision of the Development Agreement to the contrary.

DEVELOPER:

WIMMER BROTHERS DEVELOPMENT COMPANY, LLC

By: _____

Name: *John J. Wimmer*

Title: *Member*

Attachments:

Exhibit 1   Legal Description of Property and Property Summary
Exhibit 2   Financial Forecast
Schedule A  Schedule of Members

55

STATE OF WISCONSIN )
) SS.
COUNTY OF _Milwaukee_ )

On this _31st_ day of August, 2000, before me, the undersigned, a Notary Public in and for the State of Wisconsin, personally came John J. Wimmer known to me to be a duly authorized officer of Centennial Partners, LLC, Wimmer Brothers Realty, Inc. and Wimmer Brothers Development Company, LLC, who executed the above instrument in his individual capacity and on behalf of said entities and acknowledged to me that he executed the same as his free act and deed and the free act and deed of said entities.

_____
Notary Public

My commission ~~expires:~~ _is permanet_


STATE OF WISCONSIN )
) SS.
COUNTY OF _Milwaukee_ )

On this _31st_ day of August, 2000, before me, the undersigned, a Notary Public in and for the State of Wisconsin, personally came Mark J. Wimmer known to me to be a duly authorized officer of Centennial Partners, LLC, Wimmer Brothers Realty, Inc. and Wimmer Brothers Development Company, LLC, who executed the above instrument in his individual capacity and on behalf of said entities, and acknowledged to me that he executed the same as his free act and deed and the free act and deed of said entities.



_Patricia A. Zacher_
Notary Public

My commission expires: _11/10/02_

STATE OF ~~OHIO~~ _WI_ }
COUNTY OF _Milwauka_ } SS.

On this _31st_ day of August, 2000, before me, the undersigned, a Notary Public in and for said State, personally came Charles W. Ewing, Jr., known to me to be an authorized officer of Banc One Tax Credit Fund IX, LLC, who executed the above instrument on behalf of said entity and acknowledged to me that ~~she~~ _he_ executed ~~the~~ _the_ same as ~~her~~ _his_ free act and deed and the free act and deed of said entity.

_____
Notary Public

My commission ~~expires:~~ _is permet_

STATE OF ~~OHIO~~ _WI_ }
COUNTY OF _Milwauka_ } SS.

On this _31st_ day of August, 2000, before me, the undersigned, a Notary Public in and for said State, personally came Charles W. Ewing, Jr., known to me to be an authorized officer of BOC IX Asset Management LLC, who executed the above instrument on behalf of said entity and acknowledged to me that he executed the same as his free act and deed and the free act and deed of said entity.

_____
Notary Public

My commission ~~expires:~~ _is permet_

57

Exhibit 1

CENTENNIAL, LLC

Legal Description Of Property
and
Property Summary


Parcel 3 of Certified Survey Map No. 6766; recorded on December 23, 1999, as Document No. 7851532, being a redivision of Parcel 4 of Certified Survey Map No. 6765, being a part of the Southeast ¼ of the Northwest ¼ of Section 21, T5N, R22E, City of Oak Creek, County of Milwaukee, State of Wisconsin.

EXCEPTING THEREFROM, that part of Parcel 3 more particularly described as follows:  Commencing at the Northwest corner of the Northwest ¼ of said Section 21; thence South 00°20'37" West along the West line of said Northwest ¼ Section, 1323.75 feet to the South line of the North ½ of said Northwest ¼ Section; thence North 89°27'57" East along said South line 1332.70 feet to the point of beginning of the lands to be described; thence North 00°23'28" East 0.66 feet to a point; thence North 89°28'54" East 32.41 feet to a point; thence South 00°26'04" West 53.67 feet to a point on the North line of Centennial Drive; thence Northwesterly 38.11 feet along said North line and the arc of a curve whose center lies to the Southwest, whose radius is 254.17 feet and whose cord bears North 57°49'44.5" West 38.07 feet to a point; thence North 00°23'28" East 32.44 feet to the point of beginning.

Part of Tax Key No.  860-9015

## Exhibit 2

## CENTENNIAL, LLC

## Financial Forecast

# Centennial

## Project Summary

Blue values need to be Input

| | |
|---|---|
| File Path | O:\EXCEL\SzeiglerProjects\Centennial\Centennial 8-28-00 Reznick Model.xls |
| Partnership Name | The Centennial |
| Property Location | Oak Creek, WI |
| # of Units | 97 |
| # of Buildings | 1 |
| Projected Start Date | 9/1/00 |
| Projected Completion Date | 9/1/01 |
| Rent-Up Start (1st date of year) | 1/1/01 |
| Base Year | 2001 |
| # of Months of Construction | 12 |

### Tax Credit Information:

| | | | | | |
|---|---|---|---|---|---|
| Credit % | Fixed? | ☑ Yes | ☐ No | | 8.30% |
| Credit Allocation Amount | | | | | 528,411 |
| Difficult Developmen Area/QCT | | | | | 100% |
| Low Income Percentage | | | | | 91.72% |

| | | |
|---|---|---|
| Tax Rate | | 35% |
| Depreciation: | | |
| | Real Property | 27.5 |
| | Personal Property | 5 |
| | Sitework | 15 |
| Depreciation Average Start | | 9/1/01 |
| | Remaining Months: | 4 |
| 1st Unit Placed in Service Date | | 9/1/01 |
| | | 4 |

## Financing Assumptions

### Permanent Loan

| | | | | |
|---|---|---|---|---|
| Permanent Loan | | | | 3,710,100 |
| Interest Rate | Fixed? | ☑ Yes ☐ No | | 8.4350% |
| Amortization | | | | 360 |
| Term | | | | 216 |
| Commencement Date | | | | 8/1/02 |
| Months in Base Year | | | | 5.00 |

| | |
|---|---|
| Base Year Net Operating Income | 374,125 |
| Annual Debt Service Coverage | 340,281 |
| Base Year DSCR | 1.10 |

| | |
|---|---|
| GP Loan | 647,765 |
| Repayment from Cash Flow | 100.00% |
| Interest Rate | 6.49% |
| Amortization | 180 |
| Term | 180 |
| Commencement | 9/1/01 |

### Construction Loan Calculation

| | |
|---|---|
| Total Costs | 8,844,890 |
| Less: | |
| Developer Fee | (790,000) |
| Construction Advance Interest | - |
| Fees | - |
| Reserve | (26,500) |
| Cost to build | 8,028,390 |
| Equity During Construction | - |
| Required Construction Loan | 8,028,390 |

| | |
|---|---|
| Construction Loan | 3,400,000 |
| Interest Rate | 7.7500% |
| Term | 24 |

8/30/00   7:57 PM

## Sources and Uses of Funds

**Sources:**

| | |
|---|---:|
| Capital Contribution | 4,226,865 |
| General Partner Equity | |
| Permanent Loan | 3,710,100 |
| Deemed Capital | - |
| GP Loan | 647,765 |
| Return of FNMA Good Faith Deposit | 74,202 |
| Cash from Operations | 185,958 |
| | 8,844,890 |

**Uses:**

| | Depreciation Term | Rate | Total Expense | Capitalize | Amortize/ Expense | Non-Amortize |
|---|---|---|---:|---:|---:|---:|
| **Land and Building Purchase:** | | | | | | |
| Land Acquisition | | | 615,000 | - | | 615,000 |
| Building Acquisition | | | | - | | |
| Demolition | | | | - | | |
| Other | | | 72,816 | - | | 72,816 |
| **Site Work:** | | | | | | |
| Site Work and Landscaping (15 yr.) | | | 257,093 | 257,093 | | |
| Site Work and Landscaping (27.5 yr.) | | | 260,703 | 260,703 | | |
| Other: Contingency | | | | - | | |
| **Rehab and New Construction:** | | | | | | |
| New Building | | | 4,313,005 | 4,313,005 | | |
| Rehabilitation | | | - | - | | |
| Accessory Buildings | | | - | - | | |
| General Requirements | | | 199,455 | 199,455 | | |
| Builder's Overhead | | | 108,872 | 108,872 | | |
| Builder's Profit | | | 326,616 | 326,616 | | |
| Other: Misc. Fees/Costs | | | 82,874 | 82,874 | | |
| **Contingency:** | | | | | | |
| Construction Contingency | | | 85,000 | 85,000 | | |
| Rehab Contingency | | | - | - | | |
| **Construction and Engineering:** | | | | | | |
| Architectural Fees, Design, & MEP | | | 87,750 | 87,750 | | |
| Design and Consultation | | | 2,250 | 2,250 | | |
| Legal | | | 24,171 | 24,171 | | |
| Accounting | | | 4,000 | 4,000 | | |
| Civil Engineering | | | 15,238 | 15,238 | | |
| **Interim Costs:** | | | | | | |
| Construction Paid Insurance | | | 10,000 | 10,000 | | |
| Construction Interest | 1 | | 694,675 | 331,369 | 363,306 | |
| Construction Loan Origination | | 1.00% | 77,256 | 77,256 | | |
| Legal/Inspection Fees | | | 21,800 | 21,800 | | |
| Construction Advance Interest | 1 | | - | - | - | |
| Other: Closing Costs/Points | | | - | | | |
| Other: Real Estate Tax | | | 50,000 | 50,000 | | |
| **Finance Fees and Expenses:** | | | | - | | - |
| Bond Premium | | | | - | | |
| Credit Report | | | - | - | | |
| Loan Origination | 216 | 1.00% | 37,101 | - | 37,101 | |
| Loan Standby | | | | - | | |
| Rate Lock | 216 | | - | | - | |
| Title and Recording | 216 | | 5,545 | - | 5,545 | |
| Other: Legal | 216 | | 18,500 | - | 18,500 | |
| Other: FNMA Good Faith Deposit | | 2% | 74,202 | - | | 74,202 |
| Other: Misc. Fees | | | 2,750 | 2,750 | | |
| **Soft Costs:** | | | | - | | |
| Survey | | | | | | |
| Market Study | | | 5,000 | 5,000 | | |
| Environmental Study/Soils Report | | | 1,000 | 1,000 | | |
| Tax Credit Fee | 180 | | 54,342 | - | 54,342 | |
| Appraisal | | | 8,250 | 8,250 | | |
| Other: Zoning Review Fees | | | 900 | 900 | | |
| Other: Cost Certification | | | 4,000 | 4,000 | | |
| **Organization and Syndication:** | | | | | | |
| Legal (Org.) | 60 | | 10,000 | - | 10,000 | |
| Loan Orig. (Bridge) | | | - | - | | |
| Accounting Fees (Org.) | | | - | - | | |
| Tax Opinion | 0 | | - | - | | |
| Other: Disbursing Fees | | | 6,000 | 6,000 | | |
| **Developer Fees:** | | | | | | |
| Developer Fee | | | 790,000 | 790,000 | | |
| Guarantee Fee | | | - | - | | |
| Developer Overhead | | | - | - | | |
| Other | | | - | - | | |
| **Project Reserves & Other:** | | | | | | |
| Operating Reserve | | | 26,500 | - | | 26,500 |
| Working Capital Reserve | | | - | - | | |
| Marketing Fees | 60 | | 101,777 | - | 101,777 | |
| Syndication Brokerage | | | - | - | | |
| Other: Asset Administration Fee | 60 | | - | | - | |
| **Furniture and Fixtures:** | | per unit cost | | | | |
| Furniture and Fixtures | | $ 1,484 | 143,994 | 143,994 | | |
| Flooring | | | 135,455 | 135,455 | | |
| Office Equipment | | | 111,000 | 111,000 | | |
| | | | | - | | |
| Cost of Issuance | | 0.00% | - | - | | |
| | | | | - | | |
| | | | 8,844,890 | 7,465,801 | 590,571 | 788,518 |

