# Exhibit B

# Nonprofit Transfer Disputes in the Low Income Housing Tax Credit Program:

# An Emerging Threat to Affordable Housing



A Report from the Washington State Housing Finance Commission

September 2019



*Opening doors to a better life*

Case 2:20-cv-01169-BHL   Filed 08/27/20   Page 2 of 18   Document 14-2

# TABLE OF CONTENTS

1. EXECUTIVE SUMMARY ................................................................................................ 1

2. THE EMERGENCE OF AGGREGATORS ........................................................................ 2

    2.1. The LIHTC program is designed to increase the availability of low-income housing in each state. ........................................................................... 2

    2.2. Ownership transfers to nonprofit organizations are an important component of the LIHTC program. ............................................................... 3

    2.3. Aggregator firms have begun to threaten the long-term viability of these projects as low-income housing by systematically disputing transfers to nonprofits. ................................................................................. 5

3. RESOLVING NONPROFIT TRANSFER DISPUTES ......................................................... 6

    3.1. Courts should follow a clear interpretive framework for resolving the emerging disputes over LIHTC project transfers to nonprofits. ................. 6

    3.2. LIHTC statutory ambiguities, including the nature of the statutory ROFR, should be resolved in favor of nonprofit ownership and low-income housing. ........................................................................................ 7

    3.3. LIHTC project partnership agreements should also be interpreted in favor of nonprofit ownership and low-income housing. ........................... 10

4. CONCLUSION ............................................................................................................. 11

5. REFERENCES .............................................................................................................. 12

`

# EXECUTIVE SUMMARY

For decades, the Low-Income Housing Tax Credit ("LIHTC") program has facilitated partnerships between mission-driven nonprofit organizations and for-profit investors seeking to benefit from federal tax credits, for the sole purpose of generating affordable rental housing for low-income families across this nation.

In furtherance of this goal, the program has afforded the nonprofit partners a special privilege to secure, at the outset, a right to obtain eventual ownership of the project at a minimum purchase price after 15 years, once the investor has claimed all tax credits and before the program's rent restrictions expire. For most of the program's history, the vast majority of participating nonprofits have secured this transfer right, exercised it, and obtained full ownership to continue the project as low-income housing in accordance with their missions.

In recent years, however, some private firms have begun to systematically challenge nonprofits' project-transfer rights and disrupt the normal exit process in hopes of selling the property at market value. Rising values in certain markets have created an opportunity for these firms to profit far beyond the original investors' expectations. Some firms are taking advantage of the investor interests they already hold in LIHTC projects, while others have been acquiring investor interests in LIHTC partnerships *en masse* for this purpose. The latter, dubbed "aggregators," often use burdensome tactics that take advantage of legal ambiguities, resource disparities, and economies of scale to overwhelm their nonprofit counterparties.

> *Some private firms have begun to systematically challenge nonprofits' transfer rights and disrupt the normal exit process. The result is detrimental to the public interest.*

The result is detrimental to the public interest in several ways. First, LIHTC properties are far more likely to continue operating as low-income housing into perpetuity if left in the hands of mission-driven nonprofit partners, who will have spent close to 15 years not only managing the property but also investing in important relationships with tenants and the surrounding community. Second, disputes over project transfers invariably drain the nonprofit partner's resources, especially in case of litigation—resources that would otherwise be devoted to tenant services, building maintenance, and related low-income housing initiatives. Third, a sale of the property at market value will generally leave the new owner with fewer resources to devote to operation, maintenance, and ancillary services. In other words, aggregator challenges to the transfer rights of nonprofits undermine the goals of the LIHTC program by diverting resources away from actual housing to legal battles and costlier purchase transactions.

Multiple suits between aggregators and housing nonprofits have already been filed in courts across the country. But most of these disputes presumably will never make it to court, especially if the nonprofit lacks the resources or will to fight. The nonprofit might be quickly pressured into paying a buyout, or even ceding ultimate

ownership, in which case the aggregator can sell the property at a higher price than originally anticipated in the partnership agreement.

As the designated state agency in charge of administering the LIHTC program in Washington State, the Washington State Housing Finance Commission ("the Commission") has a substantial interest in preventing this phenomenon from undermining the intended functioning and goals of the LIHTC program. This is especially true at a time of significant need for more low-income housing; ironically, the rise in real-estate values has created both a critical lack of affordable housing as well as the financial incentive for aggregators to profit from the LIHTC program. Yet these emerging disputes generally are not subject to the direct regulatory authority of state administrating agencies such as the Commission. Instead, these disputes will be adjudicated, if at all, in courts of law applying the LIHTC statute and enforcing contractual agreements between LIHTC project partners.

> *Ambiguities in the statute and in related partnership agreements should be resolved in favor of nonprofit ownership and low-income housing.*

Courts are therefore being called upon to resolve ambiguities both in the LIHTC statute and in LIHTC partnership agreements in the growing number of suits over nonprofit project transfers. Given the overall complexity of the statutory scheme, including various provisions that are ambiguous and sometimes inconsistent, a clear interpretive framework is needed.

This report explains that using established principles of construction, given the fundamental policies reflected in the LIHTC statute, ambiguities in the statute and in related partnership agreements—including as to the nature of nonprofit transfer rights in particular—should be resolved in favor of nonprofit ownership and low-income housing. Courts should adhere to these principles to help clarify applicable law, resolve and prevent burdensome transfer disputes going forward, and preserve LIHTC projects as low-income housing, as Congress intended.