# Centennial

## Capital Contribution Schedule

| Payment Date | Net Investor Equity | % of Net Equity | Gross Investor Equity | % of Gross Equity | |
|---|---|---|---|---|---|
| 7/1/00 | - | 0.00% | - | 0.00% | |
| 8/1/00 | - | 0.00% | - | 0.00% | |
| 9/1/00 | - | 0.00% | - | 0.00% | |
| 10/1/00 | - | 0.00% | - | 0.00% | |
| 11/1/00 | - | 0.00% | - | 0.00% | |
| 12/1/00 | - | 0.00% | - | 0.00% | Includes Fees |
| 9/1/01 | 4,015,522 | 95.00% | 4,015,522 | 95.00% | |
| 12/1/01 | - | 0.00% | - | 0.00% | Includes Reserve |
| 8/1/02 | 211,343 | 5.00% | 211,343 | 5.00% | |
| 2/1/03 | - | 0.00% | - | 0.00% | |
| | 4,226,865 | 100.00% | 4,226,865 | 100.00% | |

$      0.800   net cents per $1.00 of tax credits.

| | |
|---|---|
| Net Equity | 4,226,865 |
| Cost of Issuance | - |
| Total Investment | 4,226,865 |

Deemed Capital Contribution     -

## Syndication Percentages

**% of Ownership**
| | |
|---|---|
| General Partners | 0.01000000% |
| SLP | 0.00100000% |
| Investor - Fund | 99.98900000% |
| - Fund GP | 0.00999890% |
| - Fund Investor | 99.97900110% |
| | 100.00000000% |

**Cash Flow Distribution:**
| | |
|---|---|
| General Partners | 80.00000000% |
| SLP | 0.00020000% |
| Investor - Fund | 19.99980000% |
| - Fund GP | 0.00199998% |
| - Fund Investor | 19.99780002% |
| | 100.00000000% |

**Loss Allocation:**
| | |
|---|---|
| General Partners & SLP | 0.01000000% |
| Investor - Fund | 99.99000000% |
| - Fund GP | 0.00999900% |
| - Fund Investor | 99.98000100% |
| | 100.00000000% |

**LIHTC and Depreciation Allocation:**
| | |
|---|---|
| General Partners & SLP | 0.01000000% |
| Investor - Fund | 99.99000000% |
| - Fund GP | 0.00999900% |
| - Fund Investor | 99.98000100% |
| | 100.00000000% |

**Sales Proceeds Distribution:**
% after return of positive capital
| | |
|---|---|
| General Partners | 80.00000000% |
| SLP | 0.00020000% |
| Investor - Fund | 19.99980000% |
| - Fund GP | 0.00199998% |
| - Fund Investor | 19.99780002% |
| | 100.00000000% |

8/30/00   7:57 PM

## Rental Income

| Type of Unit | # of Units | Maximum | | | Underwritten | | | |
|---|---|---|---|---|---|---|---|---|
| | | Gross Rent per Month | Utility Allowance | Net Rent per Month | Net Rent | Total Rent per Month | Sq. Ft. per Unit | Total Sq. Ft. |
| 1 BR/1 BA - 30% | 1 | 334 | 69 | 265 | 265 | 265 | 886 | 886 |
| 1 BR/1 BA - 40% | 3 | 446 | 69 | 377 | 378 | 1,128 | 886 | 2,658 |
| 1 BR/1 BA - 50% | 1 | 557 | 69 | 488 | 487 | 487 | 886 | 886 |
| 1 BR/1 BA - 60% | 31 | 668 | 69 | 599 | 599 | 18,569 | 886 | 27,466 |
| 1 BR/1 BA - Market | 3 | 599 | - | 599 | 599 | 1,797 | 886 | 2,658 |
| 2 BR/1 BA - 40% | 3 | 535 | 94 | 441 | 441 | 1,323 | 1,015 | 3,045 |
| 2 BR/1 BA - 50% | - | 668 | 94 | 574 | - | - | 1,015 | - |
| 2 BR/1 BA - 60% | 50 | 802 | 94 | 708 | 708 | 35,400 | 1,015 | 50,750 |
| 2 BR/1 BA - Market | 5 | 708 | - | 708 | 708 | 3,540 | 1,015 | 5,075 |
| | | | | | | | | |
| Totals | 97 | | | | 4,183 | 62,509 | | 93,424 |

| | | Underwritten Annual Rental | Low Income Square Ft. |
|---|---|---|---|
| Low Income Units | 89 | | 85,691 |
| % Low Income based on Units | 91.75% | | |
| % Low Income based on Sq. Ft. | 91.72% | 750,108 | |
| | 2000 AMI: | 59,400 | |

## Rent-Up Schedule

| Month | # of Units Rented | # of Low-Income Units Rented | Rental Income | Other Income | Operating Expenses | Fed Tax Credits |
|---|---|---|---|---|---|---|
| | | | 644.42 | 3.32 | 248.60 | 453.92 |
| 01/2001 | 0 | | - | - | - | - |
| 02/2001 | 0 | | - | - | - | - |
| 03/2001 | 0 | | - | - | - | - |
| 04/2001 | 0 | | - | - | - | - |
| 05/2001 | 0 | | - | - | - | - |
| 06/2001 | 0 | | - | - | - | - |
| 07/2001 | 0 | | - | - | - | - |
| 08/2001 | 0 | | - | - | - | - |
| 09/2001 | 20 | 18 | 12,888 | 66 | 4,972 | - |
| 10/2001 | 30 | 28 | 19,333 | 100 | 7,458 | - |
| 11/2001 | 40 | 37 | 25,777 | 133 | 9,944 | - |
| 12/2001 | 50 | 46 | 32,221 | 166 | 12,430 | - |
| Total/Average | 12 | 11 | 90,219 | 465 | 34,803 | - |
| | | | | | | |
| 01/2002 | 60 | 55 | 39,825 | 205 | 15,512 | 27,235 |
| 02/2002 | 70 | 64 | 46,463 | 240 | 18,098 | 31,774 |
| 03/2002 | 80 | 73 | 53,100 | 274 | 20,683 | 36,313 |
| 04/2002 | 90 | 83 | 59,738 | 308 | 23,269 | 40,852 |
| 05/2002 | 97 | 89 | 64,384 | 332 | 25,078 | 44,030 |
| 06/2002 | 97 | 89 | 64,384 | 332 | 25,078 | 44,030 |
| 07/2002 | 97 | 89 | 64,384 | 332 | 25,078 | 44,030 |
| 08/2002 | 97 | 89 | 64,384 | 332 | 25,078 | 44,030 |
| 09/2002 | 97 | 89 | 64,384 | 332 | 25,078 | 44,030 |
| 10/2002 | 97 | 89 | 64,384 | 332 | 25,078 | 44,030 |
| 11/2002 | 97 | 89 | 64,384 | 332 | 25,078 | 44,030 |
| 12/2002 | 97 | 89 | 64,384 | 332 | 25,078 | 44,030 |
| Total/Average | 90 | 82 | 714,201 | 3,685 | 278,188 | 488,414 |

## Income

| | |
|---|---|
| Year of Operations Commencement | 1/1/01 |
| | |
| Base Rental Income | 750,108 |
| 1st Year Rental Income | 90,219 |
| 2nd Year Rental Income | 714,201 |
| 3rd Year Rental Income | 772,611 |
| Inflation Factor | 103% |
| | |
| Base Other Income | 3,870 |
| 1st Year Other Income | 465 |
| 2nd Year Other Income | 3,685 |
| 3rd Year Other Income | 3,986 |
| | |
| Vacancy Rate | 5.00% |

## Expenses

| | |
|---|---|
| Base Operating Expense | 289,365 |
| 1st Year Operating Expense | 34,803 |
| Additional 1st Year Operating Expense | |
| 2nd Year Operating Expense | 289,365 |
| Additional 2nd Year Operating Expense | - |
| Inflation Factor | 104% |
| | |
| Replacement Reserve / Unit | 175 |
| Base Replacement Reserve | 16,975 |
| | |
| 2001 Administration Fee | 862 |
| BOCM Administration Fee | equals 1% of total rental income. |
| Inflation Factor | |
| Administration Fee % | 1.00% |
| Management Fee Cap | 10.00% |
| | |
| Property Management Fee | 5.00% |
| | |
| Subordinated Management Fee | 1.00% |

| Base Expenses | Per Unit Per Year | Per Sq. Ft. Per Year |
|---|---|---|
| Administration | 15,920  164.12 | 0.17 |
| Payroll | 57,562  593.42 | 0.62 |
| Utilities | 30,825  317.78 | 0.33 |
| Repair & Maintenance | 36,375  375.00 | 0.39 |
| Real Estate Taxes | 118,825  1,225.00 | 1.27 |
| Insurance | 7,857  81.00 | 0.08 |
| Lifestyle Services and Advertising | 22,001  226.81 | 0.24 |
| Misc. Expenses | -  - | - |
| Management Fee | 35,814  369.22 | 0.38 |
| Replacement Reserves | 16,975  175.00 | 0.18 |
| Total Operating Expense | 342,154  3,527.36 | 3.66 |
| | | |
| Less: | | |
| Management Fee | (35,814) | |
| Replacement Reserves | (16,975) | |
| Base Operating Expense | 289,365 | |