# THE EMERGENCE OF AGGREGATORS

## 2.1. The LIHTC program is designed to increase the availability of low-income housing in each state.

Enacted in 1986 and codified at 26 U.S.C. § 42, the LIHTC program offers federal tax credits to qualifying private developers of affordable rental housing.[1] To qualify, a proposed development must dedicate a minimum portion of units to serving low-income tenants for at least 30 years: an initial 15-year "compliance period," during which the tax credits are claimed and can be reclaimed by the IRS in case of noncompliance, followed by an "extended use period" of at least 15 years.[2] After the extended use period ends and the project has fulfilled its obligations, the rent and income restrictions are lifted and the project formally exits the program.

Much of the federal LIHTC program is operated through participating state government agencies. Each year, credits are allocated to each state based on population.[3] A designated state-level administrating agency allocates its state's available credits to qualifying projects annually, generally through a competitive process.[4] Additional credits are also made available to any qualifying projects financed with tax-exempt bonds.[5] The LIHTC statute mandates that preference be given to projects operating as low-income housing "for the longest periods" and that "sponsor characteristics," such as nonprofit status, be taken into account.[6]

In Washington State, the designated LIHTC program administrator is the Commission.[7] The Commission thus allocates the credits in Washington based on the governing LIHTC statutory provisions and its own supplemental policies.[8] LIHTC program administration is one of numerous housing initiatives the Commission operates in pursuit of its public mission to improve housing conditions for all Washington residents.[9]

> *The LIHTC program has generated more than 103,000 affordable rental units in Washington, and millions nationwide.*

To date, the LIHTC program has generated more than 103,000 units in Washington, and millions nationwide, far more than any other program.[10] Still, much unmet need remains. Housing need has significantly outpaced supply, and a variety of economic and social factors have contributed to a growing affordable housing crisis throughout the country that has only worsened in recent years.[11] There is thus a pressing need not only to generate more affordable housing, but also to preserve existing LIHTC projects as low-income housing for as long as possible, consistent with the express federal policy set forth in the LIHTC statute.

## 2.2. Ownership transfers to nonprofit organizations are an important component of the LIHTC program.

In practice, LIHTC projects tend to be collaborative partnerships between an investment firm and some combination of housing developers, managers, and sponsors, whether for-profit or nonprofit.[12] A private investment firm is usually needed to make the project financially viable, because such firms "have large and predictable federal tax obligations" whereas most real-estate developers "do not have income that is large enough or predictable enough" to take advantage of the tax credits.[13] A typical LIHTC project thus involves an investor partner, which provides funding in exchange for using the tax credits to offset its federal taxes and which holds "the lion's share" of ownership; and some combination of operational partners, which develop, manage, and oversee the project, charge fees for services, exercise contractual partnership rights, and hold minor ownership interests.[14] The operational partners are generally financially liable for the property's construction, leasing, operations, and compliance.

3

As operational partners, mission-driven housing nonprofits play a key role in the success of the LIHTC program. The LIHTC statute facilitates their involvement in at least two significant ways: First, ten percent or more of each state's competitively awarded credits *must* be awarded to projects involving "qualified" nonprofits that "own an interest" and "materially participate" in the project.[15] A nonprofit is "qualified" if it is tax-exempt under section 501 of the federal tax code, has a formal purpose of fostering low-income housing, and is determined by the state administrating agency "not to be affiliated with or controlled by a for-profit organization."[16]

> *The LIHTC statute facilitates the involvement of housing nonprofits in two significant ways: requiring that 10% of credits be awarded to nonprofit projects, and providing a right of first refusal for ultimate ownership of the property.*

Second, the LIHTC statute allows nonprofits to hold a special right of ultimate ownership. It provides that a qualified nonprofit may hold "a right of 1st refusal . . . to purchase the property" at a specified "minimum purchase price" after the 15-year compliance period, without disallowing the tax credits to the investor.[17] As discussed below, the purpose of this provision is to allow the investor, contrary to normal tax principles, to give up a significant degree of ultimate ownership to its nonprofit partner without giving up the tax credits it plans to collect in the interim.

This nonprofit right of first refusal (the "statutory ROFR") is an important component of the program that has facilitated nonprofit ownership of many LIHTC projects. As a matter of industry practice, nonprofit partners have commonly secured this right in their LIHTC partnership agreements, sometimes supplemented with other transfer rights the parties have negotiated.[18] Investors have consistently agreed to this arrangement at the outset because they generally foresee "little economic motivation to stay" after all tax credits have been claimed from the project, and prefer to avoid "administrative burdens" and related project costs many years into the future.[19] The statutory ROFR is so common that the Internal Revenue Service previously identified it as a presumptive requirement for any tax-exempt nonprofit to obtain in any LIHTC deal.[20]

For decades, the widespread expectation and practice has been that the nonprofit partners will secure ownership of LIHTC projects as a matter of course after the 15-year compliance period, usually by exercising the statutory ROFR at the specified minimum price.[21] In most deals, the original financial projections will confirm that ultimate transfer to the nonprofit partner at the statutory ROFR price was the operating assumption of all parties.[22]

Consistent with this understanding, for years the vast majority of LIHTC projects involving nonprofits have in fact been transferred to the nonprofit partner at the end of the 15-year compliance period as a matter of course.[23] This commonly has been accomplished through exercise of the statutory ROFR.[24] These transfers have helped ensure that LIHTC properties remain low-income housing into perpetuity, consistent with the program's goals and policies.[25]

## 2.3. Aggregator firms have begun to threaten the long-term viability of these projects as low-income housing by systematically disputing transfers to nonprofits.