## Base DSC

| | |
|---|---|
| Rental Income | 750,108 |
| Other Income | 3,870 |
| Vacancy | (37,699) |
| Operating Expenses | (289,365) |
| Management Fee | (35,814) |
| Replacement Reserve | (16,975) |
| | 374,125 |
| | |
| Funds Available | 374,125 |
| Mortgage Debt Service | 340,281 |
| | |
| Base DSC | 1.10 |

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 67 of 89   Document 14-1

## Projected Cash Flow

| Year | Rental Income | Vacancy | Other Income | Operating Expenses | Management Fee | Net Operating Income | Interest from Operating Reserves | Replacement Reserves | 1st Mortgage Debt Service | Cash Flow | DSC |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 0 | 0 | 0 | - | 0 | - | | | | - | |
| 2001 | 90,219 | (4,534) | 465 | 34,803 | 4,308 | 47,040 | - | | - | 47,040 | |
| 2002 | 714,201 | (35,894) | 3,685 | 289,365 | 34,100 | 358,527 | | 7,073 | 141,784 | 209,670 | 2.48 |
| 2003 | 772,611 | (38,830) | 3,986 | 300,940 | 36,888 | 399,939 | | 16,975 | 340,281 | 42,684 | 1.13 |
| 2004 | 795,790 | (39,995) | 4,106 | 312,977 | 37,995 | 408,928 | | 16,975 | 340,281 | 51,673 | 1.15 |
| 2005 | 819,663 | (41,195) | 4,229 | 325,496 | 39,135 | 418,066 | | 16,975 | 340,281 | 60,811 | 1.18 |
| 2006 | 844,253 | (42,430) | 4,356 | 338,516 | 40,309 | 427,353 | | 16,975 | 340,281 | 70,098 | 1.21 |
| 2007 | 869,581 | (43,703) | 4,486 | 352,057 | 41,518 | 436,789 | | 16,975 | 340,281 | 79,533 | 1.23 |
| 2008 | 895,668 | (45,014) | 4,621 | 366,139 | 42,764 | 446,372 | | 16,975 | 340,281 | 89,116 | 1.26 |
| 2009 | 922,538 | (46,365) | 4,760 | 380,785 | 44,047 | 456,102 | | 16,975 | 340,281 | 98,846 | 1.29 |
| 2010 | 950,214 | (47,756) | 4,902 | 396,016 | 45,368 | 465,977 | | 16,975 | 340,281 | 108,721 | 1.32 |
| 2011 | 978,721 | (49,189) | 5,049 | 411,857 | 46,729 | 475,996 | | 16,975 | 340,281 | 118,740 | 1.35 |
| 2012 | 1,008,082 | (50,664) | 5,201 | 428,331 | 48,131 | 486,157 | | 16,975 | 340,281 | 128,902 | 1.38 |
| 2013 | 1,038,325 | (52,184) | 5,357 | 445,464 | 49,575 | 496,459 | | 16,975 | 340,281 | 139,203 | 1.41 |
| 2014 | 1,069,475 | (53,750) | 5,518 | 463,283 | 51,062 | 506,898 | | 16,975 | 340,281 | 149,642 | 1.44 |
| 2015 | 1,101,559 | (55,362) | 5,683 | 481,814 | 52,594 | 517,472 | | 16,975 | 340,281 | 160,216 | 1.47 |
| 2016 | 1,134,606 | (57,023) | 5,854 | 501,087 | 54,172 | 528,178 | | 16,975 | 340,281 | 170,922 | 1.50 |
| Totals | 14,005,506 | (703,888) | 72,258 | 5,828,929 | 668,694 | 6,876,253 | - | 244,723 | 4,905,714 | 1,725,817 | |

| Year | Transfer (to)/from Operations * | BOCM Admin Fee | Cash Flow | GP Loan | Cash Flow | Subordinated Management Fee | Cash Flow | Incentive Management Fee | GP Distribution | Cash Flow | Cash Flow to Investor | Upper-Tier Cash Flow to Investor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | | | - | | | | | | | | | |
| 2001 | (46,178) | 862 | 0 | 0 | | | | | | | | |
| 2002 | (139,780) | 6,820 | 63,070 | 63,070 | | | | | | | | |
| 2003 | - | 7,378 | 35,306 | 35,306 | | | | | | | | |
| 2004 | - | 7,599 | 44,074 | 44,074 | | | | | | | | |
| 2005 | | 7,827 | 52,984 | 52,984 | | | | | | | | |
| 2006 | | 8,062 | 62,036 | 62,036 | | | | | | | | |
| 2007 | | 8,304 | 71,229 | 71,229 | | | | | | | | |
| 2008 | | 8,553 | 80,563 | 80,563 | | | | | | | | |
| 2009 | | 8,809 | 90,037 | 90,037 | | | | | | | | |
| 2010 | | 9,074 | 99,648 | 99,648 | | | | | | | | |
| 2011 | | 9,346 | 109,395 | 109,395 | | | | | | | | |
| 2012 | | 9,626 | 119,275 | 119,275 | | | | | | | | |
| 2013 | | 9,915 | 129,288 | 129,288 | | | | | | | | |
| 2014 | | 10,212 | 139,430 | 139,430 | | | | | | | | |
| 2015 | - | 10,519 | 149,698 | 24,808 | 124,890 | 10,519 | 114,371 | 42,075 | 49,422 | 22,874 | 22,874 | 22,872 |
| 2016 | - | 10,834 | 160,088 | - | 160,088 | 10,834 | 149,254 | 43,337 | 76,066 | 29,850 | 29,850 | 29,847 |
| Totals | (185,958) | 133,739 | 1,406,120 | 1,121,142 | 284,978 | 21,353 | 263,624 | 85,413 | 125,487 | 52,724 | 52,724 | 52,719 |

* Transfer to operations is used to pay construction interest prior to the permanent loan funding.

8/30/00   7:57 PM

# Centennial

## Projected Taxable Income/(Loss)

| Year | Net Operating Income | Interest Income on Escrow | Interest Income on Reserves | Interest on Permanent Loan | Interest on GP Loan | BOCM Admin. Fee | Subordinated Management Fee | Incentive Prop. Mgr. Fee | Depreciation | Funded Expenses | Net Income (Loss) | Net Income (Loss) to Investor | Upper-Tier Net Income (Loss) to Investor |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | - | | | | | | - | - | | | - | - | - |
| 2001 | 47,040 | - | 66 | - | 0 | 862 | - | - | 156,914 | 141,978 | (252,647) | (252,622) | (252,597) |
| 2002 | 358,527 | - | 797 | 130,233 | 56,963 | 6,820 | - | - | 388,943 | 256,174 | (479,810) | (479,762) | (479,714) |
| 2003 | 399,939 | - | 821 | 310,852 | 35,306 | 7,378 | - | - | 342,961 | 29,375 | (325,112) | (325,080) | (325,047) |
| 2004 | 408,928 | - | 846 | 308,272 | 44,074 | 7,599 | - | - | 313,764 | 29,375 | (293,310) | (293,281) | (293,251) |
| 2005 | 418,066 | - | 871 | 305,465 | 43,023 | 7,827 | - | - | 319,433 | 29,375 | (286,186) | (286,157) | (286,129) |
| 2006 | 427,353 | - | 897 | 302,412 | 42,377 | 8,062 | - | - | 308,486 | 21,923 | (255,009) | (254,984) | (254,958) |
| 2007 | 436,789 | - | 924 | 299,091 | 41,101 | 8,304 | - | - | 284,128 | 7,020 | (201,931) | (201,911) | (201,891) |
| 2008 | 446,372 | - | 952 | 295,479 | 39,146 | 8,553 | - | - | 274,712 | 7,020 | (177,586) | (177,569) | (177,551) |
| 2009 | 456,102 | - | 980 | 291,551 | 36,458 | 8,809 | - | - | 269,787 | 7,020 | (156,543) | (156,528) | (156,512) |
| 2010 | 465,977 | - | 1,010 | 287,278 | 32,980 | 9,074 | - | - | 283,396 | 7,020 | (152,761) | (152,746) | (152,731) |
| 2011 | 475,996 | - | 1,040 | 282,630 | 28,654 | 9,346 | - | - | 290,266 | 7,020 | (140,880) | (140,865) | (140,851) |
| 2012 | 486,157 | - | 1,071 | 277,575 | 23,414 | 9,626 | - | - | 279,376 | 7,020 | (109,782) | (109,771) | (109,760) |
| 2013 | 496,459 | - | 1,103 | 272,076 | 17,192 | 9,915 | - | - | 272,884 | 7,020 | (81,525) | (81,517) | (81,509) |
| 2014 | 506,898 | - | 1,136 | 266,095 | 9,917 | 10,212 | - | - | 272,858 | 7,020 | (58,069) | (58,063) | (58,057) |
| 2015 | 517,472 | - | 1,170 | 259,590 | 1,512 | 10,519 | 10,519 | 42,075 | 284,970 | 7,020 | (97,562) | (97,552) | (97,543) |
| 2016 | 528,178 | - | 1,206 | 252,514 | - | 10,834 | 10,834 | 43,337 | 282,656 | 7,020 | (77,813) | (77,805) | (77,797) |
| Totals | 6,876,253 | - | 14,889 | 4,141,114 | 452,117 | 133,739 | 21,353 | 85,413 | 4,625,536 | 578,398 | (3,146,527) | (3,146,212) | (3,145,898) |