Recently, however, a number of private firms have been challenging LIHTC project transfer rights across the country as a way of obtaining additional profit from these deals at the back end. These firms appear to be aggregating investor interests in LIHTC partnerships; asserting myriad claims and arguments against project transfers, including transfers to nonprofits; and extracting value from the project or nonprofit in the shadow of protracted litigation. As noted, some in the LIHTC industry have dubbed these firms "aggregators."[26]

Based on a review of pleadings filed all over the country, it appears that there are a few primary firms seeking to profit from LIHTC projects in this way, although they are not alone. According to the websites of the three most prominent firms, each has amassed portfolios of affordable housing worth many billions of dollars in assessed property values. The mass aggregation of LIHTC projects allows an aggregator to enjoy economies of scale; to overpower the lesser resources of its counterparties, especially nonprofits; and to take full advantage of the legal ambiguities and complexities of the governing statutory and contractual frameworks, which can be used as leverage.

As noted above, at the time of dealing, LIHTC investors generally do not consider long-term retention of the property to be economically desirable or part of the deal.[27] Given potential costs and the relative uncertainty of the real-estate market many years into the future, they aim to profit from the sizeable tax credits and then withdraw.[28] Contrary to this original understanding, aggregators tend to pick out markets where property values have increased substantially in order to replace the investors and extract maximum additional return. As a direct result of the increased property values, these markets tend to be the very places facing serious housing affordability problems, where LIHTC projects are needed most.[29]

The growing body of litigation over LIHTC projects indicates that this emerging threat to low-income housing is broad in scope. At least four lawsuits involving LIHTC partnership disputes have already made their way into federal district courts in the state of Washington alone in the last few years, including multiple disputes over transfers to nonprofits.[30] Additional lawsuits challenging transfers to nonprofits have been filed in other courts across the country,[31] among scores of other suits arising from LIHTC partnerships, many involving holding companies apparently owned by or otherwise connected to the same investment firms.[32] These cases are only the tip of a growing iceberg.

A review of the cases filed to date suggests that aggregators have been using myriad tactics to obtain value from LIHTC projects and thwart nonprofit transfers. These include disputing the conditions and scope of transfer rights; delaying, obstructing, and disagreeing with related valuations; refusing consent to refinancing, either outright or by placing significant conditions on consent; disputing fee calculations; arguing over typographical errors; and asserting alleged breaches of partnership duties from many years prior, including by arguing that rents should have been set higher to maximize profits.[33] In some instances, the aggregator might pursue an unsupported position such as the alleged failure to maximize rental profits—an argument directly contrary to the

goals and expectations of the LIHTC program—only to abandon it once the dispute is litigated and nears trial.[34]

These tactics pressure nonprofits to abandon their transfer rights, pay a substantial buyout, agree to a forced sale, or otherwise provide financial benefit to the aggregator—all at the expense of

*When transfers to nonprofits are systematically thwarted, or nonprofits are drained of resources that would otherwise go into these projects, the LIHTC program suffers and its goals are undermined.*

low-income housing. Though some nonprofits fight back, many lack the resources or will to do so, and regardless, the aggregator can still extract a net profit from these projects overall. Based on the sheer volume of litigation alone to date, it is obvious that substantial revenues have already been diverted from nonprofits and LIHTC projects.[35] When transfers to nonprofits are systematically thwarted, or nonprofits are drained of resources that would otherwise go into these projects, the LIHTC program suffers and its goals are undermined.[36]

# RESOLVING NONPROFIT TRANSFER DISPUTES

## 3.1. Courts should follow a clear interpretive framework for resolving the emerging disputes over LIHTC project transfers to nonprofits.

As shown above, there is a growing body of litigation in Washington and elsewhere over LIHTC project transfers to nonprofit partners, including numerous disputes over the exercise of statutory ROFRs in LIHTC partnership agreements. Such disputes are relatively complex and involve a highly technical statute that is not a model of clarity on the surface.[37] This complexity, combined with the relative uncertainty of the law in this area to date, allows aggregators to obtain value from LIHTC projects and nonprofit partners at the expense of low-income housing.

To properly adjudicate these disputes, courts must determine the meaning of the LIHTC statute and the terms of related partnership agreements concerning nonprofit transfer rights, including specifically the statutory ROFR. In doing so, courts are empowered to "identify and apply the proper construction of governing law," regardless of the "particular legal theories" advanced by any given parties.[38] Courts called upon to adjudicate LIHTC project transfer disputes should adopt a clear interpretive framework for this purpose that does justice to the provisions and policies of the program. Such a framework will not only help to ensure that the growing number of disputes between aggregators and nonprofit partners are resolved consistently and efficiently, but will also prevent them from occurring in the first place. This is critical as more and more LIHTC properties near the end of their respective compliance periods, especially because the projects that have more recently entered the LIHTC program are greater in number, larger in size, more valuable, and more likely to involve nonprofit partners than those from the program's early years.[39]

## 3.2. LIHTC statutory ambiguities, including the nature of the statutory ROFR, should be resolved in favor of nonprofit ownership and low-income housing.