8/30/00    7:57 PM

# Centennial

## Benefits Schedule

| Year | Capital Contributions Date | Amount | Net Income/(Loss) | Tax Savings (Expense) | Annual Federal Tax Credits | Total Tax Savings (Expense) | Cash Flow | Annual Benefit from Partnership | Cumulative Benefit | Cumulative Net Investment |
|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | * | - | - | - | | - | - | - | - | - |
| 2001 | ** | 4,015,522 | (252,647) | 88,427 | - | 88,427 | - | 88,427 | 88,427 | 3,927,095 |
| 2002 | *** | 211,343 | (479,810) | 167,933 | 488,414 | 656,347 | - | 656,347 | 744,773 | 3,482,092 |
| 2003 | **** | - | (325,112) | 113,789 | 528,358 | 642,147 | - | 642,147 | 1,386,921 | 2,839,944 |
| 2004 | | | (293,310) | 102,659 | 528,358 | 631,017 | - | 631,017 | 2,017,938 | 2,208,927 |
| 2005 | | | (286,186) | 100,165 | 528,358 | 628,523 | - | 628,523 | 2,646,461 | 1,580,404 |
| 2006 | | | (255,009) | 89,253 | 528,358 | 617,611 | - | 617,611 | 3,264,072 | 962,793 |
| 2007 | | | (201,931) | 70,676 | 528,358 | 599,034 | - | 599,034 | 3,863,106 | 363,759 |
| 2008 | | | (177,586) | 62,155 | 528,358 | 590,513 | - | 590,513 | 4,453,620 | (226,755) |
| 2009 | | | (156,543) | 54,790 | 528,358 | 583,148 | - | 583,148 | 5,036,768 | (809,903) |
| 2010 | | | (152,761) | 53,466 | 528,358 | 581,825 | - | 581,825 | 5,618,593 | (1,391,728) |
| 2011 | | | (140,880) | 49,308 | 528,358 | 577,666 | - | 577,666 | 6,196,259 | (1,969,394) |
| 2012 | | | (109,782) | 38,424 | 39,945 | 78,368 | - | 78,368 | 6,274,627 | (2,047,762) |
| 2013 | | | (81,525) | 28,534 | | 28,534 | - | 28,534 | 6,303,161 | (2,076,296) |
| 2014 | | | (58,069) | 20,324 | | 20,324 | - | 20,324 | 6,323,485 | (2,096,620) |
| 2015 | | | (97,562) | 34,147 | | 34,147 | 22,874 | 57,021 | 6,380,505 | (2,153,640) |
| 2016 | | | (77,813) | 27,235 | | 27,235 | 29,850 | 57,085 | 6,437,590 | (2,210,725) |
| Totals | | 4,226,865 | (3,146,527) | 1,101,284 | 5,283,582 | 6,384,866 | 52,724 | 6,437,590 | | |

### Capital Account Analysis

| | | |
|---|---|---|
| Total Capital Contributions | | $ 4,226,865 |
| | Beginning Capital Bal. | $ 4,226,865 |
| Less: | | |
| Tax Losses | | $ (3,146,527) |
| Cash Flow | | |
| Ending Capital Account | | $ 1,080,338 |
| | Tax Rate | 35.0% |
| Assumed Write-off | | $ 378,118 (1) |

### Capital Contribution Schedule

| | Date | Amount | |
|---|---|---|---|
| * | 7/1/00 | $ - | Includes Fees |
| * | 8/1/00 | $ - | |
| * | 9/1/00 | $ - | |
| * | 10/1/00 | $ - | |
| * | 11/1/00 | $ - | |
| * | 12/1/00 | $ - | |
| ** | 9/1/01 | $ 4,015,522 | |
| ** | 12/1/01 | $ - | Includes Reserve |
| *** | 8/1/02 | $ 211,343 | |
| **** | 2/1/03 | $ - | |
| | | $ 4,226,865 | |

8/30/00   7:57 PM

# Centennial

## Monthly Internal Rate of Return

<u>Monthly W/O Cash Effective IRR</u>       9.26%

| Year | Month | Capital Contribution | Low Income Housing Tax Credits | Tax Savings (Expense) | Net Benefit |
|------|-------|-----------------------|--------------------------------|------------------------|-------------|
| 2000 | January-00 | - | | | - |
| | February-00 | - | | | - |
| | March-00 | - | | | - |
| | April-00 | - | | | - |
| | May-00 | - | | | - |
| | June-00 | - | | | - |
| | July-00 | - | | | - |
| | August-00 | - | | | - |
| | September-00 | - | | | - |
| | October-00 | - | | | - |
| | November-00 | - | | | - |
| | December-00 | - | | | - |
| 2001 | January-01 | - | | | - |
| | February-01 | - | | | - |
| | March-01 | - | - | 22,107 | 22,107 |
| | April-01 | - | | | - |
| | May-01 | - | | | - |
| | June-01 | - | - | 22,107 | 22,107 |
| | July-01 | - | | | - |
| | August-01 | - | | | - |
| | September-01 | (4,015,522) | - | 22,107 | (3,993,415) |
| | October-01 | - | | | - |
| | November-01 | - | | | - |
| | December-01 | - | - | 22,107 | 22,107 |
| 2002 | January-02 | - | | | - |
| | February-02 | - | | | - |
| | March-02 | - | 122,103 | 41,983 | 164,087 |
| | April-02 | - | | | - |
| | May-02 | - | | | - |
| | June-02 | - | 122,103 | 41,983 | 164,087 |
| | July-02 | - | | | - |
| | August-02 | (211,343) | | | (211,343) |
| | September-02 | - | 122,103 | 41,983 | 164,087 |
| | October-02 | - | | | - |
| | November-02 | - | | | - |

8/30/00    7:57 PM

Case 2:20-cv-01169-BHL    Filed 08/27/20    Page 71 of 89    Document 14-1

| | | | | |
|---|---|---|---|---|
| December-02 | - | 122,103 | 41,983 | 164,087 |
| 2003 January-03 | - | | | - |
| February-03 | - | | | - |
| March-03 | - | 132,090 | 28,447 | 160,537 |
| April-03 | - | | | - |
| May-03 | - | | | - |
| June-03 | - | 132,090 | 28,447 | 160,537 |
| July-03 | - | | | - |
| August-03 | - | | | - |
| September-03 | - | 132,090 | 28,447 | 160,537 |
| October-03 | - | | | - |
| November-03 | - | | | - |
| December-03 | - | 132,090 | 28,447 | 160,537 |
| 2004 January-04 | | | | - |
| February-04 | | | | - |
| March-04 | | 132,090 | 25,665 | 157,754 |
| April-04 | | | | - |
| May-04 | | | | - |
| June-04 | | 132,090 | 25,665 | 157,754 |
| July-04 | | | | - |
| August-04 | | | | - |
| September-04 | | 132,090 | 25,665 | 157,754 |
| October-04 | | | | - |
| November-04 | | | | - |
| December-04 | | 132,090 | 25,665 | 157,754 |
| 2005 January-05 | | | | - |
| February-05 | | | | - |
| March-05 | | 132,090 | 25,041 | 157,131 |
| April-05 | | | | - |
| May-05 | | | | - |
| June-05 | | 132,090 | 25,041 | 157,131 |
| July-05 | | | | - |
| August-05 | | | | - |
| September-05 | | 132,090 | 25,041 | 157,131 |
| October-05 | | | | - |
| November-05 | | | | - |
| December-05 | | 132,090 | 25,041 | 157,131 |
| 2006 January-06 | | | | - |
| February-06 | | | | - |
| March-06 | | 132,090 | 22,313 | 154,403 |
| April-06 | | | | - |
| May-06 | | | | - |
| June-06 | | 132,090 | 22,313 | 154,403 |
| July-06 | | | | - |

8/30/00    7:57 PM

|  |  |  |  |  |
|---|---|---|---|---|
| | August-06 | | | - |
| | September-06 | 132,090 | 22,313 | 154,403 |
| | October-06 | | | - |
| | November-06 | | | - |
| | December-06 | 132,090 | 22,313 | 154,403 |
| 2007 | January-07 | | | - |
| | February-07 | | | - |
| | March-07 | 132,090 | 17,669 | 149,759 |
| | April-07 | | | - |
| | May-07 | | | - |
| | June-07 | 132,090 | 17,669 | 149,759 |
| | July-07 | | | - |
| | August-07 | | | - |
| | September-07 | 132,090 | 17,669 | 149,759 |
| | October-07 | | | - |
| | November-07 | | | - |
| | December-07 | 132,090 | 17,669 | 149,759 |
| 2008 | January-08 | | | - |
| | February-08 | | | - |
| | March-08 | 132,090 | 15,539 | 147,628 |
| | April-08 | | | - |
| | May-08 | | | - |
| | June-08 | 132,090 | 15,539 | 147,628 |
| | July-08 | | | - |
| | August-08 | | | - |
| | September-08 | 132,090 | 15,539 | 147,628 |
| | October-08 | | | - |
| | November-08 | | | - |
| | December-08 | 132,090 | 15,539 | 147,628 |
| 2009 | January-09 | | | - |
| | February-09 | | | - |
| | March-09 | 132,090 | 13,698 | 145,787 |
| | April-09 | | | - |
| | May-09 | | | - |
| | June-09 | 132,090 | 13,698 | 145,787 |
| | July-09 | | | - |
| | August-09 | | | - |
| | September-09 | 132,090 | 13,698 | 145,787 |
| | October-09 | | | - |
| | November-09 | | | - |
| | December-09 | 132,090 | 13,698 | 145,787 |
| 2010 | January-10 | | | - |
| | February-10 | | | - |
| | March-10 | 132,090 | 13,367 | 145,456 |