When interpreting a statute, courts first consider the "text," the surrounding "specific context," and the "broader context of the statute as a whole."[40] These elements are analyzed in light of the "purpose" of the statute and "any precedents or authorities that inform the analysis."[41] If ambiguity remains after this inquiry, only then will a court resort to legislative history and similar extrinsic indicators to resolve the remnant ambiguity.[42]

In accordance with these established principles of statutory interpretation, courts faced with LIHTC project transfer disputes should hold that ambiguities in the statute, including with regard to the statutory ROFR in particular, are to be resolved in favor of nonprofit ownership and low-income housing. This is consistent with the text and context of the LIHTC statute, which includes interrelated provisions giving express preference to projects "serving the lowest income tenants" for "the longest periods";[43] requires "sponsor characteristics" be taken into account;[44] sets aside a minimum but not maximum portion of credits that must go to projects with qualified nonprofits that "own an interest";[45] and allows such nonprofits to hold a special right toward ultimate full ownership.[46] The statute's overall context and structure are thus squarely in favor of greater nonprofit ownership and low-income housing. Moreover, the entire purpose of the statute is to increase the nation's stock of low-income housing, including through the involvement of nonprofit organizations dedicated to "the fostering of low-income housing."[47] Ambiguities in the statute should be interpreted in favor of these policies.

> *The entire purpose of the LIHTC statute is to increase the nation's stock of low-income housing, including through the involvement of nonprofit organizations.*

As applied to the statutory ROFR in particular, the same principles of statutory interpretation establish that this special transfer right should be construed in favor of ultimate nonprofit ownership of LIHTC projects. Specifically, and as explained below, the statutory ROFR should be deemed to allow the nonprofit holder to demand a transfer at the statutory minimum price after the compliance period if and when any third party makes an earnest offer to purchase the property at or above the ROFR price. The context and purpose of the pertinent statutory provision confirm this understanding.

Initially, the language establishing the statutory ROFR is internally inconsistent and thus ambiguous on its face. The LIHTC statute provides for the special nonprofit transfer right as follows:

> No [f]ederal income tax benefit shall fail to be allowable to the taxpayer . . . merely by reason of a right of 1st refusal held by . . . a qualified nonprofit organization . . . to purchase the property after the close of the compliance period for a price which is not less than the minimum purchase price [defined as outstanding indebtedness plus taxes on the sale].[48]

In common usage, a "right of first refusal" means a "right to meet the terms of a third party's higher offer."[49] Generally, and in practice, such a right is also conditioned on the owner's intent to sell.[50] Notwithstanding these normal characteristics, however, any "inconsistent expressions" in a provision granting a right of first refusal may "render it ambiguous."[51] Here, while the statutory ROFR authorized under the LIHTC statute is labeled a "right of 1st refusal," in light of the surrounding text and context, it cannot reasonably be understood as a classic right of first refusal as that term is commonly used.

First, the statute describes the statutory ROFR as a right "to purchase" the property "for a price" set at or above a statutory minimum—without reference to any third-party offer or other trigger. This is inconsistent with a classic right of first refusal, which allows the holder to purchase only on the same terms that a third party has offered.[52] The statutory language also suggests an entitlement to purchase, unlike a classic right of first refusal, which generally depends on the owner's interest and willingness to sell.[53]

Second, the entire function of the statutory ROFR provision is to allow a nonprofit to hold this transfer right without causing the LIHTC tax credits to "fail to be allowable" to the investor as owner.[54] The necessary implication of this safe-harbor provision is that the statutory ROFR *would* invalidate the investor's tax credits absent the provision. Otherwise the provision would do no work, contrary to "one of the most basic interpretive canons" of construction.[55]

Under normal tax principles, a third party's transfer right will invalidate an owner's status only if it is "obvious and natural" or "inevitable" that the holder of the transfer right ultimately can and will "obtain" the property at issue for little to no additional consideration.[56] This applies, for example, to an option to purchase property at a "nominal" price at some point in the future.[57] In such cases, the holder of the transfer right is treated as the true owner for tax purposes, including tax-credit purposes.[58]

While this general tax rule relating to divestiture of ownership has been applied to options, it has never been applied to a classic right of first refusal.[59] This makes sense, as a classic right of first refusal does not render an ultimate transfer of ownership inevitable, and certainly not at a nominal price, given that the owner must still agree to any sale and its terms. In sum, interpreting the LIHTC statute to allow nonprofits merely to hold a classic right of first refusal would render the statutory ROFR provision ineffectual and superfluous, contrary to a basic rule of statutory interpretation.

Although the statutory ROFR cannot reasonably be interpreted as a classic right of first refusal for the above reasons, it does not appear to be a pure option to purchase either. An "option" is defined as a right to "buy [a] property at a fixed price . . . at the election of the purchaser."[60] Congress could have used this simple term had it intended to allow a pure option without any distinguishing characteristics. Instead, Congress used "right of 1st refusal," while also describing this as a right "to purchase" at a specified low price, for the sole purpose of allowing a functional divestiture of ultimate ownership.

The only coherent explanation, given all the above, is that Congress chose a statutory-specific phrasing to minimize any unintended effects on normal tax principles outside this particular context, while still intending to provide a meaningful safe harbor for nonprofits to secure ultimate ownership of LIHTC projects. And to the extent there is any ambiguity on this point, for the reasons identified above regarding the text, context, and purpose of the LIHTC statute, such ambiguity should be resolved in favor of greater nonprofit ownership. The best interpretation of the statutory ROFR is thus a transfer right just short of an option, technically distinguishable but functionally equivalent.