8/30/00    7:57 PM

# Centennial

| | | | |
|---|---|---|---|
| April-10 | | | - |
| May-10 | | | - |
| June-10 | 132,090 | 13,367 | 145,456 |
| July-10 | | | - |
| August-10 | | | - |
| September-10 | 132,090 | 13,367 | 145,456 |
| October-10 | | | - |
| November-10 | | | - |
| December-10 | 132,090 | 13,367 | 145,456 |
| 2011 January-11 | | | - |
| February-11 | | | - |
| March-11 | 132,090 | 12,327 | 144,417 |
| April-11 | | | - |
| May-11 | | | - |
| June-11 | 132,090 | 12,327 | 144,417 |
| July-11 | | | - |
| August-11 | | | - |
| September-11 | 132,090 | 12,327 | 144,417 |
| October-11 | | | - |
| November-11 | | | - |
| December-11 | 132,090 | 12,327 | 144,417 |
| 2012 January-12 | | | - |
| February-12 | | | - |
| March-12 | 9,986 | 9,606 | 19,592 |
| April-12 | | | - |
| May-12 | | | - |
| June-12 | 9,986 | 9,606 | 19,592 |
| July-12 | | | - |
| August-12 | | | - |
| September-12 | 9,986 | 9,606 | 19,592 |
| October-12 | | | - |
| November-12 | | | - |
| December-12 | 9,986 | 9,606 | 19,592 |
| 2013 January-13 | | | - |
| February-13 | | | - |
| March-13 | - | 7,133 | 7,133 |
| April-13 | | | - |
| May-13 | | | - |
| June-13 | - | 7,133 | 7,133 |
| July-13 | | | - |
| August-13 | | | - |
| September-13 | - | 7,133 | 7,133 |
| October-13 | | | - |
| November-13 | | | - |

8/30/00    7:57 PM

# Centennial

| | | | | |
|---|---|---|---:|---:|
| | December-13 | - | 7,133 | 7,133 |
| 2014 | January-14 | | | - |
| | February-14 | | | - |
| | March-14 | - | 5,081 | 5,081 |
| | April-14 | | | - |
| | May-14 | | | - |
| | June-14 | - | 5,081 | 5,081 |
| | July-14 | | | - |
| | August-14 | | | - |
| | September-14 | - | 5,081 | 5,081 |
| | October-14 | | | - |
| | November-14 | | | - |
| | December-14 | - | 5,081 | 5,081 |
| 2015 | January-15 | | | - |
| | February-15 | | | - |
| | March-15 | - | 8,537 | 8,537 |
| | April-15 | | | - |
| | May-15 | | | - |
| | June-15 | - | 8,537 | 8,537 |
| | July-15 | | | - |
| | August-15 | | | - |
| | September-15 | - | 8,537 | 8,537 |
| | October-15 | | | - |
| | November-15 | | | - |
| | December-15 | - | 8,537 | 8,537 |
| 2016 | January-16 | | | - |
| | February-16 | | | - |
| | March-16 | | 6,809 | 6,809 |
| | April-16 | | | - |
| | May-16 | | | - |
| | June-16 | | 6,809 | 6,809 |
| | July-16 | | | - |
| | August-16 | | | - |
| | September-16 | | 6,809 | 6,809 |
| | October-16 | | | - |
| | November-16 | | | - |
| | December-16 | | 6,809 | 6,809 |
| 2017 | January-17 | | | - |
| | February-17 | | | - |
| | March-17 | | 378,118 | 378,118 |
| | | (4,226,865) | 5,283,582 | 1,479,403 |

## Monthly Schedule

|  | 9/1/00 | 10/1/00 | 11/1/00 | 12/1/00 | 1/1/01 | 2/1/01 | 3/1/01 | 4/1/01 | 5/1/01 | 6/1/01 | 7/1/01 | 8/1/01 | Construction Completion 95% 9/1/01 | 10/1/01 | 11/1/01 | 12/1/01 | 1/1/02 | 2/1/02 | 3/1/02 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Units placed in service |  |  |  |  |  |  |  |  |  |  |  |  | 1 | 1 | 1 | 1 | 1 | 1 | 1 |
| Permanent Loan |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Equity |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| FNMA Forward Proceeds | 1,067,671 | 526,108 | 528,300 | 530,502 | 532,712 | 524,607 | - | - | - | - | - | - | 4,015,522 |  |  |  |  |  |  |
| Construction Loan Draws |  |  |  |  | 0 | 10,125 | 537,184 | 540,653 | 544,145 | 547,659 | 551,196 | 554,756 | (3,285,717) |  |  |  |  |  |  |
| Refund of Good Faith Deposit |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Interest Income on Equity Escrow |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Interest Income on FNMA Escrow |  | 11,010 | 8,818 | 6,617 | 4,406 | 2,187 | - | - | - | - | - | - |  |  |  |  |  |  |  |
| Interest Carry Escrow |  |  |  |  |  |  |  |  |  |  |  |  | (10,997) | 12,882 | 12,936 | 12,990 | 10,964 | 11,009 | 11,055 |
| Interest Carry Escrow Earnings |  |  |  |  |  |  |  |  |  |  |  |  |  | 48 | (8) | (62) | (116) | (162) | (207) |
| Net Operating Income |  |  |  |  |  |  |  |  |  |  |  |  |  | 15,393 | 15,393 | 15,393 | 17,473 | 17,473 | 17,473 |
| Total Sources | 1,067,671 | 537,118 | 537,118 | 537,118 | 537,118 | 537,118 | 537,184 | 540,653 | 544,145 | 547,659 | 551,196 | 554,756 | 718,808 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 |
| Total Uses | 1,067,671 | 537,118 | 537,118 | 537,118 | 537,118 | 537,118 | 537,184 | 540,653 | 544,145 | 547,659 | 551,196 | 554,756 | 718,808 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 |
| Variance in Sources and Uses |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
|  | 7,096,206 | 14.00% | 7.17% | 7.17% | 7.17% | 7.17% | 7.17% | 7.17% | 7.17% | 7.17% | 7.17% | 7.17% | 7.13% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% |
| Uses: |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Construction Costs | 993,469 | 508,798 | 508,798 | 508,798 | 508,798 | 508,798 | 508,798 | 508,798 | 508,798 | 508,798 | 508,798 | 508,798 | 505,959 | - | - | - | - | - | - |
| Fund Reserve |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Contractor Profit |  |  |  |  |  |  |  |  |  |  |  |  | 163,308 |  |  |  |  |  |  |  |
| Developer Fee |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| FNMA Good Faith Deposit | 74,202 |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Construction/FNMA Interest |  | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,386 | 31,855 | 35,347 | 38,861 | 42,398 | 45,958 | 49,541 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 |
| Cummulative FNMA Balance | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 |
| Cummulative Construction Loan Balance | - | - | - | - | 0 | 10,125 | 547,308 | 1,087,961 | 1,632,106 | 2,179,765 | 2,730,961 | 3,285,717 |  |  |  |  |  |  |  |
| Total Construction Exposure | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,720,225 | 4,257,408 | 4,798,061 | 5,342,206 | 5,889,865 | 6,441,061 | 6,995,817 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 |
| FNMA Proceeds Interest Rate | 9.15% |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Construction Loan Interest | 7.750% |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Interest Expense on FNMA Proceeds |  | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 |
| Interest Expense on Construction Loan |  |  |  |  | 0 | 65 | 3,535 | 7,026 | 10,541 | 14,078 | 17,637 | 21,220 |  |  |  |  |  |  |  |
| Total Construction Interest |  | 28,320 | 28,320 | 28,320 | 28,320 | 28,386 | 31,855 | 35,347 | 38,861 | 42,398 | 45,958 | 49,541 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 |  |
| FNMA Escrow |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Equity Installment | 3,710,100 | 2,642,429 | 2,116,321 | 1,588,021 | 1,057,519 | 524,807 | - | - | - | - | - |  |  |  |  |  |  |  |  |
| Less: Current Draws | (1,067,671) | (526,108) | (528,300) | (530,502) | (532,712) | (524,807) | - | - | - | - | - |  |  |  |  |  |  |  |  |
| Balance | 2,642,429 | 2,116,321 | 1,588,021 | 1,057,519 | 524,807 | - | - | - | - | - | - |  |  |  |  |  |  |  |  |
| FNMA Escrow Earnings |  | 11,010 | 8,818 | 6,617 | 4,406 | 2,187 | - | - | - | - | - |  |  |  |  |  |  |  |  |
| Money Market Account Rate | 5.00% |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Interest Carry Escrow |  |  |  |  |  |  |  |  |  |  |  |  |  | 10,997 | (1,885) | (14,821) | (27,810) | (38,774) | (49,783) |
| Deposits/(Draws) |  |  |  |  |  |  |  |  |  |  |  |  | 10,997 | (12,882) | (12,936) | (12,990) | (10,964) | (11,009) | (11,055) |
| Balance |  |  |  |  |  |  |  |  |  |  |  |  | 10,997 | (1,885) | (14,821) | (27,810) | (38,774) | (49,783) | (60,838) |
| Escrow Earnings |  |  |  |  |  |  |  |  |  |  |  |  |  | 48 | (8) | (62) | (116) | (162) | (207) |
| Construction Advance Interest | 9/1/00 | 10/1/00 | 11/1/00 | 12/1/00 | 1/1/01 | 2/1/01 | 3/1/01 | 4/1/01 | 5/1/01 | 6/1/01 | 7/1/01 | 8/1/01 | 9/1/01 | 10/1/01 | 11/1/01 | 12/1/01 | 1/1/02 | 2/1/02 | 3/1/02 |
| Balance |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Short Term AFR | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% |
| Total Interest |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Capitalized |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Uncapitalized |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |  |
| Construction Interest | - | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,386 | 31,855 | 35,347 | 38,861 | 42,398 | 45,958 | 49,541 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 |
| Capitalized | - | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,386 | 31,855 | 35,347 | 38,861 | 42,398 | 45,958 |  | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 |
| Expensed | - |  |  |  |  |  |  |  |  |  |  |  | 49,541 |  |  |  |  |  |  |  |
| Interest Income | - | 11,010 | 8,818 | 6,617 | 4,406 | 2,187 | - | - | - | - | - | - |  | 48 | (8) | (62) | (116) | (162) | (207) |
| Capitalized | - | 11,010 | 8,818 | 6,617 | 4,406 | 2,187 | - | - | - | - | - | - |  |  |  |  |  |  |  |
| Expensed | - |  |  |  |  |  |  |  |  |  |  |  |  | 48 | (8) | (62) | (116) | (162) | (207) |

| Calculation of Construction Costs |  |
|---|---|
| Total Costs | 8,844,890 |
| Less: Net Construction Interest | (694,675) |
| Construction Advance Interest | - |
| Developer Fee | (790,000) |
| Contractor Profit Deferred | (163,308) |
| FNMA Good Faith Deposit | (74,202) |
| Reserves | (26,500) |
|  | 7,096,206 |
| Construction Interest | 694,675 |
| Good Faith Deposit | 74,202 |
| Total Construction Period Costs | 7,865,082 |