In sum, to give proper meaning and effect to the statutory ROFR provision, and to achieve its intended purpose and the broader goals of the LIHTC program, the statutory ROFR should be interpreted as a transfer right that is not a pure option but one that still empowers the nonprofit to take ownership as a practical matter. This means triggering the right should require an earnest offer from a third party actually willing to purchase at or above the specified ROFR price, but nothing more. The nonprofit should be able to seek out such an offer, including from related entities. And the offer should not need to be accepted in order to trigger the nonprofit's right of transfer. Requiring an earnest offer from a third party provides some of the trappings of a classic right of first refusal, without creating any practical impediment to the nonprofit taking ownership, as Congress intended.[61]

> *The best interpretation of the statutory ROFR is thus a transfer right just short of an option, technically distinguishable but functionally equivalent.*

Adding further requirements would severely limit the effect of the statutory ROFR, contrary to the text, context, and purpose of the LIHTC statute. An informed third party generally will not bother to prepare an enforceable or detailed offer, especially not for its own benefit, given the nonprofit's underlying right to purchase the property. For the same reason, an owner is unlikely to accept any such offer unless already willing to sell to the nonprofit at the ROFR price. Moreover, many statutory ROFRs may be limited in time, to ensure their legal viability and in light of the historically prevailing understanding that such rights would be exercised as a matter of course.[62]

The one court to address this issue to date reached a different result, but only after failing to give effect to the statutory ROFR provision as a safe harbor and prematurely resorting to snippets of legislative history.[63] In *Homeowner's Rehab*, the Massachusetts Supreme Court specifically held an offer must be enforceable and accepted to trigger a nonprofit partner's statutory ROFR.[64] Based on an early draft of the LIHTC bill, a single passing sentence in a sizeable House Report, and a statement in a post-enactment article from a legislative assistant, the court reasoned that Congress was concerned about tax implications, specifically rejected the use of an option, and thus intended to condition the statutory ROFR on the owner's consent to sell.[65] The court insisted that Congress wanted to do "the least violence to the traditional rules of tax law"—ignoring that the very purpose and only effect of the statutory ROFR provision is to provide an exemption from those very rules.[66] In other words, the court skipped over context and purpose, and jumped straight to legislative history (and a dubious reading at best), contrary to the proper

9

rules of statutory construction and in conflict with the context, structure, and purpose of the relevant statute. Other courts should not make the same mistake.

In the end, the statutory ROFR provision gives nonprofit partners the ability to obtain and hold a transfer right that makes their ultimate ownership of the project assured at little to no additional cost. To be clear, while the LIHTC statute allows for the inclusion of such a transfer right in any given LIHTC partnership agreement without adverse tax consequences, it does not require it.[67] Other, less robust transfer rights may thus be agreed upon in any given deal, or none at all. In each instance, the nonprofit's transfer rights will depend on what terms the parties agreed upon and how the parties proceeded under their agreement.

### 3.3. LIHTC project partnership agreements should also be interpreted in favor of nonprofit ownership and low-income housing.

Turning to LIHTC partnership agreements, courts should similarly hold, in accordance with established principles of contract interpretation, that ambiguities in such agreements—including with regard to nonprofit transfer rights in particular—are to be resolved consistent with the LIHTC statute and in favor of greater nonprofit ownership and low-income housing. In other words, the terms of such a deal should be interpreted in the context of the LIHTC program, with due regard for its underlying terms and goals.

The starting point for contract interpretation is determining whether federal or state contract law applies. While state law normally governs most contracts, federal law applies in areas "of uniquely federal interest" to the extent there is a "significant conflict" between a "federal policy or interest" and the application of state law.[68] Here, federal law should apply in case of conflict. First, these partnership agreements are executed specifically for participation in the federal LIHTC program; they are submitted and relied upon in the credit allocation process and are subsequently monitored for compliance and other program purposes.[69] Second, the disposition of LIHTC projects directly implicates the efficacy of federal aid and the need for additional federal funding going forward.[70] These factors weigh in favor of applying federal contract law as needed to protect the significant federal interests in this area.[71]

Under federal contract law, "existing laws are read into contracts in order to fix the rights and obligations of the parties."[72] Moreover, contracts made under "the authority of statutes" are "to be interpreted according to the language used" to "express the obligation assumed," and any words with "a certain meaning" in the relevant context will be "given the same meaning" in each contract absent clear intent to the contrary.[73]

Even if federal law does not apply, state law is no different. State courts throughout the country adhere to the same two universal and overarching principles in interpreting contracts, both the incorporation of relevant statutes,[74] and the acknowledgment of technical terms used in context.[75]

As applied to LIHTC partnership agreements, these principles establish that ambiguities in such agreements should be resolved consistent with the provisions and policies of the LIHTC statute and in furtherance of nonprofit ownership and low-income housing. Those are, after all, the presumptive purposes for which such agreements are executed and implemented within the LIHTC program in pursuit of federal tax credits. A partner's duty to set rents at appropriate levels, for example, should be construed with due regard for the purpose of each LIHTC project to serve as affordable housing, rather than in a vacuum.

> *Ambiguities in partnership agreements should be resolved consistent with the provisions and policies of the LIHTC statute and in furtherance of nonprofit ownership and low-income housing.*

Similarly, any terms that have special meaning under the LIHTC statute or within the LIHTC industry should be construed accordingly, unless the agreement at issue clearly demonstrates a contrary intent. As applied to the statutory ROFR in particular, the phrase "right of first refusal" carries a special meaning in this context as shown above, and thus, it should be presumed that the parties have incorporated that meaning into their agreement—again, absent a clearly expressed intent to the contrary.