8/30/00   7:57 PM

| | 4/1/02 | 5/1/02 | 6/1/02 | 7/1/02 | 8/1/02 | 9/1/02 | Stabilization 5% 10/1/02 | 11/1/02 | 12/1/02 | 100% 1/1/03 Totals |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | 3,710,100 | | | | | 3,710,100 |
| | | | | | 211,343 | | | . | | 4,226,865 |
| | | | | | (3,710,100) | | | | | (3,710,100) |
| | | | | | | | | | | |
| | | | | | 74,202 | | | | | 74,202 |
| | | | | | | | | . | | 33,038 |
| | 11,101 | 11,148 | 11,194 | 11,241 | (105,523) | | | | | |
| | (253) | (300) | (346) | (393) | (440) | | | | | (2,241) |
| | 17,473 | 17,473 | 17,473 | 17,473 | 17,473 | | | | | 165,958 |
| | 28,320 | 28,320 | 28,320 | 28,320 | 197,055 | | . | . | | 8,227,922 |
| | 28,320 | 28,320 | 28,320 | 28,320 | 197,055 | | | . | | 8,227,922 |
| | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 0.00% | 100.00% |
| | | | | | | | | | | |
| | | | | | 26,500 | | | | | 7,096,205 |
| | | | | | | | | | | 28,500 |
| | | | | | | | | | | 163,308 |
| | | | | | 142,235 | | | | | 142,235 |
| | | | | | | | | | | 74,202 |
| | 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | | | . | | 725,472 |
| | 28,320 | 28,320 | 28,320 | 28,320 | 197,055 | | . | . | | 8,227,922 |

| 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | . | . |
|---|---|---|---|---|---|
| 3,710,100 | 3,710,100 | 3,710,100 | 3,710,100 | . | . |

| 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | . | | | 651,370 |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | 74,103 |
| 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | . | | | 725,472 |

| | | | | . | | | (3,710,100) |
|---|---|---|---|---|---|---|---|
| | | | | . | | | 33,038 |

| (60,839) | (71,940) | (83,088) | (94,282) | (105,523) | . | (83,088) | |
|---|---|---|---|---|---|---|---|
| (11,101) | (11,148) | (11,194) | (11,241) | 105,523 | . | . | |
| (71,940) | (83,088) | (94,282) | (105,523) | . | . | (83,088) | |
| (253) | (300) | (346) | (393) | (440) | . | (346) | |

| 4/1/02 | 5/1/02 | 6/1/02 | 7/1/02 | 8/1/02 | 9/1/02 | 10/1/02 | 11/1/02 | 12/1/02 |
|---|---|---|---|---|---|---|---|---|
| 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | 0.44% | | |

| | | | | | | . |
|---|---|---|---|---|---|---|
| | | | | | | . |
| 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | . | . |
| | | | | | | 725,472 |
| | | | | | | 364,407 |
| 28,320 | 28,320 | 28,320 | 28,320 | 28,320 | . | . |
| | | | | | | 361,065 |
| (253) | (300) | (346) | (393) | (440) | . | . |
| | | | | | | 30,797 |
| | | | | | | 33,038 |
| (253) | (300) | (346) | (393) | (440) | . | . |
| | | | | | | (2,241) |

Fee Paid Per Sources and Uses    142,235
Fee Paid Per Monthly Schedule    142,235
   0

Plus Interest Income on FNMA Escrow
Plus Escrow Interest Income

Plus Interest Carry Escrow
   0   should be 0

Fee Paid    142,235
Deferred Fee    647,765
   790,000
Total Fee    790,000

Less Interest Income on FNMA Escrow
Less Escrow Interest Income

Less Interest Carry Escrow
   should be 0

Net Interest Expense
694,675
331,369
363,306

Net Interest Expensed
2000
2001   134,526
2002   228,780
363,306

# Centennial

## Permanent Loan Amortization

Permanent Loan

| | |
|---|---|
| Principal | 3,710,100 |
| Rate | 8.435% |
| Term | 216 |
| Amortization | 360 |
| Start Date | 08/01/02 |
| Months Remaining | 5.00 |
| Monthly Payment | 28,357 |

| Year | Payment of Principal & Interest | Principal | Interest | Ending Balance | Mortgage Balance at Sale |
|---|---|---|---|---|---|
| 2001 | | | | | |
| 2002 | 141,784 | 11,550 | (130,233) | 3,698,550 | |
| 2003 | 340,281 | 29,428 | (310,852) | 3,669,121 | |
| 2004 | 340,281 | 32,009 | (308,272) | 3,637,112 | |
| 2005 | 340,281 | 34,816 | (305,465) | 3,602,296 | |
| 2006 | 340,281 | 37,869 | (302,412) | 3,564,427 | |
| 2007 | 340,281 | 41,189 | (299,091) | 3,523,238 | |
| 2008 | 340,281 | 44,801 | (295,479) | 3,478,437 | |
| 2009 | 340,281 | 48,730 | (291,551) | 3,429,707 | |
| 2010 | 340,281 | 53,003 | (287,278) | 3,376,704 | |
| 2011 | 340,281 | 57,651 | (282,630) | 3,319,053 | |
| 2012 | 340,281 | 62,706 | (277,575) | 3,256,347 | |
| 2013 | 340,281 | 68,205 | (272,076) | 3,188,142 | |
| 2014 | 340,281 | 74,185 | (266,095) | 3,113,957 | |
| 2015 | 340,281 | 80,691 | (259,590) | 3,033,266 | |
| 2016 | 340,281 | 87,766 | (252,514) | 2,945,500 | 2,945,500 |
| Totals | 4,905,714 | 764,600 | (4,141,114) | | 2,945,500 |

8/30/00    7:57 PM

## Construction Advance Interest Amortization

Construction Advance Interest

| | |
|---|---|
| Principal | 4,226,865 |
| Rate | 5.25% |
| Term | |
| Amortization | 360 |
| Start Date | 07/01/00 |

| Month | Beginning Loan Balance | Construction Advances | Balance Outstanding | Draw Repay Amount | Accrued Interest | Ending Balance |
|---|---|---|---|---|---|---|
| Dec-99 | 0 | | - | - | - | - |
| Jan-00 | 0 | | - | - | - | - |
| Feb-00 | - | | - | - | - | - |
| Mar-00 | - | | - | - | - | - |
| Apr-00 | - | | - | - | - | - |
| May-00 | - | | - | - | - | - |
| Jun-00 | - | | - | - | - | - |
| Jul-00 | - | | - | - | - | - |
| Aug-00 | - | | - | - | - | - |
| Sep-00 | - | | - | - | - | - |
| Oct-00 | - | | - | - | - | - |
| Nov-00 | - | | - | - | - | - |
| Dec-00 | - | | - | - | - | - |
| Jan-01 | - | | - | | - | - |
| Feb-01 | - | | - | | - | - |
| Mar-01 | - | | - | | - | - |
| Apr-01 | - | | - | | - | - |
| May-01 | - | | - | | - | - |
| Jun-01 | - | | - | | - | - |
| Jul-01 | - | | - | - | - | - |
| Aug-01 | - | | - | | - | - |
| Sep-01 | - | | - | | - | - |
| Oct-01 | - | | - | | - | - |
| Nov-01 | - | | - | | - | - |
| Dec-01 | - | | - | | - | - |
| Totals | | - | - | - | - | - |

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 79 of 89   Document 14-1

# Centennial

## General Partner Loan Amortizaiton

**General Partner Loan**

| | |
|---|---|
| Principal | 647,765 |
| Rate | 6.49% |
| Amortization | 180 |
| Start Date | 09/01/01 |
| Months in 1st Year | 4.00 |

| | Year | Available Cash Flow | Payment | Principal | Calculated Interest | Paid Interest | Accrued Interest | Ending Balance |
|---|---|---|---|---|---|---|---|---|
| | 2001 | 0 | 0 | - | 14,013 | 0 | 14,013 | 661,779 |
| | 2002 | 63,070 | 63,070 | 6,107 | 42,949 | 56,963 | - | 655,671 |
| | 2003 | 35,306 | 35,306 | - | 42,553 | 35,306 | 7,247 | 662,918 |
| | 2004 | 44,074 | 44,074 | - | 43,023 | 44,074 | - | 662,918 |
| | 2005 | 52,984 | 52,984 | 9,960 | 43,023 | 43,023 | - | 652,958 |
| | 2006 | 62,036 | 62,036 | 19,659 | 42,377 | 42,377 | - | 633,299 |
| | 2007 | 71,229 | 71,229 | 30,128 | 41,101 | 41,101 | - | 603,171 |
| | 2008 | 80,563 | 80,563 | 41,418 | 39,146 | 39,146 | - | 561,753 |
| | 2009 | 90,037 | 90,037 | 53,579 | 36,458 | 36,458 | - | 508,174 |
| | 2010 | 99,648 | 99,648 | 66,667 | 32,980 | 32,980 | - | 441,507 |
| | 2011 | 109,395 | 109,395 | 80,741 | 28,654 | 28,654 | - | 360,766 |
| | 2012 | 119,275 | 119,275 | 95,862 | 23,414 | 23,414 | - | 264,904 |
| | 2013 | 129,288 | 129,288 | 112,096 | 17,192 | 17,192 | - | 152,809 |
| | 2014 | 139,430 | 139,430 | 129,512 | 9,917 | 9,917 | - | 23,296 |
| | 2015 | 149,698 | 24,808 | 23,296 | 1,512 | 1,512 | - | - |
| | 2016 | 160,088 | - | - | - | - | - | - |
| Total | | 1,406,120 | 1,121,142 | 669,026 | 458,314 | 452,117 | 21,260 | |