One federal district court was recently called upon to interpret a right of first refusal in a LIHTC partnership agreement but unfortunately ignored the LIHTC statute and the context it provides.[76] In *SHAG*, the district court for the Western District of Washington reasoned that "the term right of first refusal is not ambiguous or open to interpretation" and refused to assign any special meaning to it unless the parties' agreement "clearly demonstrate[d]" an intent contrary to a classic right of first refusal.[77] The court thus inverted the appropriate presumption in this context, ignoring the LIHTC statute and overlooking the need to assign technical terms of art their special meaning. Other courts should not make the same mistake.

# CONCLUSION

The LIHTC program facilitates and promotes partnerships between qualified nonprofits seeking to meet housing needs and investor partners seeking to profit from federal tax credits, in order to increase the availability of low-income housing. Aggregators are asserting interpretations of LIHTC agreements that undermine the LIHTC program's goals. Multiple lawsuits have already arisen between aggregators and nonprofits over transfer rights, with more on the way.

To ensure these disputes are resolved appropriately, courts should follow a clear interpretive framework under which ambiguities in the LIHTC statute and related agreements—including specifically with regard to the statutory right of first refusal—are construed in favor of nonprofit ownership and low-income housing. This approach is in furtherance of Congressional intent and will help safeguard the LIHTC program in a time of crisis.

# REFERENCES

[1] *See, e.g.*, Jill Khadduri et al., *What Happens to Low Income Housing Tax Credit Properties at Year 15 and Beyond*, U.S. Dep't of Housing and Urban Dev't Report at 1 (2012) ("HUD Report"), *available at* www.huduser.gov/publications/pdf/what_happens_lihtc_v2.pdf (all cited websites last visited Sept. 3, 2019).

[2] *Id.* at 6-7.

[3] *See id.* at 1.

[4] See id.

[5] *See id.* at 2, 57-58.

[6] 26 U.S.C. § 42(m)(1)(A)-(C).

[7] *See, e.g.*, Commission, *9% Competitive Housing Tax Credit Policies* at 1 (2020) and *Bond/Tax Credit Program Policies* at 6 (2019), *available at* www.wshfc.org/mhcf/9percent/2020application/c.policies.pdf and www.wshfc.org/mhcf/4percent/2019BondTCPolicies.pdf.

[8] See id.

[9] *See, e.g.*, Commission, *2018 Impact Report* (2018), available at www.wshfc.org/admin/WSHFCImpactReport2018.pdf.

[10] *See* HUD Report at 2.

[11] *See, e.g.*, Commission, *My View* (June 2018), *available at* www.wshfc.org/Newsletter/WSHFCMyViewHOMEOWNERSHIPJUNE18.pdf; Commission, *New financing to create 200 apartments for homeless* (July 11, 2019), *available at* www.wshfc.org/admin/releases/CommissionFundings196.pdf.

[12] *See, e.g.*, HUD Report at 25-26.

[13] Id.

[14] See id.

[15] *See* 26 U.S.C. § 42(h)(5)(A)-(C).

[16] Id.

[17] 26 U.S.C. § 42(i)(7).

[18] *See* HUD Report at 15, 30-31 & n.20.

[19] *Id.* at 29.

[20] *See* Memo from Robert S. Choi, Director of EO Rulings and Agreements, Internal Revenue Service, to LIHTC Limited P'ships at §5(e) (July 30, 2007), *available at* www.novoco.com/sites/default/files/atoms/files/choi_memo_073007.pdf.

[21] *See, e.g.*, HUD Report at 15, 29-31 & n.20.

[22] *See, e.g.*, *id.* at 31 n.20 (noting that brokers of LIHTC deals have "tended to anticipate back-end sale at [the statutory ROFR] price in the deals' initial structure from the outset").

[23] *See id.* at 29 (relaying estimate of "95 percent" of such properties being "transferred to the original nonprofit developers").

[24] *See id.* at 31 n.20. [25] *See* HUD Report at 7, 29, 32, 41.

[26] *See* David Davenport, *Year 15: Facing Off with the Aggregator*, TAX CREDIT ADVISOR (May 2019) and *Beware the Aggregator*, TAX CREDIT ADVISOR (Apr. 2017), *available at* www.winthrop.com/wp-content/uploads/2019/05/Davenport_Year-15-Facing-Off-with-the-Aggregator-Tax-Credit-Advisor-May-2019.pdf and www.winthrop.com/wp-content/uploads/2018/04/TCA-April-2017-BewareAgg.pdf.

[27] *See* HUD Report at 29.

[28] See id.

[29] *See, e.g.*, Commission, *My View*, *supra* n.11.

[30] See Senior Housing Assistance Group v. Amtax Holdings 260, LLC, No. C17-1115RSM, 2019 WL 687837 (W.D. Wash. Feb. 19, 2019) ("SHAG"); Downtown Action to Save Housing v. Midland Corp. Tax Credit XIV, LP, No C18-0138-JCC, 2019 WL 934887 (W.D. Wash. Feb. 26, 2019) ("DASH"); Downtown Action to Save Housing v. Boston Financial Institutional Tax Credits XXVII LP, No 2:19-CV-00721 (W.D. Wash. 2019); Hidden Hills Mgmt., LLC v. Amtax Holdings 114, LLC, No. 3:17-cv-06048-RBL, 2019 WL 3297251 (W.D. Wash. July 23, 2019).