# Centennial

## Reserves Schedule

| | | | | |
|---|---|---|---|---|
| Operating Reserve | 26,500 | | | |
| Working Capital Reserve | - | | | |
| | | | | |
| Total Reserves | 26,500 | | | |
| | | | | |
| Rate | 3.00% | | | |
| Initial Deposit Month | 12/1/01 | | | |

| Year | Beginning Balance | Deposits | Transfers | 3.00% Interest | Withdrawals | Ending Balance |
|---|---|---|---|---|---|---|
| 2001 | | 26,500 | - | 66 | | 26,566 |
| 2002 | 26,566 | - | - | 797 | | 27,363 |
| 2003 | 27,363 | - | - | 821 | | 28,184 |
| 2004 | 28,184 | - | | 846 | | 29,030 |
| 2005 | 29,030 | - | | 871 | | 29,901 |
| 2006 | 29,901 | - | | 897 | | 30,798 |
| 2007 | 30,798 | - | | 924 | | 31,721 |
| 2008 | 31,721 | - | | 952 | | 32,673 |
| 2009 | 32,673 | - | | 980 | | 33,653 |
| 2010 | 33,653 | - | | 1,010 | | 34,663 |
| 2011 | 34,663 | - | | 1,040 | | 35,703 |
| 2012 | 35,703 | - | | 1,071 | | 36,774 |
| 2013 | 36,774 | - | | 1,103 | | 37,877 |
| 2014 | 37,877 | - | | 1,136 | | 39,013 |
| 2015 | 39,013 | - | | 1,170 | | 40,184 |
| 2016 | 40,184 | - | | 1,206 | | 41,389 |
| Totals | | 26,500 | - | 14,889 | - | |

8/30/00    7:57 PM

# Centennial

## Calculation of Tax Credit

|  | Low-Income Credit |
|---|---|
| Depreciable Basis | 7,465,801 |
| Less: | |
| Cost of Issuance | - |
| Developer Fee Over State Limit | - |
| Eligible Basis Before Adjustment | 7,465,801 |
| LIH Percentage | 91.72% |
|  | 6,847,833 |
| Difficult Development Area/QCT | 100% |
| Basis for LIH Credit | 6,847,833 |
| LIH Credit Percentage | 8.30% |
| LIH Credit Calculation | 568,370 |
| Credit Allocation Amount | 528,411 |
| Minimum of Allocation or Calculation | 528,411 |
| Percentage of Tax Credits to the Investor | 99.9900% |
| Annual Tax Credits to the Investor | 528,358 |
| Tax Credits Per Unit Per Month | 453.92 |

8/30/00    7:57 PM

## Funded Expenses

| | | Base | 2001 | 2002 | 2003 | 2004 | 2005 | 2006 | 2007 | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Construction Interest | 1 | 363,306 | 134,526 | 228,780 | | | | | | | | | | | | | | | |
| Construction Advance Interest | 1 | | · | | | | | | | | | | | | | | | | 363,306 |
| Loan Origination | 216 | 37,101 | | 859 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 2,061 | 29,715 |
| Other: Legal | 216 | 18,500 | | 428 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 1,028 | 14,817 |
| Tax Credit Fee | 180 | 54,342 | 667 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 3,623 | 54,342 |
| Legal (Org ) | 60 | 10,000 | | 2,000 | 2,000 | 2,000 | 2,000 | 1,333 | | | | | | | | | | | 10,000 |
| Other: Asset Administration Fee | 60 | · | · | · | · | · | · | · | | | | | | | | | | | |
| Title and Recording | 216 | 5,545 | | 128 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 308 | 4,441 |
| Marketing Fees | 60 | 101,777 | 6,785 | 20,355 | 20,355 | 20,355 | 20,355 | 13,570 | | | | | | | | | | | 101,777 |
| | | 590,571 | | | | | | | | | | | | | | | | | |
| Investor Service Fee | 36 | · | · | · | · | | | | | | | | | | | | | | · |
| Fund Management Fee | 60 | · | · | · | · | · | · | | | | | | | | | | | | · |
| Acquisition Fees | 330 | · | · | · | · | · | · | · | · | · | · | · | · | · | · | · | · | | · |
| Offering and Organizational Expense | 60 | · | · | · | · | · | · | | | | | | | | | | | | · |
| Acquisition Expense | 330 | · | · | · | · | · | · | · | · | · | · | · | · | · | · | · | · | | · |
| Fund Reserve | 1 | · | · | · | · | · | · | | | | | | | | | | | | · |
| | | · | | | | | | | | | | | | | | | | | |
| | | 590,571 | 141,978 | 256,174 | 29,375 | 29,375 | 29,375 | 21,923 | 7,020 | 7,020 | 7,020 | 7,020 | 7,020 | 7,020 | 7,020 | 7,020 | 7,020 | 7,020 | 578,398 |

| Cost of Issuance Detail | Percentage | | Yrs. | Total |
|---|---|---|---|---|
| Acquisition Fees | 0.00% | 0% | 27.5 | · |
| Acquisition Expense | 0.00% | 0% | 27.5 | · |
| Offering and Organizational Expense | 0.00% | 0% | 5* | · |
| Placement Agent Fee | 0.00% | 0% | N/A | · |
| Fund Management Fee | 0.00% | 0% | 5 | · |
| Investor Service Fee | 0.00% | 0% | 3 | · |
| Fund Reserve | 0.00% | 0% | N/A | · |
| | 0.00% | 0.00% | | · |

* One half of the Offering and Organizational Expense is amortized over 5 years.

8/30/00   7:57 PM

# Centennial

## Depreciation Schedule

| | Total | | 100% |
|---|---|---|---|
| Real Property (27.5) | 6,557,556 | | 6,557,556 |
| Site Work (15 Yr.) | 257,093 | | 257,093 |
| Site Work (27.5 Yr.) | 260,703 | | 260,703 |
| Personal Property (5 Yr.) | 143,994 | | 143,994 |
| Flooring (5 Yr.) | 135,455 | | 135,455 |
| Office Equipment (7 Yr.) | 111,000 | | 111,000 |
| | 7,465,801 | | 7,465,801 |

| | 2005 | 2010 | 2015 |
|---|---|---|---|
| Replacement Reserves | 57,998 | 84,875 | 84,875 |
| Capital Improvements | - | - | - |

| Year | Real Property & Sitework 27.5 SL | Sitework 15 yr. | Personal Property 5 yr. | Office Equipment 7 yr. | Replacement Reserves 5 yr. | Replacement Reserves 5 yr. | Replacement Reserves 5 yr. | Total |
|---|---|---|---|---|---|---|---|---|
| 2001 | 72,308 | 12,855 | 55,890 | 15,862 | | | | 156,914 |
| 2002 | 247,912 | 24,424 | 89,424 | 27,184 | | | | 388,943 |
| 2003 | 247,912 | 21,981 | 53,654 | 19,414 | | | | 342,961 |
| 2004 | 247,912 | 19,796 | 32,193 | 13,864 | | | | 313,764 |
| 2005 | 247,912 | 17,817 | 32,193 | 9,912 | 11,600 | | | 319,433 |
| 2006 | 247,912 | 16,017 | 16,096 | 9,901 | 18,559 | | | 308,486 |
| 2007 | 247,912 | 15,168 | - | 9,912 | 11,136 | | | 284,128 |
| 2008 | 247,912 | 15,168 | | 4,951 | 6,681 | | | 274,712 |
| 2009 | 247,912 | 15,194 | | - | 6,681 | | | 269,787 |
| 2010 | 247,912 | 15,168 | | | 3,341 | 16,975 | | 283,396 |
| 2011 | 247,912 | 15,194 | | | | 27,160 | | 290,266 |
| 2012 | 247,912 | 15,168 | | | | 16,296 | | 279,376 |
| 2013 | 247,912 | 15,194 | | | | 9,778 | | 272,884 |
| 2014 | 247,912 | 15,168 | | | | 9,778 | | 272,858 |
| 2015 | 247,912 | 15,194 | | | | 4,889 | 16,975 | 284,970 |
| 2016 | 247,912 | 7,584 | | | | | 27,160 | 282,656 |
| Totals | 3,543,074 | 249,509 | 279,449 | 111,000 | 57,998 | 84,875 | 16,975 | 4,342,880 |