[31] See Riseboro Comm'y P'ship Inc. v. SunAmerica Housing Fund No. 682, No. 18-CV-7261 (RJD) (VMS), 2019 WL 3753795 (E.D.N.Y. Aug. 7, 2019); Homeowner's Rehab., Inc. v. Related Corporate V SLP, L.P., 479 Mass. 741 (2018); Opa-locka Comm'y Dev't Corp., Inc. v. HK Aswan, LLC, No. 2019-016913-CA-01 (Fla. Cir. Ct. 2019); CommonBond Inv't Corp. v. Heartland Props. Equity Inv't Fund IV, LLC, No. 62-CV-13-8165 (Minn. D. Ct. 2013).

[32] See, e.g., Saugatuck, L.L.C. v. St. Mary's Commons Assocs., L.L.C., No. 19-CV-217 (E.D.N.Y. 2019); Urban 8 Danville Corp. v. Nationwide Affordable Housing Fund 4, LLC, No. 1:19-cv-03171 (N.D. Ill. 2019); Bradley-Fern Hall I, LLC v. MMA Fern Hall Crossing LLC, No. 1:19-cv-11181 (D. Mass. 2019); Nationwide Affordable Housing Fund 4, LLC v. Urban 8 Danville Corp., No. 2:19-cv-01848 (D. Ohio 2019); Amtax Holdings 463, LLC v. KDF Communities-Hallmark, LLC, No. 3:18-CV-03604 (N.D. Cal. 2018); Amtax Holdings 168, LLC v. KDF Communities-Glen Haven, LLC, No. 3:18-CV-05097 (N.D. Cal. 2018); Amtax Holdings 168, LLC v. KDF Communities-Glen Haven, LLC, No. 4:18-CV-05097 (N.D. Cal. 2018); CED Cap. Holdings 2000 EB, L.L.C. v. CTCW-Berkshire Club, LLC, No. 2018-CA-013886-O (Fla. Cir. Ct. 2018); Urban 8 Fox Lake Corp. v. Nationwide Affordable Housing Fund 4, LLC, No. 1:18-cv-06109 (N.D. Ill. 2018); MMA Fern Hall Crossing LLC v. Bradley-Fern Hall I, LLC, No. 1:18-cv-12486 (D. Mass. 2018); Amtax Holdings 463, LLC v. KDF Communities-Hallmark, LLC, No. 8:17-CV-01899 (C.D. Cal. 2017); Midland Corp. Tax Credit VII L.P. v. Douglas Co., L.L.C., No. 6:17-cv-02605 (D.S.C. 2017); Pelican Rapids Leased Housing Assocs. I, LLC v. Broadway/Pelican Rapids, L.P., No. 56-CV-16-372 (Minn. D. Ct. 2016); Centerline/Fleet Housing P'ship, L.P. v. Hopkins Court Apartments, L.L.C., No. 812426/2016 (N.Y. Sup. Ct. 2016); Am. Tax Credit Corp. Fund IV, L.P. v. James Investments IA-II, LLC, No. CV059334 (Iowa D. Ct. 2015); Am. Tax Credit Corp. Fund XII, L.P. v. Sioux Falls Leased Housing Assocs., L.L.C., No. 15-2998 (S.D. Cir. Ct. 2015).

[33] *See, e.g.*, *SHAG*, 2019 WL 687837, at *4 (transfer rights); *DASH*, 2019 WL 934887, at *3-6 (valuations); *Hidden Hills Mgmt., LLC v. Amtax Holdings 114, LLC*, No. 3:17-cv-06048-RBL, 2019 WL 3297251, at *11, 14, 16 (W.D. Wash. July 23, 2019) (transfer rights, valuations, and rent levels); Davenport, *supra* n.26 (describing such tactics).

13

[34] *See, e.g.*, *Hidden Hills*, 2019 WL 3297251, at *6, 11 (noting that before trial investor partner dropped breach of fiduciary duty claim arising from alleged failure to set higher rents at LIHTC project); *see also id.* at 12-13 (noting testimony of investor partner's expert on rents was "riddled with errors and miscalculations" and "not well developed").

[35] *See supra*, nn.31-33.

[36] *See, e.g.*, HUD Report at 7, 29, 32, 41.

[37] *See generally* 26 U.S.C. § 42.

[38] *U.S. Nat'l Bank of Or. v. Ind. Ins. Agents of Am., Inc.*, 508 U.S. 439, 446 (1993) (internal quotes omitted).

[39] *See* HUD Report at 73-76.

[40] *E.g.*, *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997).

[41] *E.g.*, *Dolan v. U.S. Postal Serv.*, 546 U.S. 481, 486 (2006); *Robinson*, 519 U.S. at 346.

[42] E.g., Dep't of Housing and Urban Dev't v. Rucker, 535 U.S. 125, 132 (2002).

[43] 26 U.S.C. 42 §§ (m)(1)(B)(ii)(I)-(II).

[44] 26 U.S.C. 42 § (m)(1)(C)(iv).

[45] 26 U.S.C. 42 §§ (h)(5)(A)-(B).

[46] 26 U.S.C. 42 § (i)(7).

[47] 26 U.S.C. §§ 42(g)(1), (h)(5)(C)(iii).

[48] 26 U.S.C. § 42(i)(7)(A)-(B).

[49] BLACK'S LAW DICT. (11th ed. 2019).

[50] *See, e.g.*, 49 AM. JUR. 2D LANDLORD AND TENANT § 308 (2019).