8/30/00    7:57 PM

## Depreciation Tables

| Year | 27.5 SL 9/1/01 | 40 Yr. SL 9/1/01 | 31.5 SL 9/1/01 | 200% DB 7 Yr. | 150% DB 12 Yr. | 4th Quarter 200% DB 7 Yr. | 4th Quarter 150% DB 12 Yr. | Mid Year 200% DB 7 Yr. | Mid Year 150% DB 12 Yr. | 3rd qtr. 15 Yr. | 3rd qtr. 20 Yr. | 4th qtr. 15 Yr. | 4th qtr. 20 Yr. | Mid Year 15 Yr. | Mid Year 20 Yr. | 4th qtr. 5 Yr. | Mid Year 5 Yr. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2001 | 0.01061 | 0.00833 | 0.01058 | 0.10710 | 0.04690 | 0.03570 | 0.01560 | 0.14290 | 0.06250 | 0.03750 | 0.02813 | 0.01250 | 0.00938 | 0.05000 | 0.03750 | 0.05000 | 0.20000 |
| 2002 | 0.03636 | 0.02500 | 0.03175 | 0.25510 | 0.11910 | 0.27550 | 0.12300 | 0.24490 | 0.11720 | 0.09630 | 0.07289 | 0.09880 | 0.07430 | 0.09500 | 0.07219 | 0.38000 | 0.32000 |
| 2003 | 0.03636 | 0.02500 | 0.03175 | 0.18220 | 0.10430 | 0.19680 | 0.10770 | 0.17490 | 0.10250 | 0.08660 | 0.06742 | 0.08890 | 0.06872 | 0.08550 | 0.06677 | 0.22800 | 0.19200 |
| 2004 | 0.03636 | 0.02500 | 0.03175 | 0.13020 | 0.09120 | 0.14060 | 0.09420 | 0.12490 | 0.08970 | 0.07800 | 0.06237 | 0.08000 | 0.06357 | 0.07700 | 0.06177 | 0.13680 | 0.11520 |
| 2005 | 0.03636 | 0.02500 | 0.03175 | 0.09300 | 0.07980 | 0.10040 | 0.08240 | 0.08930 | 0.07850 | 0.07020 | 0.05769 | 0.07200 | 0.05880 | 0.06930 | 0.05713 | 0.10940 | 0.11520 |
| 2006 | 0.03636 | 0.02500 | 0.03175 | 0.08850 | 0.07330 | 0.08730 | 0.07690 | 0.08920 | 0.07330 | 0.06310 | 0.05336 | 0.06480 | 0.05439 | 0.06230 | 0.05285 | 0.09580 | 0.05760 |
| 2007 | 0.03636 | 0.02500 | 0.03175 | 0.08860 | 0.07330 | 0.08730 | 0.07690 | 0.08930 | 0.07330 | 0.05900 | 0.04936 | 0.05900 | 0.05031 | 0.05900 | 0.04888 | | |
| 2008 | 0.03636 | 0.02500 | 0.03175 | 0.05530 | 0.07330 | 0.07640 | 0.07690 | 0.04460 | 0.07330 | 0.05900 | 0.04566 | 0.05900 | 0.04654 | 0.05900 | 0.05422 | | |
| 2009 | 0.03636 | 0.02500 | 0.03175 | | 0.07330 | | 0.07690 | | 0.07330 | 0.05900 | 0.04460 | 0.05900 | 0.04458 | 0.05900 | 0.04462 | | |
| 2010 | 0.03636 | 0.02500 | 0.03175 | | 0.07330 | | 0.07690 | | 0.07330 | 0.05900 | 0.04460 | 0.05910 | 0.04458 | 0.05900 | 0.04461 | | |
| 2011 | 0.03636 | 0.02500 | 0.03175 | | 0.07330 | | 0.07690 | | 0.07330 | 0.05910 | 0.04460 | 0.05900 | 0.04458 | 0.05910 | 0.04462 | | |
| 2012 | 0.03636 | 0.02500 | 0.03175 | | 0.07310 | | 0.07690 | | 0.07330 | 0.05900 | 0.04460 | 0.05910 | 0.04458 | 0.05900 | 0.04461 | | |
| 2013 | 0.03636 | 0.02500 | 0.03175 | | 0.04580 | | 0.03880 | | 0.03650 | 0.05900 | 0.04460 | 0.05910 | 0.04458 | 0.05900 | 0.04461 | | |
| 2014 | 0.03636 | 0.02500 | 0.03175 | | | | | | | 0.05910 | 0.04461 | 0.05900 | 0.04458 | 0.05910 | 0.04462 | | |
| 2015 | 0.03636 | 0.02500 | 0.03175 | | | | | | | 0.05900 | 0.04460 | 0.05910 | 0.04458 | 0.05900 | 0.04461 | | |
| 2016 | 0.03636 | 0.02500 | 0.03175 | | | | | | | 0.03690 | 0.04460 | 0.05170 | 0.04458 | 0.02950 | 0.04461 | | |

**Date Table**

| Date | Number Value |
|------|--------------|
| 1/1/00 | 36526 |
| 2/1/00 | 36557 |
| 3/1/00 | 36586 |
| 4/1/00 | 36617 |
| 5/1/00 | 36647 |
| 6/1/00 | 36678 |
| 7/1/00 | 36708 |
| 8/1/00 | 36739 |
| 9/1/00 | 36770 |
| 10/1/00 | 36800 |
| 11/1/00 | 36831 |
| 12/1/00 | 36861 |
| 12/31/00 | 36891 |
| 1/1/01 | 36892 |
| 2/1/01 | 36923 |
| 3/1/01 | 36951 |
| 4/1/01 | 36982 |
| 5/1/01 | 37012 |
| 6/1/01 | 37043 |
| 7/1/01 | 37073 |
| 8/1/01 | 37104 |
| 9/1/01 | 37135 |
| 10/1/01 | 37165 |
| 11/1/01 | 37196 |
| 12/1/01 | 37226 |
| 12/31/01 | 37256 |
| 1/1/02 | 37257 |
| 2/1/02 | 37288 |
| 3/1/02 | 37316 |
| 4/1/02 | 37347 |
| 5/1/02 | 37377 |
| 6/1/02 | 37408 |
| 7/1/02 | 37438 |
| 8/1/02 | 37469 |
| 9/1/02 | 37500 |
| 10/1/02 | 37530 |

Variance between Excel Model and Lotus Model:

| Resolved | Excel Sheet | Lotus Sheet | Responsible Party | Variance | Solution |
|---|---|---|---|---|---|
| X | IRR | D | DSM | Need to remove the supplemental contribution and change the reserve to 3%. | |
| X | Capital Contr. | D | DSM | Reserve needs to be moved to 12-01 on the Lotus Model. | |
| X | Summary | D | DSM | Fees should be 7.75%. | |
| | Rent Sched. | A | | Budget calls for RR of 175/unit, lotus has 150/unit. FNMA requires 200/unit. | Senior deal use $150, FNMA may require $175 or $200. |
| X | Summary | A | SDZ | DSC 1.10 or 1.15? | DSC can be 1.10 if the project is 100% affordable. Market Rate units have been reduced to 60% rents. |
| X | Summary | A | | Verify Perm Loan amount and rate. | Rate good 7-7. Adjust amount for 1.1 DSC. |
| X | Rent Sched. | F | | Lotus expenses do not appear to match latest budget. | Expenses on lotus have been adjusted to meet underwriting requirements. I will rely on Dave for the expense #'s. |
| X | Rent Sched. | A | SDZ | Change the Excel model market rents to equal 60% units. | |
| X | Sources & Uses | | | Lotus model does not include FNMA deposit in the sources & uses, however the # is included in the monthly schedule. | |
| X | Summary | C | DSM | Changed Other Income on Excel (13,674) to match the Lotus (2,973). Check with Dave regarding why? | Spoke with Terry Taylor 7-12 regarding budget. He said to us 3,870. |
| | Rent Sched. | A | | FNMA inflates income 2% and expenses 3%. | |
| X | Cash Flow | | SDZ | 2002 Replacement Reserves should be changed on Excel to be a full year. Reznick said that the amount should be changed to match the perm loan. | |
| X | | F | DSM | check Lotus formula sheet F:U159 & V159. | SDZ made changes to correct formulas 7-11. |
| X | Cash Flow | B | | Lotus model does not include interest from Oper. Reserves. | |
| X | Amort | | DSM | 1st Mort. Debt service #'s are different in Lotus due to the rounding of the formulas. | |
| X | Rent Sched. | F | | Check 1st year expenses. Models match after the 1st year. | Set Excel model to include an additional 2 full months of expenses in year 1. |
| X | Expense | | | The constr. Interest being expensed in years 2001 & 2002 are lower in excel. | #'s are close |
| X | Expense | | | Depreciation is different between the models. | Reznick will review. |
| X | Summary | A | | GP Loan amounts vary between models. | The GP Loan on excel is a plug number based on the cash flow compared to the lotus having the cash flow being a plug based on the GP Loan. |
| X | Expense | | | Excel model amortizes the tax credit fee (54,342) over 15 years and the asset admin. Fee (2,790) over 5 years. | Reznick will review. |
| X | Depreciation | | | Include flooring (5yr.) and Office Equipment (7yr.) in Depreciation. | |
| X | Rent Sched. | A | | Dave has a 2000 AMI of 59,400, I have 61,400. The rents are OK with the lower figure. | The 59,400 needs to be used because of the rent calculations. |
| X | Summary | A | | Per Dave, changed the construction loan amount to 3,400,000. | |
| X | Monthly Sched. | Monthly Sched. | | Changed the Construction Interest amount to net out interest earned on the FNMA deposit and the interest carry escrow earnings. | |
| X | Rent Sched. | | | Changed Admin Fee to equal 1% of Rental Income. | Matches Letter of Intent |
| X | Summary | | | Updated Perm Loan and Rate 8-2-00 for closing numbers. | |
| X | Reznick Comments | Reznick Comments | | See file O:\word\szeigler\reznick comments\centennial\memo 8-1-00.doc | |
| | Income | | | Reznick wants the subordinated management fee to be expensed in the year it is used. | |
| | Monthly Sched. | | | Moved Construction Interest Rate to 9.16% (7.66+1.50) | |
| X | Expense | | | Changed reference cells on Interest to refer to new cells on the Monthly Schedule. | |
| X | Monthly Sched. | | | Revised Construction Interest to be net of interest income, also changed the formula for the expensing of the construction interest to be net of income. | |
| X | Monthly Sched. | | | Deferred 1/2 of the contractors profit to the construction completion. | |
| X | Summary | | | Moved Depreciation and placed in service date to match the construction completion date of 9-1-01. | |
| X | Rent Sched. | | | There will be no credits taken in 2001. | |
| X | | | | Moved compiance period end to 2016. Changed all corresponding schedule to match | |
| X | Rent Sched. | | | Changed lease up. | |

## Exhibit 3

## CENTENNIAL, LLC

### NOT APPLICABLE

# CENTENNIAL, LLC

## Schedule A -- Schedule of Members

| MANAGING MEMBERS | Total Agreed-to Capital Contribution | Paid-in Capital Contribution | Share of Total Member Class Interest |
|---|---|---|---|
| Centennial Partners, LLC<br>5300 South 108th Street, Suite 1<br>Hales Corners, Wisconsin 531014 | $100 | $100 | 100% |

LIMITED MEMBERS

Special Limited Member

| BOC IX Asset Management, LLC<br>c/o Banc One Capital Markets<br>150 East Gay Street, 22nd Floor<br>Mail Code: OH1-1222<br>Columbus, OH 43215 | $100.00 | $100.00 | .001% |

Investor Limited Member

| Banc One Tax Credit Fund IX, LLC<br>c/o Banc One Capital Markets<br>150 East Gay Street, 22nd Floor<br>Mail Code: OH1-1222<br>Columbus, OH 43215 | $4,226,865 | $100* | 99.989% |

---

\* Paid-in Capital Contribution as of the date of this Schedule A. Future Installments of Capital Contribution are subject to adjustment and are due from the Investor Limited Member at the times and subject to the conditions set forth in this Operating Agreement to which this Schedule A is attached.

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 89 of 89   Document 14-1