[51] *See id.* at § 311 (2019).

[52] *See id.* at § 306.

[53] *See id.* at §§ 307-308.

[54] 26 U.S.C. § 42(i)(7)(A).

[55] *Hunsaker v. United States*, 902 F.3d 963, 969 (9th Cir. 2018) (internal quotes omitted); *see also Util. Air Regulatory Group v. E.P.A.*, 573 U.S. 302, 321 (2014) (noting a statutory interpretation is disfavored if it fails to produce "a substantive effect that is compatible with the rest of the law").

[56] *Burroughs Adding Mach. Co. v. Bogdon*, 9 F.2d 54, 56 (8th Cir. 1925); *see also* IRS Rev. Rul. 55-540, 1955 WL 10043, at *2-3 (1955) (citing *Burroughs*).

[57] IRS Rev. Rul. 55-540, 1955 WL 10043, at *2-3.

[58] See id.

[59] See id.

[60] BLACK'S LAW DICT. (11th ed. 2019).

[61] *See* 49 AM. JUR. 2D LANDLORD AND TENANT § 308 (noting right of first refusal generally requires "a bona fide offer" from a third party); BLACK'S LAW DICT. (11th ed. 2019) (defining "bona fide" as "without fraud or deceit" and "sincere"); *see also, e.g.*, *Rappaport v. Estate*

*of Banfield*, 181 Vt. 447, 455-56 (2007) (noting offer "made honestly and with serious intent" could trigger right of first refusal (internal quotes omitted)).

[62] *See, e.g.*, Ronald R. Volkmer, *Validity of Rights of First Refusal*, 19 EST. PLAN. 123 (1992) (noting some courts have invalidated indefinite rights of first refusal under rules against perpetuities and direct restraints on alienation); *SHAG*, 2019 WL 687837, at *3 (noting partnership agreement allowed nonprofit to exercise statutory ROFR within "two years after the close of the compliance period").

[63] See Homeowner's Rehab, Inc. v. Related Corp. V SLP, L.P., 479 Mass. 741 (2018).

[64] 479 Mass. at 757-60.

[65] *See id.* at 754-57 & nn.10-11.

[66] *Id.* at 756.

[67] *See* 26 U.S.C. § 42(i)(7)(A).

[68] *Boyle v. United Techs. Corp.*, 487 U.S. 500, 507 (1988) (internal quotes omitted).

[69] *See, e.g.*, Commission, *9% Policies*, *supra* n.7, at 73, 76.

[70] *See, e.g.*, HUD Report at 1, 70.

[71] *See, e.g.*, *West v. Harris*, 573 F.2d 873, 881 (5th Cir. 1978) (applying federal contract law to private contract related to federal program because of federal government's role "in the program both in a supervisory capacity and financially"); *Boyle*, 487 U.S. at 507 (holding potential direct effect on federal funding implicated significant federal interest).

[72] *Rehart v. Clark*, 448 F.2d 170, 173, 174 n.2 (9th Cir. 1971).

[73] *Fla. Cent. R. Co. v. Schutte*, 103 U.S. 118, 140 (1880).

[74] *See, e.g.*, 11 Williston on Contracts § 30:19 (4th ed. 2019) (noting contracts "must be interpreted in light of existing law, the provisions of which are regarded as implied terms of the contract"); *see also, e.g.*, *Ellingstad v. State, Dep't of Nat. Res.*, 979 P.2d 1000, 1008 (Alaska 1999); *Pinal Cty. v. Hammons*, 30 Ariz. 36, 42 (1926); *Walther v. Occidental Life Ins. Co.*, 40 Cal. App. 2d 160, 164 (1940); *Kawakami v. Kahala Hotel Inv'rs, LLC*, 142 Haw. 507, 514 (2018); *Robinson v. Joint Sch. Dist. No. 150*, 100 Idaho 263, 265 (1979); *State ex rel., Bullock v. Philip Morris, Inc.*, 352 Mont. 30, 36 (2009); *Gilman v. Gilman*, 114 Nev. 416, 426 (1998); *Pinnacle Packing Co. v. Herbert*, 157 Or. 96, 104 (1937); *Wagner v. Wagner*, 95 Wash.2d 94, 98-99 (1980).

[75] *See, e.g.*, Restatement (Second) of Contracts § 202(3)(b) (1981) ("Unless a different intention is manifested . . . technical terms and words of art are given their technical meaning when used in a transaction within their technical field."); *see also, e.g.*, *Nat'l Bank of Alaska v. J. B. L. & K. of Alaska, Inc.*, 546 P.2d 579, 583 (Alaska 1976); *Phelps Dodge Corp. v. Brown*, 112 Ariz. 179, 181 (1975); *Weil v. Fed. Kemper Life Assurance Co.*, 7 Cal. 4th 125, 152 (1994); *Kinney v. Oahu Sugar Co.*, 23 Haw. 747 (1917); *J.R. Simplot Co. v. Rycair, Inc.*, 138 Idaho 557, 562 (2003); *In re Marriage of Mease*, 320 Mont. 229, 239 (2004); *Carrigan v. Ryan*, 109 Nev. 797, 800 (1993); *Dorsey v. Oregon Motor Stages*, 183 Or. 494, 511 (1948); *Berg v. Hudesman*, 115 Wash.2d 657, 669 (1990).

[76] *See SHAG*, 2019 WL 687837, at *7.

[77] *Id.* (emphasis omitted).